ROBERT LANG,
and SUSANNE LANG,

                    Plaintiffs,

                                                Case No. 18-cv-1077-pp

        v.

DONALD R. THARPE,
DONALD R. THARPE TRUST,
and PETER COLASANTE,

                    Defendants.

**ORDER GRANTING DEFENDANT COLASANTE'S MOTION TO THE EXTENT THAT THE COURT FINDS IT LACKS PERSONAL JURISDICTION (DKT. NO. 14), DEFERRING RULING ON COLASANTE'S REQUEST TO DISMISS (DKT. NO. 14), SETTING A DEADLINE OF OCTOBER 2, 2020 FOR COLASANTE TO RESPOND TO PLAINTIFFS' MOTION TO TRANSFER VENUE (DKT. NO. 106), DENYING THARPE DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION (DKT. NO. 51), GRANTING THARPE DEFENDANTS' MOTION TO SET ASIDE DEFAULT (DKT. NO. 47), DENYING WITHOUT PREJUDICE THARPE DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DKT. NO. 51) AND ALLOWING PLAINTIFFS TO FILE AMENDED COMPLAINT**

## I.      Facts Alleged in the Amended Complaint

        Plaintiffs Robert and Susanne Lang live in Oconomowoc, Wisconsin. Dkt. No. 11 at ¶1. There is a dispute as to defendant Donald R. Tharpe's exact address, but the parties agree that he lives in Virginia. Id. at ¶2. Tharpe is the trustee of defendant Donald R. Tharpe Trust. Id. at ¶3. The amended complaint says that defendant Peter Colasante owns and operates the L'Enfant Art Gallery in Washington, D.C.; it does not indicate where he lives. Id. at ¶4.

A.     <u>Robert Lang Meets Colasante</u>

The plaintiffs allege that in August 2010, Robert Lang met Colasante at the L'Enfant Gallery; Lang says that before August 2010, he'd not had any contact with Colasante or the gallery. <u>Id.</u> at ¶7. At some point, while commenting on a painting called the "Dorchester Painting"[1] that Colasante had on exhibit, Lang told Colasante that Lang had a collection of "Lincoln art in the Appomattox Surrender Table." <u>Id.</u> at ¶8. Around August 2011, Colasante called Lang and expressed an interest in that collection. <u>Id.</u> at ¶9.

B.     <u>The Restoration of the Lincoln Matthews Painting</u>

In September or October 2011, Lang's collection was being exhibited at various locations in Wabash, Indiana. <u>Id.</u> at ¶10. Colasante drove to Wabash; while there, he gave Lang an estimate of between $2 and $3 million for the collection. <u>Id.</u> at ¶¶10-11. The plaintiffs allege that "Colasante convinced Lang of his many connections in the art world, his ability to quickly restore and sell paintings and art, his experience in the civil war and the names of many wealthy clients he had." <u>Id.</u> at ¶11.

One of the paintings Lang owned was "an extremely valuable painting of Abraham Lincoln," known as the "Lincoln Matthews Painting." <u>Id.</u> at ¶21. The plaintiffs assert that Colasante convinced Lang that Colasante could restore

_____

[1] The amended complaint never specifies who owned the Dorchester painting at what points in time. One can infer from the allegations in paragraph 72 of the amended complaint that the Langs owned the painting. The agreement at Dkt. No. 11-4 says that the Langs contributed the painting to a collection to be sold, but it also indicates a balance due to Colasante of $375,000. Dkt. No. 11-4. Paragraph 45 says that the Langs paid over $1.5 million to "Colasante and affiliates" for, among other things, "the acquisition of the Dorchester Painting."

the Lincoln Matthews Painting and other pieces of art in Lang's collection, and that the restoration (given Colasante's alleged expertise) would increase the value of the collection. Id. at ¶12. They say that Colasante convinced Lang that "it was appropriate in the art industry for him to do restorations without documentation;" the plaintiffs maintain that Lang wasn't an expert in the art world and that he orally agreed to have Colasante restore the Lincoln Matthews Painting. Id. at ¶13. In November 2011, Lang had the collection sent to the L'Enfant Gallery and Colasante worked on the restoration through the spring of 2012. Id. at ¶14. The plaintiffs assert that other than the time it was being restored in D.C., the Lincoln Matthews Painting has been located in Wisconsin. Id. at ¶21.[2]

C.      The Joining of the Collections

The plaintiffs say that in December 2011, Colasante "proposed a scheme to Lang" where Colasante would join Lang's collection with "contributions from" Tharpe, someone named Robert Turak and Colasante's collections. Id. at ¶15. The plaintiffs claim that the "scheme was conceived of and communicated by Colasante," who said he'd worked with Tharpe for over twenty years, buying and selling art and artifacts. Id. So in December 2011, Lang "commit[ted]"

_____

[2] The phrasing of the complaint—Colasante "convinced" Lang that he could restore the Lincoln Matthews painting and that he did not need documentation to do so—implies that Colasante's restoration of the painting was nefarious in some way. The remainder of the complaint does not support that implication— it appears Colasante did restore the Lincoln Matthews painting and that it remained titled to and in the possession of the Langs. Dkt. No. 11 at ¶76. It appears that the only relevance of Colasante's offer to restore the Lincoln Matthews painting is that it played a role in Lang sending Colasante the entire Lincoln collection and in the development of Lang's relationship with Tharpe.

3

$300,000, which he obtained from his wife Susanne, to fund the collection; the plaintiffs say Lang did this at Colasante's urging, "based on oral representations and promises of future millions of dollars of profit from the combined Collections." Id. at ¶16.

D.    Lang Meets Tharpe and Lang and Proposes a Venture

In February 2012, "Colasante was restoring the Lincoln Matthews painting and documenting its value." Id. at ¶27. At this point, Lang met. Tharpe at the L'Enfant Gallery—Colasante introduced the two and was present at the meeting. Id. at ¶28. The plaintiffs believe that Tharpe was one of Colasante's clients. Id. at ¶29. During the meeting, Colasante told Lang that Tharpe was "a wealthy real estate developer from Warrenton, Virginia who was a collector or purchaser of Revolutionary and Civil War artifacts and art work." Id. at ¶30. The plaintiffs say that during this meeting, Tharpe "took Lang aside and told him about a real estate development in Warrenton, Virginia," identified as the "White Marsh Project." Id. at ¶31.

The White Marsh property was composed of two parcels—ninety-four acres owned by Tharpe and three acres, called the "Shaw Property," that provided ingress and egress to the project. Id. at ¶33. The plaintiffs believe Tharpe lived in a home that adjoined the property, and they say that Tharpe told Lang that the land was available for development and that Tharpe had been working for a few years to obtaining zoning. Id. at ¶31. Tharpe also told Lang that Tharpe was in debt to "Gibralter, LLC," and that the debt was secured by "the 94 acres supposedly owned by Tharpe." Id. The plaintiffs say

that Tharpe had "deals" with a national real estate investment firm called the "Toll Brothers" to develop the White Marsh Project. Id. According to the Langs, during this February 2012 meeting at the L'Enfant Gallery, Tharpe invited Lang to join the White Marsh development venture. Id.

### E. The Langs Purchase Art from Tharpe

The plaintiffs say that in March and April 2012, Tharpe convinced the plaintiffs to buy two paintings, one called "War and Peace" and one called "Healy," from him for $800,000. Id. at ¶46. The plaintiffs paid the $800,000 with a March 15, 2012 wire transfer of $200,000 and an April 13, 2012 check for $600,000. Id. The plaintiffs allege that Tharpe used $600,000 of this money "as payment to the Toll Brothers on their alleged loan to Tharpe, in order to reinstate the purchase of the Shaw Property by the White Marsh business entity." Id. at ¶66.

### F. The Formation of Lang & Tharpe, LLC

Around April 12, 2012, Lang agreed to pay "on behalf of Tharpe" some $3.3 million to Gibralter, LLC and the Toll Brothers for the ninety-four Tharpe acres and the Shaw Property. Id. at ¶34. The plaintiffs say that the $3.3 million was Lang's capital contribution to what eventually would become an investment venture called Lang and Tharpe LLC, and the land was Tharpe's contribution. Id. They indicate that around the same time, Tharpe agreed on behalf of Lang and Tharpe, LLC to "assume 50% of any outstanding liabilities of the Toll Brothers on White Marsh." Id.

The plaintiffs assert, however, that as of April 12, when Lang agreed to make this contribution, Tharpe was in debt to Sona Bank. Id. at ¶35. They assert that Tharpe had pledged as collateral to Sona Bank "many of the artwork and artifacts supposedly being sold to Lang." Id. They say, for example, that at the time that the Langs paid the $800,000 to purchase the War and Peace and Healy paintings from Tharpe, "it was represented"—they do not say by whom—that War and Peace was being transferred free and clear of liens. Id. at ¶37. They contend, however, that Tharpe and Colasante were borrowers on a $750,000 promissory note to Sona Bank, and that Tharpe and Colasante had pledged as collateral for that note "several items that supposedly were being sold to Langs or included as part of transactions with the Langs." Id. at ¶38. The plaintiffs say that "most notably, the War & Peace painting, the General Grant Epaulettes, and the McClellan Sword" were pledged as collateral on the promissory note, "even though these items were sold to Langs in April 2012 for $750,000 and $250,000 respectively,[3] the same painting for which at least a portion of the initial $800,000, paid by the Langs, was supposed to acquire." Id. The plaintiffs also allege that a Virginia Attorney named Ronald Aiani prepared letter agreements in which he represented that the Healy painting would be delivered "free and clear of all liens," when Aiani knew, based on Aiani's representation of Tharpe in Tharpe's transactions with Sona Bank, that

_____

[3] The amended complaint provides no details regarding the epaulettes or a McClellan sword.

"these same pieces of real estate, art and valuable artifacts were pledged as collateral for the Sona Bank loans to Tharpe." Id. at ¶56.

The plaintiffs allege that around April 27, 2012, "Tharpe convinced Lang" to form a business venture to develop White Marsh; the venture was called "Lang and Tharpe LLC." Id. at ¶32. They say, however, that Tharpe didn't disclose at that time "the full extent of his debt on the property involved or his other business dealings with Gibralter, LLC or the Toll Brothers." Id. As noted, the property to be developed was comprised of two parcels of land—the ninety-four acres Tharpe owned and the "Shaw Property" that provided ingress and egress. Id. at ¶33. The plaintiffs say that "[a]pparently, the Shaw Property was controlled by the Toll Brothers pursuant to some sort of security agreement with Tharpe." Id.

G.    The Facebook Stock

The Langs have a daughter named Molly Mattison. Id. at ¶90. In May 2012, Ms. Mattison wanted to buy Facebook stock; the plaintiffs allege that Tharpe offered to purchase shares in Facebook and give them to Ms. Mattison. Id. The Langs wrote a check for $75,000—the cost of acquiring the Facebook shares—to Tharpe's security broker. Id. at ¶91. The plaintiffs believe that Tharpe then bought the stock in his own name. Id. at ¶92.

H.    The "Icon Collection" and the Washington Lafayette Watch

The plaintiffs say that in October 2012, Tharpe told Lang that Tharpe needed additional cash for the White Marsh project. Id. at ¶71. They assert that around October 31, 2012, Tharpe told Lang that Tharpe owned a pocket watch

7

that had belonged to George Washington—the "Washington Lafayette Watch"—worth up to $5,000,000. Id. at ¶69. Lang asked for verification that Tharpe was the owner of the watch; the plaintiffs say that both Aiani and Tharpe told Lang that Tharpe had title to the watch. Id.

The plaintiffs alleged that in November 2012, in order to obtain the additional cash he needed for the White Marsh project, Tharpe "convinced Lang" to enter into an agreement regarding the "Icon Collection;" the parties to the agreement would include Tharpe, the Langs and the Langs' daughters, Molly Mattison and Katie DeGroft. Id. at ¶72. On November 7, 2012,[4] these parties entered into an agreement in which "Langs were to contribute a painting known as the 'Dorchester' painting valued at $800,000." Id. While the amended complaint doesn't explain any of this, the agreement itself reflects that the purpose of the agreement was to "organize, promote and sell for value the Lincoln Washington Icon Collection during the next three-six years." Dkt. No. 11-4. The agreement reflects that Lang would contribute the Lincoln Matthews portrait valued at $1,675,000 and the Dorchester painting valued at $800,000, and that Tharpe would contribute the Washington Lafayette watch, valued at $3,125,000. Id.

The plaintiffs say that "Tharpe always represented to Langs that the Washington Lafayette watch [w]as more valuable than the Lincoln Matthews and the Dorchester paintings." Dkt. No. 11 ¶73. They assert that Tharpe "used

_____

[4] The amended complaint says that the Icon Agreement was dated *October* 7, 2012. Dkt. No. 11 at ¶72. The attached agreement, however, is dated *November* 7, 2012. Dkt. No. 11-4.

the discrepancy between these valuations to sell 'fractional interests' to the Lang Family in the amount of $324,000," and that Tharpe "solicited and accepted over $324,000 from the Lang Family to fund promotion of the Icon Collection." Id. The plaintiffs believe, however, that Tharpe "never possessed, controlled or owned the Washington Lafayette Watch, at any of the relevant times, or if he did he failed to provide[] evidence of title to the watch." Id. at ¶70. They say that, "[c]ontrary to the representations of Tharpe, Aiani and Colasante," none of the Lang family members have received assets or financial return on their investment into the Icon Collection, and that they have never received proof that Tharpe owns or ever owned the Washington Lafayette watch. Id. at ¶74. They assert that Tharpe converted the $324,000 "fractional interests" he received from various Lang family members, and the Dorchester painting, to his own use. Id. at ¶75. The Langs still have title to and possession of the Lincoln Matthews painting. Id. at ¶76.)

I.   The Victor Xie Transaction

The amended complaint says that "[n]either Lang nor Tharpe were able to successfully raise enough funds to acquire the White Marsh project and the Shaw Property from Gibralter, LLC or the Toll Brothers." Id. at ¶77. But in December 2013, the Toll Brothers gave Lang and Tharpe an extension to raise the money "in exchange for a cash payment of $150,000." Id. at ¶78. About that time, Lang met—"in connection with the transaction"—a Chinese investor named Victor Xie, who agreed to lend Lang $312,000. Id. at ¶79. The amended complaint indicates that by this point, Lang had no "further liquid funds," and

9

that he had a $715,000 first mortgage on a home he owned in Washington, D.C. Id. at ¶80.

The amended complaint says that "[a]llegedly, pursuant to representations made by Tharpe and Aiani, Lang and Tharpe were co-owners (50/50) [of] the 'Burnside Sword,'"[5] which was purchased at auction for $180,000. Id. at 81. $150,000 of the purchase price came from the Langs. Id. It also asserts that Tharpe "had certain historic pistols, supposedly owned by King George, that were allegedly worth $1,500,000;" the plaintiffs assert that Colasante valued the pistols at Tharpe's request. Id. at ¶82.

As collateral for his loan of $312,000 to Lang, Victor Xie accepted the Burnside Sword, the King George pistols and a second mortgage on the Langs' home in Washington, D.C. Id. at ¶83. Aiani prepared the security agreement and the deed of trust on the Langs' D.C. home "to facilitate the transaction being proposed for the benefit of the joint business venture between the Langs and Tharpe." Id. The plaintiffs believe that Xie did not want to do business with Tharpe, so Aiani prepared paperwork to transfer title of the King George pistols to Lang "in exchange for another $750,000 note." Id. at ¶84.

In July 2014, Lang retained a Wisconsin law firm then known as DeWitt, Ross & Stevens, S.C.—now known as DeWitt, LLP—to represent him "in negotiating a resolution to the Victor Xie loan." Id. at ¶86. The plaintiffs assert that "[l]ater in 2014, with the assistance of the DeWitt Ross & Stevens firm,

_____

[5] The amended complaint sheds no light on what the "Burnside Sword" was.

Case 2:18-cv-01077-PP   Filed 09/14/20   Page 10 of 83   Document 107

Susanne Lang paid $224,000 to Victor Xie and obtained a release of the second mortgage on their Washington, D.C. home." Id. at ¶87. The plaintiffs assert that Aiani told Lang that "Tharpe is responsible for 50% of any payments to Victor Xie." Id. at ¶88.

J.     Events of Late 2014 and 2015

The plaintiffs say that in September 2014, during a conference between Lang, Tharp and Aiani, Lang asked about the Facebook stock Tharpe had said he would give to Molly Mattison. Id. at ¶93. The plaintiffs allege that Tharpe and Aiani responded that the shares would be delivered either to Lang or Mattison. Id. at ¶94. The plaintiffs say, however, that in February 2015, Lang learned that Tharpe had sold the Facebook shares in July 2014 and had kept the proceeds. Id. at ¶95.

The amended complaint claims that on July 17, 2015, during a phone call with someone in Colasante's office named Maureen Taylor, Lang "was informed, for the first time, that Sona Bank had a security interest (lien) on the War & Peace Painting purchased from Tharpe in April of 2012." Id. at ¶85. The plaintiffs allege that Taylor also told Lang that Sona Bank had placed the War and Peace painting, along with the Grant Epaulettes and the McClellan Sword "with Colasante as trustee to retain and hold as collateral." Id. The plaintiffs assert that this was the first time they learned that Sona Bank had a security interest in these items. Id. at ¶39.

The plaintiffs say that Lang confronted Tharpe and Aiani in August 2015 and that "it was agreed" that the Facebook shares Molly Mattison had wanted

"would be repurchased in the market and transferred to the Langs." Id. at ¶96. The plaintiffs also assert that during this confrontation, "it was agreed that the shares cashed in by Susanne Lang and her family in reliance on Aiani's and Tharpe's misrepresentations would be repurchased by Aiani and Tharpe in the market and transferred back to the Langs;" they indicate that "[e]ventually the shares were returned." Id. at ¶58(g).

The plaintiffs assert that the L'Enfant Gallery, "White Marsh LLC or Trust" and the Donald R. Tharpe Trust are "alter egos" of Colasante and Tharpe. Id. at ¶40. They say that between March 2012 and February 2014, they advanced over $2.6 million dollars—either directly to the defendants or for the benefit of the defendants—"with the understanding that they would receive an[] ownership interest in the White Marsh Real Estate Project, historical artifacts, artwork, or some ownership interest in said assets." Id. at ¶¶41-44. They also say that they paid another $1.5 million to "Colasante and affiliates" to acquire "the Dorchester Painting, to cover the Turak payments and other restoration or acquisitions." Id. at ¶45. Finally, they allege that the defendants converted $666,000 in art and artifacts belonging to the plaintiffs without the plaintiffs' consent. Id. at ¶114.

## II.    Procedural History

The plaintiffs filed their original complaint on July 13, 2018. Dkt. No. 1. Less than two months later—before any of the defendants had answered— then-defendant Aiani filed a motion to dismiss for failure to state a claim and for lack of personal jurisdiction. Dkt. No. 6. In his supporting brief, Aiani

argued that under Federal Rule of Civil Procedure 12(b)(2) and Wisconsin's long-arm statute, the court did not have personal jurisdiction over him. Dkt. No. 7. He argued that he did not live in Wisconsin, was not licensed in Wisconsin, had no office or property in Wisconsin, had no registered agent in Wisconsin and provided no legal services in Wisconsin. Id. at 21. He also argued that none of the actions or omissions alleged in the complaint occurred in Wisconsin. Id. He argued, "Aiani represented co-Defendant Donald R. Tharpe, a citizen of the Commonwealth of Virginia, in connection with a real estate development project located in Virginia and with the various business ventures and/or sales transactions which occurred within the Commonwealth of Virginia." Id.

About three weeks later, the plaintiffs filed an amended complaint, which rendered moot Aiani's motion to dismiss. Dkt. No. 11. But on October 3, 2018, Colasante—representing himself—filed a motion to dismiss the original and the amended complaint under Fed. R. Civ. P. 12(b)(2) and 12(b)(6). Dkt. No. 14. In his brief, Colasante incorporated by reference Aiani's legal memorandum in support of Aiani's motion. Dkt. No. 15 at 1. He stated that he was in "the exact same position as Aiani when it comes to jurisdiction and the lack of any contact with the State of Wisconsin." Id. He also asserted that "most of the relevant witnesses and evidence are in the Greater Washington DC area and can be easily served with process in the Eastern District of Virginia." Id. A few days later, Aiani filed a motion to dismiss the amended complaint. Dkt. No. 17.

On November 27, 2018, however, the parties stipulated to dismissal of Ronald Aiani as a defendant. Dkt. No. 38. As things now stand, Colasante's brief in support of his motion to dismiss incorporates by reference the brief of a defendant who has been dismissed, and a brief in support of dismissal of the original complaint that was mooted by the filing of the amended complaint.

In December 2018, the plaintiffs sought entry of default against Tharpe and the Tharpe trust. Dkt. No. 41. The clerk entered default on December 21, 2018. Before the plaintiffs filed a motion for default judgment, however, the Tharpe defendants appeared and moved to set aside the default, arguing they had not been properly served. Dkt. No. 47. They also filed a motion to dismiss the amended complaint on the grounds of lack of personal jurisdiction and failure to state a claim upon which relief could be granted. Dkt. No. 51.

Three weeks after Colasante filed his motion to dismiss, the plaintiffs timely filed a brief in opposition,[6] dkt. no. 31; Colasante did not file a reply brief within fourteen days as required by Civil L.R. 7(c). The plaintiffs timely filed an opposition brief to the Tharpe defendants' motion to dismiss, dkt. no. 62, and the Tharpe defendants filed a reply in support, dkt. no. 64.

Although the motions have been fully briefed since late July 2019, the court has not ruled on them. At a hearing on October 2, 2019, the court expressed concern about whether it had personal jurisdiction, but allowed the

---

[6] Civil Local Rule 7(b) (E.D. Wis.) ("For all motions other than those for summary judgment or those brought under Civil L.R. 7(h) . . . any memorandum and other papers in opposition must be filed within 21 days of service of the motion.")

parties to conduct limited discovery "on two issues: contact with the forum district and the question of where defendant Donald Tharpe kept his dwelling or abode." Dkt. No. 72 at 2. The court ordered the parties to complete the discovery by January 31, 2020 and scheduled a status conference for February 6, 2020. Id. Defense counsel argued that the court should bifurcate the discovery—if the court denied the motion to set aside default, they argued, there would be no need for them to conduct discovery on personal jurisdiction. Id. The court disagreed, finding it more efficient for the parties to conduct discovery on both the question of proper service and the question of personal jurisdiction at the same time. Id.

On February 5, 2020, the Tharpe defendants filed supplemental evidence relating to the motion to set aside entry of default and their motion to dismiss. Dkt. No. 73. They did not cite any caselaw or other authority; the supplement stated facts and was accompanied by declarations. Id.; Dkt. Nos. 74-77. At the February 6, 2020 hearing, the court gave the plaintiffs a deadline of March 10, 2020 by which to file their supplemental evidence. Dkt. No. 80 at 2. The plaintiffs' counsel argued that the court did not need to schedule an evidentiary hearing on personal jurisdiction, opining that once the court reviewed Colasante's deposition and the case law it could decide the personal jurisdiction question on the law. Id. at 1. Defense counsel went further, arguing that the court could decide both personal jurisdiction and the question of proper service on the briefs. Id. The court scheduled an evidentiary hearing for April 3, 2020 but said that if it "determine[d] from the parties' filings that

15

the hearing will not be necessary, it will remove the hearing from the calendar." Id.

The plaintiffs filed their supplemental materials on March 10, 2020. Dkt. Nos. 81-86. Like the defendants, they filed several declarations, and attached exhibits to those declarations. But their sixteen-page brief also contained eight pages that contained a previously unbriefed legal argument. Dkt. No. 81 at 8-16. They argued that the amended complaint pled federal securities law violations and violations of the federal Racketeering Influenced and Corrupt Organizations Act, known as "RICO," and that both these statutes authorized nationwide service of process. Id. at 8. They asserted that if a federal statute authorizes nationwide service of process, the court has personal jurisdiction as long as the defendant had minimum contacts with the United States, rather than a particular state. Id. The Tharpe defendants asked the court to strike these new arguments. Dkt. No. 87. They pointed out that briefing on their motion to dismiss has been completed on July 26, 2019—almost eight months earlier. Id. at 2.

As the defendants were filing this motion, the coronavirus pandemic was erupting in Wisconsin, and in the next several days, the court issued the first of a series of orders suspending all in-person hearings. On March 17, 2020, the court removed the April 3, 2020 evidentiary hearing from the hearing calendar. Dkt. No. 89. When the suspension of in-person hearings lapsed on July 2, 2020, the court issued an order requiring the parties to indicate whether they would agree to hold the evidentiary hearing via video, having forgotten that it

had said it would review the pleadings to see if it could decide the issues without a hearing. Dkt. No. 95. A dispute ensued between the parties about whether the evidentiary hearing should be in-person or by video. The court held a telephone hearing on August 3, 2020. Dkt. No. 100. It granted the defendants' motion to strike the new arguments in the plaintiffs' March 10, 2020 filings, finding them untimely and not responsive to the court's request. Id. at 1. The court discussed with the parties its safety concerns about an in-person hearing, as well as authority indicating that a court could require the parties in a civil case to conduct evidentiary hearings via video, even over objection. Id. at 2. At the end of the hearing, the court asked that by the end of the day on August 14, 2020, the parties let the court know how much time they needed for the evidentiary hearing and to give the court possible dates. Id. at 3.

On August 7, the court received a letter from the Tharpe defendants, noting that it had appeared at the August 3 hearing that the court intended to hold a hearing on the question of whether to set aside default without having determined the question of personal jurisdiction. Dkt. No. 101. The defendants cited Seventh Circuit law holding that a court must have personal jurisdiction over a defendant in order to enter a default judgment against that defendant. Id. at 2. They asked the court to decide the personal jurisdiction issue first, and to do so on the pleadings. Id. The plaintiffs responded by insisting that there were factual disputes about personal jurisdiction and that they were entitled to an evidentiary hearing on that issue (a position contrary to the

17

position they had taken at the February 6, 2020 hearing). Dkt. No. 102 at 1. They also asked for the opportunity to be heard or submit further briefing on the new personal jurisdiction arguments the court had stricken from their March 10, 2020 filings. Id. at 1-2. The Tharpe defendants responded that there were no material facts in dispute as to personal jurisdiction and strongly objected to the court allowing the plaintiffs to brief the issue the court had stricken from the plaintiffs' March 10 pleadings. Dkt. No. 104.

On August 25, 2020, the court issued an order, informing the parties that it was "going to do what it should have done" before—review and analyze the pleadings and evidence relating to personal jurisdiction. Dkt. No. 105 at 11-12. It stated that it was not going to allow either party to supplement briefs, because the deadline for briefing the personal jurisdiction issue had passed, and the court said it would decide after reviewing the pleadings whether it believed an evidentiary hearing was necessary on the question of personal jurisdiction. Id. at 12. The court told the parties that it hoped to give them a decision—either on the merits of the motions to dismiss for lack of personal jurisdiction or on whether the court believed an evidentiary hearing was necessary—by the end of the day on August 31, 2020. Id.

At 10:18 a.m. on August 31, 2020, the plaintiffs filed a motion asking that if the court determined that it could not exercise personal jurisdiction over the case, it transfer venue to the Eastern District of Virginia or the District of Columbia or both, rather than dismissing the case as the defendants had requested. Dkt. No. 106.

18

### III. Personal Jurisdiction

   A.   <u>Governing Law</u>

Personal jurisdiction is a due process concept.

> The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. Thus, the test for personal jurisdiction requires that "the maintenance of the suit . . . not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 . . . (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463 . . . (1940)).

<u>Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 702-03 (1982). For a federal court to have personal jurisdiction over a defendant, the plaintiff is required to show that "[t]he defendant must have purposefully established minimum contacts with the forum." <u>Cent. States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.</u>, 230 F.3d 934, 942-43 (7th Cir. 2000) (citing <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 474-76 (1985)). The question is "whether the defendant's conduct and connection with the forum are such that it should reasonably anticipate being hailed into court there . . . ." <u>Id.</u> at 943.

When a defendant moves to dismiss a case for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the burden is on the plaintiff to establish personal jurisdiction. <u>Curry v. Revolution Laboratories, LLC</u>, 949 F.3d 385, 392 (7th Cir. 2020) (citing <u>Purdue Research Found. V. Sanofi-Synthelabo, S.A.</u>, 338 F.3d 773, 782 (7th Cir. 2003)). Without benefit of an evidentiary hearing, "the plaintiff bears only the burden of making a prima facie case for

personal jurisdiction." uBID, Inc. v. GoDaddy Group, Inc., 623 F.3d 421, 423 (7th Cir. 2010). The court takes "the plaintiff's asserted facts as true and resolve[s] any factual disputes in its favor." Id. at 424 (citing Tamburo v. Dworkin, 601 F.3d 693, 700 (7th Cir. 2010); Purdue, 338 F.3d at 782).

In determining whether it has personal jurisdiction, a federal court looks to the forum state of the case in which it sits to determine the limits of its personal jurisdiction. Adv. Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796, 800 (7th Cir. 2014). This court looks to the law of Wisconsin. Wisconsin courts employ a two-step inquiry when determining whether a court has personal jurisdiction over a nonresident defendant. First, the court determines whether any of the criteria for personal jurisdiction under Wisconsin's long-arm statute are satisfied. U.S. Venture Inc. v. McCormick Transp. LLC, No. 15-cv-990, 2015 WL 6694031, *2-3 (E.D. Wis. 2015) (citations omitted). Wisconsin's personal jurisdiction statute, Wis. Stat. §801.05, "has been interpreted to confer jurisdiction 'to the fullest extent allowed under the due process clause.'" Felland v. Clifton, 682 F.3d 665, 678 (7th Cir. 2012) (quoting Daniel J. Hartwig Assocs., Inc. v. Kanner, 913 F.2d 1213, 1217 (7th Cir. 1990)).

If the requirements of the long-arm statute are satisfied, the court then must consider whether the exercise of jurisdiction over the defendant is consistent with due process. U.S. Venture, 2015 WL 6694031 at *2-3. "[B]ecause Wisconsin presumes its long-arm statute merely codifies the federal due process requirements . . . the burden shifts to [the defendant] to show that

20

jurisdiction would nonetheless violate due process." Total Admin. Servs. Corp.
v. Pipe Fitters Union Local No. 120 Ins. Fund, 131 F. Supp. 3d 841, 844 (W.D.
Wis. 2015) (quoting Logan Prods. Inc. v. Optibase, Inc., 103 F.3d 49, 52 (7th
Cir. 1996)).

"The primary focus of [a court's] personal jurisdiction inquiry is the
defendant's relationship to the forum State." Bristol-Myers Squibb Co. v.
Superior Court of Cal., San Francisco Cty., ___ U.S. ___, 137 S. Ct. 1773, 1779
(2017). The Supreme Court has identified "two types of personal jurisdiction:
'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes
called 'case-linked') jurisdiction." Id. at 1780 (quoting Goodyear Dunlop Tires
Operations, S.C. v. Brown, 564 U.S. 915, 919 (2011)). When the defendant is
an individual, "the paradigm forum for the exercise of general jurisdiction is the
individual's domicile[.]" Id. at 1780 (quoting Goodyear, 564 U.S. at 919).
Specific personal jurisdiction, however, "requires that the defendant's contacts
with the forum state relate to the challenged conduct." Felland, 682 F.3d at
673. "In other words, there must be 'an affiliation between the forum and the
underlying controversy, principally, [an] activity or an occurrence that takes
place in the forum State and is therefore subject to the State's regulation.'"
Bristol-Myers, 137 S. Ct. at 1780 (quoting Goodyear, 564 U.S. at 919). "The
relevant contacts are those that center on the relations among the defendant,
the forum, and the litigation." Advanced Tactical, 751 F.3d at 801 (citing
Walden v. Fiore, 571 U.S. 277, 284 (citing Keeton v. Hustler Magazine, Inc.,
465 U.S. 770, 775 (1984)).

> [N]ot just any contacts will do: "[f]or a state to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." [*Walden v. Fiore*, [571 U.S. 277, 284], 134 S. Ct. 1115, 1121 (2014)] (emphasis added). The "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." Id. at 1126. Furthermore, the relation between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum . . . ." Id. at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 . . . (1985)).

Id. "Notably, it must be the activity of the defendant that makes it amenable to jurisdiction, not the unilateral activity of the plaintiff or some other entity." Purdue, 338 F.3d at 780. The due process requirement of "fair warning" to an out-of-state defendant that he might be sued in the forum state "is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum. Burger King, 471 U.S. at 472 (citing Keeton, 465 U.S. at 774). "Such 'purposeful direction' may be shown by evidence that the defendant's actions, even if initiated outside of the forum state, nevertheless were directed at the forum state." Curry, 949 F.3d at 398.

B.    Discussion

1.    *Colasante (Dkt. No. 14)*

The amended complaint does not state where the plaintiffs believed Colasante lived, but it does state that he owns and operates the L'Enfant Gallery in Washington, D.C. Dkt. No. 11 at ¶4. Colasante lists his address as 1442 Wisconsin Avenue NW, Washington, DC 20007[7]. Dkt. No. 14 at 1. In his

---

[7] This appears to be the address of the L'Enfant Gallery. https://www.yelp.com/biz/l-enfant-gallery-washington.

brief in support of his motion to dismiss, Colasante stated that he was in "the exact same position as Aiani when it comes to jurisdiction and the lack of any contact with the State of Wisconsin." Dkt. No. 15 at 1. Aiani had argued that he did not live in Wisconsin, was not licensed here, had no office or property here, had no registered agent here and provided no professional services here. Dkt. No. 18 at 20. The plaintiffs do not contend that the court has general personal jurisdiction over Colasante, dkt. no. 31 at 5 n.1, and the court has no evidence to allow it to conclude that it has general personal jurisdiction over him. Instead, in their opposition to Colasante's motion to dismiss, the plaintiffs argued that this court has specific personal jurisdiction over Colasante.

a.     The Plaintiffs' Arguments

The plaintiffs argued that Colasante "used his misrepresentations of expertise and connections in the artworld to induce Plaintiffs to make numerous payments to him and Tharpe into business enterprises that he claimed pooled collections of artworks with the promise of a return on investment." Dkt. No. 31 at 6. The plaintiffs asserted that these allegedly intentional misrepresentations were directed at the forum state—Wisconsin—and that Colasante knew that the plaintiffs would be injured in Wisconsin. Id. at 7. They maintained that Colasante knew "from the beginning" that the plaintiffs were Wisconsin residents because their Wisconsin residency was noted in various documents that the plaintiffs possessed and signed. Id. They also alleged that "Colasante made several trips to Wisconsin over several years

to solicit [Robert Lang's] business and Colasante and his co-Defendants directed multiple communications to the Robert's [sic] Wisconsin office." Id.

The plaintiffs admitted that Colasante's original misrepresentations "may have occurred in Washington D.C. or Virginia," but argued that this does not mean that this Wisconsin court has no personal jurisdiction. Id. They said that Colasante's "repeated communications and solicitations lulled [them] into a false sense of security and reassured [them] that there was no reason to back out of their various agreements." Id. They argued that their injuries "arise out of" Colasante's "contacts with Wisconsin." Id. at 9. The plaintiffs asserted that if they cannot sue Colasante in Wisconsin, they would "likely face a heavier burden if forced to litigate the matter in two different districts," the Eastern District of Virginia (where the plaintiff alleged that the Tharpe defendants resided) and the District of Columbia. Id. at 10.

Finally, the plaintiffs argued that under Wisconsin's long-arm statute, the court had specific personal jurisdiction. They cited Wis. Stat. §801.05(3), asserting that they were injured by an act or omission Colasante committed within the state of Wisconsin. Id. They cite both Wis. Stat. §§801.05(4)(a) (injury to a person or property within Wisconsin arising out of an act or omission the defendant made outside the state, provided that at the time of the injury solicitation or service activities were carried on within the state by or on behalf of the defendant) and 801.05(4)(b) (injury to a person or property within Wisconsin arising out of an act or omission the defendant made outside the state, provided that at the time of the injury products, materials or things

24

processed, serviced or manufactured by the defendant were used or consumed within Wisconsin in the ordinary course of trade). Id. at 10-11. And they cited Wis. Stat. §801.05(5)(d), asserting that Colasante's misrepresentations caused them to ship goods and money from Wisconsin to Colasante in another state at his order or direction. Id. at 11.

b.    Lang's First Affidavit

In support of their opposition to Colasante's motion, the plaintiffs filed an affidavit from plaintiff Lang. Dkt. No. 32. Lang averred that he had had "numerous dealings" with Colasante "in Wisconsin." Id. at ¶2. He asserted that in 2012, he—Lang—was in Wisconsin when Colasante represented to Lang by phone that Tharpe owned the War and Peace painting; he says that later Colasante indicated that Colasante had owned a 50% share in the painting "all along." Id. Lang stated that more than once, while Lang was in Lang's office in Delafield, Wisconsin, Colasante solicited his business, such as restoration and framing of "numerous pieces of art, which were, or are, part of [Lang's] collection housed in Delafield, Wisconsin." Id. at ¶3. Lang stated that more than once, after Colasante had solicited Lang for business, Lang had shipped paintings from Wisconsin to Colasante's D.C. gallery for restoration and framing. Id. at ¶4. Lang asserted that in 2012, Colasante sold the Dorchester painting to Lang and Tharpe after phone conversations during which Lang was in his office in Delafield. Id. at ¶6. Lang averred that numerous times, Colasante asked him for money to pay for the services Colasante had solicited, and that again, Lang was in Lang's office in Wisconsin when Colasante made

25

these requests; Lang says that Colasante's communications "lulled [him] into a false sense of security and reassured [the plaintiffs] that there was no reason to back out of the various agreements and that [the plaintiffs'] best interests were being protected." Id. at ¶7.

Lang also averred that in 2015, Colasante visited Lang at Lang's offices in Delafield, Wisconsin; the two went to dinner with Lang's wife and administrative assistant. Id. at ¶5. Lang stated that Colasante toured "the gallery warehouse" where Lang kept his art, artifacts and antiques, and that the two men discussed their business relationship and future business dealings. Id. Lang said that "[a]t these meetings"—implying more than one, although there seems to have been only one visit to Wisconsin—Colasante encouraged the plaintiffs "to invest more and more money into art and artifact collections, which included Don Tharpe or others." Id.

Lang asserted that when Colasante set up the agreement for the sale of the Dorchester painting, "the Defendants" knew that Lang was a Wisconsin resident, and that they targeted their solicitations to him in Wisconsin. Id. at ¶8. He says that the money for the Dorchester painting came from Susanne Lang's Wisconsin bank account. Id. He stated that most of the financial transactions with Colasante "were specifically negotiated via conversations initiated by Colasante to [Lang] while [Lang] was here in Wisconsin using telephone and email communications." Id. He averred that all the money Lang paid Colasante originated from checking accounts at Wisconsin financial institutions and were made at Colasante's direction. Id. at ¶9.

c.    Supplemental Evidence

In the supplemental evidence they filed in March, the plaintiffs reported that Colasante first met Lang in D.C. in 2010. Dkt. No. 81 at 3. They averred that Colasante later contacted Lang at Lang's home in Wisconsin and asked to meet to review Lang's art collection. Id. The two met in Indiana. Id. at 3-4. The plaintiffs stated that Colasante came to visit Lang in Wisconsin on one occasion. Id. at 4. The plaintiffs stated that Colasante's "own statement written prior to his deposition lay[s] out a long protracted business relationships [sic] that reach into Wisconsin and the Lang's finances and from which Colasante benefitted." Id. at 5. They claim that Colasante admitted at his deposition that he had customers who were Wisconsin residents and that he had shipped purchased items to Wisconsin customers, including the Langs. Id. They state that Colasante once asked the Langs to relocate their Lincoln Collection to Colasante's gallery. Id. They reiterated that Colasante initiated contact with Lang by calling Lang. Id.

Attached to the declaration of the plaintiffs' counsel is a letter from Colasante to the plaintiffs' lawyer (Sean Govern) dated January 9, 2020. Dkt. No. 86-2. It appears that Attorney Govern had sent Colasante a letter recapping phone calls between Govern and Colasante on September 10 and 18, 2019. Id. at 1. In response to Govern's request that Colasante confirm that Govern's recap was accurate, Colasante sent the January 9, 2020 letter (indicating that he did not agree with Govern's recap). In the letter, Colasante makes several representations relating to specific personal jurisdiction:

- He stated that he was involving in buying, selling, consigning and curating art, antiques and artifacts that ended up in an exhibition called "The Grand Review," and that his involvement "occurred for the most part in Washington, DC, the rest in Virginia." Id. at 1.

- He stated that he and Lang agreed that Lang would transport the Lincoln Matthews painting to DC for Colasante to restore. Id. at 2.

- Lang sent the Lincoln Matthews painting—and, according to Colasante, Lang's "full Lincoln Collection"—to Colasante's gallery in a truck. Id.

- Colasante met Lang in Colasante's gallery in DC in 2010, and Lang left Colasante a catalog with Lang's phone number. Colasante called Lang eighteen months later and they discussed Lang's "Lincoln Collection," then located in a gallery in Wabash Indiana. Id. at 3.

- Colasante met Lang more frequently than he met Tharpe, because at the time, Lang "had a house in Georgetown, close to the Gallery;" Lang told Colasante that Lang spent "1-2 weeks per month in DC." The two spoke mostly at Colasante's gallery. Id. at 4.

- Susanne Lang "very rarely came with [Lang] to the Gallery to meet [Colasante]." Id.

- Colasante could not tell "where [Lang] was physically located when [Lang] called [Colasante] from his mobile phone, which was the majority of [Lang's] calls to [Colasante]." Id. at 5.

- Colasante made one visit to Lang's home in Wisconsin, at Lang's invitation, to view the Lincoln Collection. Id. There were no formal meetings about "the Civil War collection though it likely came up in conversation." Id. at 6.

Also attached to Attorney Govern's declaration are excerpts of Colasante's January 29-30, 2020 deposition. Dkt. No. 86-1. Salient facts from the excerpts include:

- Colasante invoices clients for the products the gallery sells. Id. at 2, Tr. 16.

- He does very little marketing and no mass mailing of advertisements. Id. at 2, Tr. 17.

28

- Colasante had customers other than the Langs who were residents of Wisconsin; he could specifically remember one couple who came into the gallery every couple of years and either took their purchases with them or he shipped the purchases to Wisconsin. Id.

- Most of his customers took their purchases with them, or he delivered if he was traveling. Id. at 2-3, Tr. 17-18

- Colasante saw Lang's Lincoln Collection in Wabash, Indiana. Id. at 4, Tr. 24-25. In answer to the question of whether he saw other Lang-owned Civil War pieces in Wisconsin, Colasante answered, "Not so much Civil War, no." Id. at 4, Tr. 25.

- Colasante testified that he went to Wisconsin at Lang's invitation, possibly in 2013 (he was not certain), "basically to see this town that [Lang] had built from scratch." Id. at 6, Tr. 39-40. He testified that there was "nothing in Wisconsin" to do with the Lincoln Collection. Id. at 6, Tr. 40. He made only one visit to Wisconsin. Id.; 19, Tr. 249. While in Wisconsin, Colasante looked at "a whole set of other artwork and artifacts that Mr. Lang and Mrs. Lang owned." Id. at 7, Tr. 50

- Colasante had no idea where Lang was when Colasante called him eighteen months after they met. Id. at 14, Tr. 183. Colasante described Lang as having "a friend with gallery and a farm in Wabash." Id.

- Colasante testified about "trips where, at [Lang's] invitation, got together, but individually, to show what he had done, what he was capable of doing. His Adam Hills golf venture, he brought it in almost single-handedly. There were not business in nature at all, they were social visits." Id. at 15, Tr. 206. The transcript is not clear as to the location of these trips.

- Colasante was aware that Tharpe made a trip to Wisconsin. Id. at 15, Tr. 207.

- Colasante was aware that Lang had lost a hotel in Wisconsin; Lang showed Colasante around the hotel and showed Colasante its contents when Colasante visited. Id. at 16, Tr. 214-15.

As part of the supplemental evidence, plaintiff Lang submitted a second declaration or affidavit. Dkt. No. 82. The declaration recounts Lang's first meeting Colasante in the D.C. gallery; Lang says that he left Colasante his

business card and told Colasante about the Lincoln Matthews painting and "some other Civil War era art and artifacts" in Lang's collection. Id. at ¶4. He recounts that Colasante called him in August 2011 while Lang was at his home in Wisconsin and asked whether the men could meet so that Colasante could review Lang's collection. Id. He explains that he told Colasante the collection was on display in Indiana; he describes how Colasante arranged to meet Lang in Indiana to review the collection, and how, while in Indiana, the two agreed to transport Lang's collection to Colasante's D.C. gallery to create an exhibition. Id. Lang describes his wife's writing a check to Colasante for $300,000 to fund the exhibition. Id.

   d. Analysis

The plaintiffs have not met their burden of showing that the court has specific personal jurisdiction over Colasante.

   i. **Wisconsin's long-arm statute**

The plaintiffs argue that under Wis. Stat. §801.05(3), their injuries "arose out of" acts or omissions Colasante made within Wisconsin. The court cannot determine what acts or omissions the plaintiffs believe Colasante committed in Wisconsin—the plaintiffs have not submitted evidence showing that Colasante was in the state for more than the one visit, nor have they identified any suit-related conduct he committed while he was in Wisconsin.

The plaintiffs assert that under Wis. Stat. §801.05(4)(a), they were injured in Wisconsin by acts Colasante took outside the state and that at the time they were injured, Colasante was soliciting within the state. The

Wisconsin Court of Appeals has held that §801.05(4)(a) requires "something more than isolated and fleeting contacts with our state . . . ." Housing Horizons, LLC v. Alexander Co., Inc., 232 Wis.2d 178, 188 (Ct. App. 1999). Colasante testified at his deposition that he did very little marketing and did not mass-mail advertising. The plaintiffs allege that months after Colasante met Lang at the gallery, Colasante called Lang. Accepting as true the plaintiffs' allegation that Colasante called Lang to ask if Lang was interested in selling or marketing his civil war collection, one call does not reach beyond an isolated and fleeting contact.

The Langs assert that there were many conversations between Lang and Colasante that occurred while Lang was in Wisconsin and that during those conversations, Colasante made misrepresentations to induce Lang to make investments or purchases. The Wisconsin Court of Appeals has held that a "central purpose of the long-arm statute" is "to impose personal jurisdiction on the nonresident who solicits 'a continuing business relationship with anyone in the state.'" Johnson Litho Graphics of Eau Claire, Ltd. v. Sarver, 344 Wis.2d 374, 388 (Ct. App. 2012) (quoting Druschel v. Cloeren, 295 Wis.2d 858 (Ct. App. 2006)). While the plaintiffs have alleged that Lang had a continuing business relationship with Colasante, they have not provided evidence that Colasante solicited that relationship. Lang left his contact information with Colasante on the first visit to the gallery. The parties do not dispute that there were calls between the two, but the plaintiff has presented no evidence that all or most of the calls were from Colasante, soliciting Lang.

31

The plaintiffs allege that under Wis. Stat. §801.05(4)(b), they were injured in Wisconsin by acts Colasante took outside of the state and that at the time of the injury, products or materials processed, serviced or manufactured by Colasante were used or consumed in the state in the ordinary course of trade. The plaintiffs have provided no evidence of any "ordinary course of trade" between Colasante and the plaintiffs, much less a course that involved products or materials processed, serviced or manufactured by Colasante. See Dietrich by Padway v. Wis. Patients Comp. Fund, 169 Wis.2d 471, 480 (Ct. App. 1992) (subsection (b) inapplicable because the case did not involve "commodities in the 'ordinary course of trade'").

Finally, the plaintiffs argued that under Wis. Stat. §801.05(5)(d), their claims of injury relate to goods or other things of value shipped from Wisconsin to Colasante on his order or direction. The plaintiffs appear to be referring to Lang shipping the Lincoln Matthews painting to Colasante for Colasante's restoration and Lang shipping the Lincoln Collection to Colasante (though Colasante testified that that was not at his direction). Even if these incidents meet the requirements of the long-arm statute, they do not render the court's exercise of personal jurisdiction over Colasante consistent with due process.

ii.    **Due process**

As noted above, the plaintiffs allege that months after meeting Lang at the gallery in Georgetown, Colasante called Lang "at Lang's home in Wisconsin." Dkt. No. 81 at 3. While the court accepts as true the plaintiffs' assertion that Lang was in Wisconsin at the time Colasante called him, the

32

plaintiffs have presented no evidence that Colasante knew that. Colasante says Lang left Colasante "his phone number," but there is no evidence as to what that number was. Lang says he left Colasante his "business card," but does not indicate what address or phone number were on the card, and if Lang left his business telephone number, it is not clear how Colasante would have gotten Lang's home number in Wisconsin. There is no evidence about whether Colasante called Lang on a cell phone or a land line. Colasante testified that he had no idea where Lang was when Colasante first called Lang eighteen months after they met.

Similarly, regarding the plaintiffs' allegations that there were many calls between the two and that Colasante made misrepresentations during those calls, the plaintiffs have presented no evidence that Colasante knew that Lang was in Wisconsin during these conversations or that he purposefully directed any misrepresentations to Wisconsin. Even if, as the plaintiffs allege, Colasante engaged in a continuous pattern of telephonic misrepresentations that lulled the plaintiffs into continued dealings with him and with Tharpe, see Felland, 682 F.3d at 674, 675-76 (citing United States v. Brocksmith, 991 F.2d 1363, 1367-68 (7th Cir. 1993); United States v. Chappell, 698 F.2d 308, 311 (7th Cir. 1983)), there is no evidence that Colasante's conduct in making, receiving or participating in such calls "was purposefully directed at the forum state." Tamburo, 601 F.3d at 702 (citing Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008); (Calder v. Jones, 465 U.S. 783, 790 (1984)).

33

The plaintiffs allege that Colasante had reason to know "from the beginning" that they were Wisconsin residents because their address was on documents. There *are* documents in the record showing that the Langs listed their address in Wisconsin. Dkt. No. 11-2 (June 22, 2012 check to Ronald Aiani from Lang); Dkt. No. 11-3 at 21-22 (security affidavits signed by Susanne and Lang, notarized by Wisconsin notaries); Dkt. No. 11-4 (Icon Collection Agreement between the Langs, their daughters and Tharpe); Dkt. No. 82-4 (consulting agreement between White Marsh Manor Ltd. and Lang); Dkt. No. 82-5 (April 2012 Limited Liability Company Profile for Lang & Tharpe, LLC); Dkt. No. 82-6 (bank statements for Lang & Tharpe LLC from Town Bank, N.A. in Delafield, Wisconsin); Dkt. No. 82-7 (checks from the Lang & Tharpe, LLC bank account at Town Bank to Tharpe and Gibralter Capital Asset Management); Dkt. No. 82-8 (rent invoices from CKP Two, LLC to Lang at the Delafield address, as well as a letter on Lang and Tharpe letterhead signed by Lang and showing the Delafield address as Lang & Tharpe's address); Dkt. No. 82-10 (Alliance Capital Corporation invoice to Lang at the Delafield address); Dkt. No. 82-11 (invoice from Don Tharpe to Lang at the Delafield address); Dkt. No. 82-12 (Document titled "Lang & Tharpe Collateral," dated June 25, 2012, listing collateral in Wisconsin).

There is no evidence, however, that Colasante saw any of these documents. He is not referenced in any of them. They are not directed to him. They do not appear to relate to him. More to the point, while these documents show that the Langs were (at least some of the time) residents of Wisconsin, the

Supreme Court has held that the "minimum contacts" analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." Walden, 571 U.S. at 285 (citing International Shoe, 326 U.S. at 319).

The plaintiffs asserted in their original response to Colasante's motion to dismiss that Colasante had made "several trips to Wisconsin over several years" to solicit Lang's business. Dkt. No. 31 at 7. The evidence shows that Colasante made one trip to Wisconsin, at Lang's invitation. At his deposition, Colasante testified that the visit was social—an opportunity to see the community Lang had built and the art and antique collection he'd accumulated. Colasante's acceptance of an invitation to visit Lang is not activity directed by Colasante at Wisconsin and there is no evidence that it related to the alleged conduct that is purposefully directed at Wisconsin.[8]

The plaintiffs' assertion that Colasante testified at his deposition that he had other Wisconsin customers and that he shipped things to them in Wisconsin, is the closest the plaintiffs come to asserting that Colasante purposefully directed his activities to Wisconsin, but it overstates Colasante's testimony. Colasante could recall one couple who came into the Georgetown gallery every couple of years; sometimes they took their purchases with them

---

[8] Lang averred in his affidavit that he and Colasante discussed their business relationship and their future dealings and that Colasante encouraged him and his wife to invest more and more money in art and artifacts, including with Tharpe and others. Dkt. No. 32. Accepting these general assertions as true, Lang did not aver that the two discussed any of the transactions described in the amended complaint.

35

and sometimes he shipped the items to Wisconsin. This kind of sporadic, happenstance connection with Wisconsin does not show that Colasante purposefully directed activity to Wisconsin.

The evidence shows that Colasante met Lang in Washington, D.C. when Lang traveled to Colasante's gallery, that Lang left his contact information in the D.C. gallery with Colasante, that Colasante met with Lang (and Susanne Lang) in D.C., that he knew that Lang had a home in D.C. not far from Colasante's gallery, that he spoke with Lang via an unspecified phone number, that he introduced Lang to Tharpe in D.C. and that he visited Lang in Wisconsin once for reasons that appear to be unrelated to the transactions described in the amended complaint. Even if, as the plaintiffs allege, Colasante knew that the plaintiffs were residents of Wisconsin and received money from Wisconsin bank accounts in payment for various transactions, that is not sufficient to show that Colasante purposefully directed the conduct underlying the plaintiffs' claims to the forum state of Wisconsin. Those contacts are the kind of "merely 'random, fortuitous, or attenuated contacts'" from which the purposeful direction requirement is supposed to protect out-of-state defendants. Dudnikov, 514 F.3d at 1071 (quoting Burger King, 471 U.S. at 475). And they are contacts with residents of Wisconsin, not contacts purposefully directed at the state of Wisconsin. From the standpoint of fair play and justice, forcing Colasante to defend against the plaintiffs' claims in Wisconsin when there is no evidence that he—for lack of a better phrase—sought out Wisconsin as a target of his business violates the principles of due

36

process. Even taking the plaintiffs' asserted facts as true and considering that the plaintiffs need only make a *prima facie* showing of specific personal jurisdiction, the court concludes that the plaintiffs have not met their burden as to Colasante.

>        e.      Remedy

In his brief in support of the motion to dismiss, Colasante stated that "most of the relevant witnesses and evidence are in the Greater Washington DC area and can be easily served with process in the Eastern District of Virginia." Dkt. No. 15 at 1. In his affidavit, Colasante asked the court to dismiss the lawsuit as it concerned him. Dkt. No. 16.

In their opposition to Colasante's motion to dismiss for lack of personal jurisdiction, the plaintiffs asked only that the court deny the motion—they did not make a request for alternative relief. Dkt. No. 31 at 8-11. When they filed their supplemental evidence a year and a half later, however, the plaintiffs asserted that if the court concluded it did not have personal jurisdiction, "the proper remedy is transfer of this matter to another court pursuant to either 28 U.S.C. § 1404(a) or § 1406(a)." Dkt. No. 81 at 1. They had not raised this argument in their response to Colasante's motion, so the court granted the Tharpe defendants' request to strike the argument. Dkt. No. 100.

On August 31, 2020—the day by which the court had hoped to issue this decision—the plaintiffs filed a new motion asking the court to transfer venue if it concluded it did not have personal jurisdiction. Dkt. No. 106. In the supporting brief, the plaintiffs argued that while the case has been pending,

"many, if not most of the statutes of limitation have expired;" they asserted that if the court were to dismiss the case, rather than transfer venue, their claims, "though meritorious," would be left without resolution or remedy. Dkt. No. 106-1 at 1-2. Citing cases from district courts in Virginia, Ohio and New Jersey, as well as the Federal Circuit, the plaintiffs argue that the court should not dismiss, but should transfer venue. Id. at 3.

Under the court's local rules, Colasante has twenty-one days to respond to this new motion. Civil L.R. 7(b) (E.D. Wis.). Because this court's decision may impact Colasante's response (and because he may not be aware of the deadline for responding), the court will set a deadline by which Colasante may respond to the plaintiffs' argument that the court should transfer his case to the District of Columbia or the Eastern District of Virginia, rather than dismiss it.

2. *Tharpe Defendants (Dkt. No. 51)*

The amended complaint alleges that the Tharpe defendants were residents of Williamsburg, Virginia. Dkt. No. 11 at 1-2. In the dispute regarding whether the plaintiffs properly served the Tharpe defendants (and whether the Tharpe defendants were evading service), Tharpe has asserted that he has lived in Midland, Virginia since January 2017. Dkt. No. 48 at 2. As with Colasante, the plaintiffs are not alleging that this court has general personal jurisdiction over the Tharpe defendants, dkt. no. 62 at 4 n.2, and the court has no evidence indicating otherwise. The question is whether the court has specific general jurisdiction over the Tharpe defendants.

38

a.     The Defendants' Arguments

The Tharpe defendants reviewed the allegations in the amended complaint, noting that the word "Wisconsin" appeared only seventeen times in its forty pages, and that only two of those references could "even arguably be attributed to Defendant Tharpe." Dkt. No. 52 at 8. They pointed to the amended complaint's allegations about phone call solicitations, emails and transfers of funds, arguing that these showed, at best, contacts with people who lived in Wisconsin, not contacts with Wisconsin. Id. at 7-8.

b.     The Plaintiffs' Response

In their brief in opposition to the Tharpe defendants' motion to dismiss, the plaintiffs made the same arguments they made in response to Colasante's motion. They argued that Tharpe "knew from the beginning that the Langs were Wisconsin residents," that the Langs' Wisconsin residency was noted on documents they possessed and signed and that Lang and Tharpe communicated "numerous times" by telephone and email and occasionally by wire transfer and United States mail. Dkt. No. 62 at 6. They also asserted that Tharpe "traveled to Wisconsin, and during this trip Tharpe met with [Lang], discussed and formed a business entity, and negotiated the transactions that ultimately culminated in the assets to be included in the Icon Collection." Id.

In a single sentence, the plaintiffs stated, "Additionally, Wis. Stat. §551.613(3) provides that 'an offer to sell or to purchase a security is made in this state, whether or not either party is then present in this state, if the offer meets any of the following criteria: . . . (b) The offer is directed by the offeror to

39

a place in this state and received at the place to which it is directed . . . .'" Id.
at 8. The court assumes this argument relates to the twenty-third cause of
action in the complaint, which alleges that the defendants violated "Wisconsin
Uniform Securities Law §§ 551 as follows:

> As alleged herein, Defendants made untrue statements of material
> fact and omitted to state material facts necessary to make their
> statements not misleading and carried out a plan, scheme, and
> course of conduct in violation of the Wisconsin Uniform Securities
> Law. In particular, including but not limited to, Colasante, Tharpe,
> and Aiani knew and were involved in the creation, documentation,
> and creation of the Sonoma Bank Loan,[9] which created liens upon
> much of the artwork to be invested in as part of Lang and Tharpe,
> LLC, the Icon Collection, and the White Marsh Project and failed to
> disclose those liens as a cloud on title; represented Icon Collection's
> ownership of artwork and artifacts without verifying title or a right
> to sell; receiving investment funds for the purchase of interests in
> Lang and Tharpe, LLC, the Icon Collection, and the White Marsh
> Project without providing title, etc.

Dkt. No. 11 at ¶223.

c.      Defendants' Reply

Relying on Walden, 571 U.S. 277 (2014) and Advanced Tactical, 751 F.3d
796, the defendants argued that the fact that the Tharpe defendants may have
communicated with Wisconsin residents was not enough, standing alone, to
allow the court to exercise specific personal jurisdiction over them. Dkt. No. 64
at 3-5. They asserted that Tharpe had visited Wisconsin only one time in his
life, on a "recreational outing in response to an invitation from Plaintiff Robert
Lang." Id. at 5. They asserted that the visit lasted only twenty-four hours, and
that no business was discussed and no agreements were reached. Id. They

---

[9] The court assumes the plaintiffs meant the "Sona" Bank loan.

40

alleged that the plaintiffs had ignored the purposeful direction prong of the personal jurisdiction analysis. Id. Finally, the defendants argued that in terms of due process notions of fair play and substantial justice, it would be unfair to require the Tharpe defendants to defend themselves in Wisconsin when Tharpe had traveled to Wisconsin only once, for twenty-four hours and at Lang's invitation, while the plaintiffs had repeatedly contacted and met with Tharpe in Washington, D.C. and Virginia, including numerous visits to Tharpe's "prior home in Virginia." Id. at 6.

d.     Tharpe's Second Affidavit

Tharpe filed an affidavit dated June 21, 2019, indicating that he did not conduct business in Wisconsin or own property in Wisconsin. Dkt. No. 53. He also asserted that he'd never lived or worked in Wisconsin. Id.

e.     Lang's Service Affidavit

In connection with the dispute over Tharpe's place of residence, and whether he lived at the address at which the plaintiffs tried to serve him, Lang filed a June 28, 2019 declaration in which he stated that he had met with Tharpe and conducted business with Tharpe "in Wisconsin to discuss and form a business entity, Lang Tharpe LLC, and negotiating transactions that ultimately culminated in the assets to be included in the Icon Collection." Dkt. No. 57 at ¶9.

f.     Supplemental Evidence

The defendants submitted a handful of pages from Colasante's deposition transcript; in one, he stated that he was aware that Don Tharpe made a trip to

Wisconsin without Colasante, but said he (Colasante) did not participate in the trip and that Tharpe told Colasante that Tharpe was "very impressed with the work [Lang] had done restoring the Town of Delafield." Dkt. No. 74-2 at 2, Tr. 207.

As noted above, Lang also submitted in the supplemental evidence a second declaration. Dkt. No. 82. In it, Lang described how, in 2012, Colasante asked Lang to meet Tharpe, telling Lang that Colasante "collectively owned some art and artifacts with Mr. Tharpe as well." Id. at ¶5. Lang said that at the first meeting, Tharpe immediately began to discuss the Virginia-based White March project; he says that he and Tharpe communicated "on almost a daily basis" and that Tharpe solicited him and his family for money. Id. While the declaration indicates that Lang attached examples of Tharpe's solicitations, the referenced attachment contains three emails which are hard to characterize.

The first, which appears to be from Tharpe to Lang on February 26, 2013, begins by saying, "[m]y list of needs follows." Dkt. No. 82-1 at 1. It then thanks Lang for a "25K draw," explains what Tharpe would use that money for, and lists a string of debts Tharpe says he owes. At the end of the list of debts, Tharpe says, "Bob, I need to recoup something soon from White Marsh to handle my monthly need 15th – 15th of 20K." Id. It concludes with a discussion of the "choices," which include "Steve on whole, Steve on part, or Steve on Phase 1 and Conservation Easement on the 60 acre Phase 2 93 lot residential. - If the County will allow." Id. Tharpe says that "[w]e" needed to find out from Steve whether, if they sold the sixty acres and closed with ninety

42

days, "what would he guarantee we could receive as payment in full." Id. Tharpe says he would like to "take that amount and see if [he] could better it through a creative plan of Easement by combining Great Marsh." Id. He mentions using "those funds to pay off Kessler in full or let [Tharpe] try to get financing to pay him off by creative banking," and says that all he (Tharpe) needs is a price from Steve "net to us from an arms length sale of the 60 acres." Id.

The second email, dated later on February 26, 2013, is a response to Lang's request about whether "peter"—presumably Colasante—owes $195,000 "for total due on epauletts ans [sic] sword $390,000?" Id. at 2. Tharpe responds, "No," and then describes a series of transactions that do not appear to involve Lang. Id. He ends by saying, "If we get together on 1/3 interest on McClellan and Grant straps, Peter and I would pay that full amount to Sona to reduce the 700K 8% debt and get a release for those pieces." Id.

The last email reflects a message dated January 6, 2014 from Tharpe to Lang and his administrative assistant, which says that the "invoices applicable to our agreement" are attached. Id. at 3. It says that "Middleburg has the invoice for the picture and Coote sword and has schooled payment around the 18th of January." Id. It then says, "My invoice for the Irish Bridgade and swords, If I could have some money on the 15th, I would it as I have some payments due on that date." Id. It concludes by saying that "[t]he balance by the 20th will be alright," and by asking the administrative assistant to email Tharpe the signed agreements "signed by Bob, Peter, and me." Id.

43

The only sentence in any of these email messages that appears to be a "solicitation for money" is the sentence in the January 6, 2014 email in which Tharpe says something about having some money on the fifteenth. The other messages are hard to construe as solicitations without further context.

Lang also stated in the declaration that Tharpe borrowed money from him, and said that in two attached promissory notes, Tharpe "expressly acknowledge[d] that he was borrowing money from Wisconsin residents within the body of the promissory notes." Dkt. No. 82 at ¶6. One note is for $250,000 and indicates that Tharpe and the Tharpe trust promise to pay Susanne Lang "at 514 Wells St., Delafield, WI 53018" that amount. Dkt. No. 82-2. It also says, however, that the note was executed and delivered in the Commonwealth of Virginia and was to be construed in accordance with the laws of Virginia. Id. The other note is for $200,000, promising to pay Susanne Lang "at 514 Wells St., Delafield, WI 53018" that amount, and again says that it was executed and delivered in Virginia and would be governed under the laws of Virginia. Dkt. No. 82-3.

Lang asserts that Tharpe solicited Lang to serve as a consultant. Dkt. No. 82 at ¶7. He attached the consulting agreement between the two, dated August 1, 2013. Dkt. No. 82-4. The agreement is between White Marsh Manor Limited in Warrenton, Virginia and "Robert Lang, of 514 Wells Street, Delafield, Wisconsin 53018." Id. at 1. The agreement specifies that Lang will determine how to perform the services contracted for (procuring funding for "Phase I of Mixed-Use Development") and the specific hours. Id. It specifies that notices for

44

White Marsh Manor should be addressed to Tharpe in Warrenton, Virginia, and that notices for Lang should be addressed to Lang in Delafield, Wisconsin. Id. at 2-3. The agreement is governed by the laws of the state of Virginia. Id. at 3, ¶17. Although Lang states in his declaration that the agreement said that he would be performing the services "at [his] discretion from [his] office here in Wisconsin," dkt. no. 82 at ¶7, the court could not find such a reference in the agreement. Lang also attested that Tharpe called him regularly at Lang's Wisconsin office and home and that Tharpe emailed Lang in Wisconsin. Id.

Lang recounts that he and Tharpe formed Lang and Tharpe, LLC in Virginia, using Tharpe's lawyer. Id. at ¶8. He says that he had the duty of setting up the bank account, and that Tharpe agreed that the company bank account could be set up at a Wisconsin bank. Id. at ¶9. Lang says that he ran "the office of Lang and Tharpe, LLC from Wisconsin," and that "[a]ll business was being conducted from [his] Delafield office in Wisconsin." Id. He says he paid White Marsh expenses and expenses from the display of artwork from the Wisconsin bank account. Id. at ¶10.

The attached documents show that Lang and Tharpe, LLC was organized under the laws of Virginia on April 27, 2012, with its principal office at 6105 Great Marsh, Midland, VA 22728 and its mailing address at P.O. Box 240, Midland, VA 22728. Dkt. No. 82-5 at 1, 3. The articles of organization show that the "initial registered office" was 31 Winchester Street in Warrenton, Virginia. Id. at 3. The operating agreement shows that Lang lives in Delafield, Wisconsin. Id. at 13. Section 4.06 of that agreement says that the "place of any

meeting of the Members shall be the principal office of the Company, unless another place, either within or outside the Commonwealth of Virginia, is designated by the Managers." Id. at 15. While the agreement says that the company's funds will be kept in bank accounts insured by the federal government, it makes no mention of the location of such accounts. Id. at 24. Lang attached bank statements for a Lang & Tharpe, LLC account at Town Bank, N.A. in Delafield, Wisconsin; the account appears to have been in operation from December 2012 through February 2015. Dkt. No. 82-6. He also attached checks to Tharpe and to Gibralter Capital from that account. Dkt. No. 82-7. Lang also asserts that Tharpe received "draws" from the Town Bank account. Dkt. No. 82 at ¶19.

Lang attests in the declaration that in 2013, "at the request of Don Tharpe, for the benefit of the White Marsh Project," Lang got a commitment for $3,000,000 from a private equity firm in Milwaukee, Wisconsin. Id. at ¶11. Lang says that he paid a capital sourcing fee and received the invoice in Wisconsin, "which Tharpe knew and requested." Id. Lang says that he "advanced" the $120,000 capital sourcing fee. Id. Lang attached to the declaration a September 17, 2013 letter to Tharpe and Lang—addressed to 31 Winchester Street in Warrenton, Virginia—documenting their consent for Alliance Capital Corporation to approach capital sources for financing. Dkt. No. 82-9. The letter does not indicate the location of Alliance Capital Corporation. Id. Lang also attached an invoice from Alliance to Lang, showing the address for Alliance as 788 N. Jefferson Street in Milwaukee, Wisconsin; the invoice is

46

for the $120,000 sourcing fee for the "[l]oan made to Robert Lang/Don Tharpe and/or related entities funded by Victor Xie et al." Dkt. No. 82-10.

Lang asserts that Tharpe sold his family artwork and artifacts in Wisconsin. Dkt. No. 82 at ¶12. He attached to the declaration an invoice with the heading "White Marsh Manor, Ltd., 6103 Great Marsh Place, Midland, Virginia 22728," reflecting that one King George III pair of royal pistols was sold to Lang, 514 Wells St., Delafield, WI 53018 for $750,000; it is signed "Thank you, Don Tharpe." Dkt. No. 82-11.

Lang alleges that Tharpe was "constantly seeking funds," and that Tharpe asked Lang to coordinate a nationwide search for financing. Dkt. No. 82 at ¶13. He says that he contacted funding sources all over the country, including in Milwaukee, and that he and Tharpe compiled a list of assets that could be used as collateral which included real estate Lang owned in Wisconsin. Id. He attached a list that included the Delafield Hotel, 118 acres in the Town of Summit and fifty acres at "94 Delafield" (owned by Lang and Tharpe, it appears). Dkt. No. 82-12.

Lang says that invoices "were received" in Wisconsin seeking payment from Lang and Tharpe, LLC for business debts incurred in Virginia. Dkt. No. 82 at ¶14. While Lang references an exhibit supporting this assertion, the exhibit wasn't attached to the declaration.

Lang asserts that "it was understood and clearly contemplated" through his consulting agreement that the "Lang Collection transaction contemplated long standing performance" by the Langs "in Wisconsin. Dkt. No. 82 at ¶15. He

reiterates that there were many phone conversations about the formation of Lang and Tharpe that took place while Lang was in his office in Wisconsin. Id. at ¶17. Lang claims that on "hundreds of occasions," Tharpe contacted Lang by phone and email while Lang was in Wisconsin, and that on "numerous occasions" Lang contacted Tharpe by phone while Lang was in Wisconsin. Id. at ¶18.

Lang asserts that Tharpe "frequently" worked with Lang's assistant, Suzanne Schroeder, to advance the mutual business interests of the two men. Id. at ¶21. Lang contends that "[a]t all times relevant," Tharpe knew that Schroeder was "based in Wisconsin" and was working from an office in Wisconsin for Tharpe's benefit and for the benefit of Lang and Tharpe. Id.

Finally, Lang avers that in the summer of 2012, Tharpe traveled to Wisconsin. Id. at ¶22. He says that the two men "discussed numerous aspects" of their business dealings during this visit, "while also taking time to enjoy social time together." Id. He says that "[o]n at least one occasion," he and Tharpe met "in person at the Lang and Tharpe LLC office here in Wisconsin." Id. at ¶18. Presumably, this was during the one summer 2012 visit.

The supplemental evidence does *not* contain the deposition testimony of Tharpe. At the August 3, 2020 hearing, plaintiffs' counsel stated that if the court was going to conduct an evidentiary hearing, he wanted to depose Tharpe. He stated that he had not done so during discovery, and that he wished that he had. Dkt. No. 100 at 2; Dkt. No. 99 (audio of the hearing). He stated that he had deposed Colasante, which had been more involved than

anticipated. Id. Counsel for the Tharpes strongly objected, reminding the court that it had given the parties almost four months to conduct discovery and arguing that the plaintiffs' counsel could have deposed Tharpe during that time. Id. The court denied the request to depose Tharpe. Id. at 3. The court had issued its order allowing limited discovery on October 2, 2019, and it gave the parties a deadline of January 31, 2019 to complete that discovery, "including depositions." Dkt. No. 72 at 2. The plaintiffs had no convincing explanation for why they had not deposed Tharpe during those four months.

g. Analysis

i. **Wisconsin's long-arm statute**

Again, the court cannot determine under Wis. Stat. §801.05(3 what acts or omissions the plaintiffs believe the Tharpe defendants committed in Wisconsin—the plaintiffs have not submitted evidence showing that Tharpe was in the state for more than the one visit, nor have they identified any suit-related conduct the Tharpe defendants committed in Wisconsin. While Lang asserts that during that visit Tharpe was in the "Lang and Tharpe LLC" office in Wisconsin, the Lang and Tharpe incorporation and operating documents indicate that Lang and Tharpe's principal place of business and office were in Virginia. The court understands Lang to be saying that Tharpe was in the place Lang used to conduct Lang and Tharpe business—perhaps his residence in Delafield, perhaps his business office in Delafield. But there is no evidence showing that there was a "Lang and Tharpe" office in Wisconsin. Lang also says that the men "discussed numerous aspects of their business dealings" during

49

Tharpe's visit to Wisconsin. As with Colasante, these vague, general assertions do not prove that Tharpe conducted any suit-related activities in Wisconsin.

The plaintiffs assert that under Wis. Stat. §801.05(4)(a), they were injured in Wisconsin by acts the Tharpe defendants took outside the state and that at the time they were injured, the Tharpe defendants were soliciting within the state. As the court has noted, the three documents that the plaintiffs submitted as examples of "solicitation" are difficult to characterize as such. The plaintiffs' argument seems to be that if Tharpe—while in Virginia or D.C. or someplace outside of Wisconsin—asked the plaintiffs for money (either to pay for something he sold them or for investment purposes) via telephone or email, and the plaintiffs were in Wisconsin at the time Tharpe made these requests, that constituted "solicitation." Tharpe may well have solicited Lang when Lang was in Wisconsin, but the court doesn't have evidence of specific examples. Tharpe told Lang about the White Marsh real estate development project while the two were in the gallery in DC. The agreements for the purchases of the art were prepared in Virginia by Aiani.

The Langs claim that there were many conversations between Lang and Tharpe that occurred while Lang was in Wisconsin and that during those conversations, Tharpe made misrepresentations to induce Lang to make investments or purchases. As with Colasante, they have not provided proof that *Tharpe* solicited that relationship.

The plaintiffs allege that under Wis. Stat. §801.05(4)(b), they were injured in Wisconsin by acts the Tharpe defendants took outside of the state and that

at the time of the injury, products or materials processed, serviced or manufactured by the Tharpes were used or consumed in the state in the ordinary course of trade. As with Colasante, the plaintiffs have provided no evidence of any "ordinary course of trade" between the Tharpes and the plaintiffs.

The plaintiffs argue that under Wis. Stat. §801.05(5)(d), their claims of injury relate to goods or other things of value shipped from Wisconsin to the Tharpes on their orders or directions. There is less evidence regarding the Tharpes than there was regarding Colasante in this regard. The complaint does not say where the War and Peace and the Healy paintings were when the Langs purchased them, whether they were shipped anywhere or at whose direction. It does not say whether any other items—swords, pistols or other artifacts—were shipped anywhere or at whose direction.

The plaintiffs did not mention Wis. Stat. §801.05(5)(b). That section of the long-arm statute provides that a court sitting in Wisconsin has personal jurisdiction over a case in which "[a]rises out of . . . services actually performed for the defendant by the plaintiff within this state if such performance within this state was authorized or ratified by the defendant." The evidence shows that Tharpe entered into a consulting agreement with Lang, knowing that Lang lived and worked some of the time in Wisconsin, and the agreement gave Lang the discretion to perform the consulting services in the manner that Lang chose. Dkt. No. 82-4. Lang attests that he performed those consulting services in Wisconsin. The evidence also shows that Tharpe formed a corporation with

Lang, knowing that Lang lived and worked some of the time in Wisconsin. Dkt. No. 82-5. The minutes of the first meeting of the members of that corporate entity show that Tharpe and Lang both were designated "managers" of the corporate entity. Id. at 6. The operating agreement gave managers the authority to enter into contracts, to open and maintain bank and investment accounts, to collect funds due the company, to pay the debts and obligations of the company. Id. at 16-17. The evidence shows that Lang performed those services—he opened the Town Bank account, he wrote checks on that account, he paid invoices, he wrote letters on behalf of the corporate entity. The evidence supports the plaintiffs' assertions that Tharpe was aware that Lang was doing some, or all, of these things on the corporation's behalf in Wisconsin.

Taking the plaintiffs' asserted facts as true, the court concludes that at least one of the criteria under Wisconsin's long-arm statute has been satisfied.

ii.     **Due process**

For the same reason, the court concludes that it does not violate the principles of due process for Tharpe to defend against the plaintiffs' suit in Wisconsin. Unlike Colasante, Tharpe retained the consulting services of a Wisconsin resident. See Stayart v. Hance, 305 Wis.2d 380 (Ct. App. 2007) (court had jurisdiction over out-of-state defendant who hired Wisconsin lawyer to perform legal services). Unlike Colasante, Tharpe formed a corporation with a Wisconsin resident and entered into written contractual agreements with a Wisconsin resident. Tharpe was aware that the Wisconsin resident was doing work on behalf of that corporation—establishing bank accounts, paying

52

invoices, seeking funding—in Wisconsin. The court has emphasized in relation to Colasante that it "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." <u>Walden</u>, 571 U.S. at 285 (citing <u>International Shoe</u>, 326 U.S. at 319). But these contractual relationships go further than simple phone or email contacts with someone who happens to reside in Wisconsin.

The court has, for the most part, discussed individual defendant Donald Tharpe's actions. The plaintiffs have named the Donald R. Tharpe trust as a defendant. Dkt. No. 11 at 1; ¶3. The forty-page, 226-paragraph body of the complaint mentions the Tharpe Trust only seven times. The Tharpe defendants argue that the plaintiffs have not alleged "even a single contact between the Donald R. Tharpe Trust and the State of Wisconsin." Dkt. No. 52 at 9. They concede, however, that Donald Tharpe is the sole trustee of the Tharpe Trust, and that the trust shares the same address as Tharpe. Dkt. No. 73 at 2 n.1. The complaint is vague (if not silent) about what the plaintiffs believe the Tharpe Trust did to give rise to a cause of action, but whatever it was, Tharpe, as sole trustee of the Trust, would have done it. If the court has personal jurisdiction over Tharpe, it has personal jurisdiction over whatever Tharpe may have done in his capacity as trustee of the Trust.

The court concludes, taking the plaintiffs' asserted facts as true and resolving disputes in the plaintiffs' favor, that the plaintiffs have made a *prima facie* case of specific personal jurisdiction as to the Tharpe defendants.

## IV.    Tharpe Defendants' Motion to Set Aside Default (Dkt. No. 47)

While the court has determined that it has personal jurisdiction over the Tharpe defendants, the clerk has entered default against the Tharpe defendants because they did not timely answer the amended complaint. The Tharpe defendants have asked the court to set aside that default because the plaintiffs did not properly serve them. While conceding that the plaintiffs tried several times to serve them, the defendants argue that the address at which the plaintiffs attempted to serve them was not Tharpe's address. Dkt. No. 48 at 2. They assert that although the plaintiffs attempted service between July 2018 and December 2018, they did not receive a copy of the complaint until May 15, 2019. Id. at 1. The Tharpe defendants' counsel filed notices of appearance and the motion to set aside the default on June 7, 2019. Dkt. Nos. 45-47.

### A.    Governing Law

Fed. R. Civ. P. 55(c) allows a court to set aside an entry of default for "good cause." "An entry of default may be set aside before entry of judgment upon showing good cause for the defendant's inaction, prompt steps to correct the default, and an arguably meritorious defense to the lawsuit." Parker v. Scheck Mechanical Corp., 772 F.3d 502, 505 (7th Cir. 2014) (citing Sun v. Bd. of Trustees of the Univ. of Ill., 473 F.3d 799, 809-10 (7th Cir. 2007)). To show an arguably meritorious defense to the suit, a defendant must show "more than bare legal conclusion, e.g., *Breuer Electric Mfg. Co. v. Toronado Systems of America, Inc.*, 687 F.2d 182, 186 (7th Cir. 1982), but less than a definitive showing that the defense will prevail." Id. (citing Cracco v. Vitran Express, Inc.,

559 F.3d 625, 631 (7th Cir. 2009)). <u>Cracco</u>, 559 F.3d at 631 (citing <u>Sun</u>, 473 F.3d at 811).

> Generally, a party can show good cause for its default by convincing the court that "it did not willfully ignore the pending litigation, but, rather, failed to respond to the summons and complaint through inadvertence." <u>Cracco</u>, 559 F.3d at 61; <u>Parker</u>, 772 F.3d at 505. In *Sims* [*v. EGA Prods., Inc.*, 475 F.3d 865 (7th Cir. 2007)], Judge Easterbrook articulated that the phrase "good cause" meant "'good cause' for the judicial action, not 'good cause' for the defendant's error[.]" <u>Sims</u>, 475 F.3d at 868.

<u>United States f/u/b/o Venture Elect. Contractors, Inc. v. Liberty Mutual Ins. Co.</u>, No. 17-cv-1473-pp, 2018 WL 4120175, at *6 (E.D. Wis. Aug. 29, 2018).

B.    The Plaintiffs' Efforts to Effect Service

The plaintiffs filed this suit on July 13, 2018. Dkt. No. 1. On August 2, 2018, process server William D. Hester went to 602 River Bluff, Williamsburg, Virginia, 23185. Dkt. No. 43-2 at 1-2. Williamsburg is in James City County, Virginia. https://jamescitycountyva.gov. It is on the eastern side of the state, north of Yorktown. https://demographics.coopercenter.org/sites/demographics/files/VirginiaMap_Cities-Counties.pdf.

Hester described the River Bluff address as a gated community that allowed service only during business hours and required that a police officer escort him. Id. He indicated that he attempted service at 2:43 p.m., but that there was no answer; he said that a neighbor said that Tharpe was home and that his car was in his parking space. Id. On August 10, 2018 at 3:47 p.m., Hester tried again, but there was no officer available to escort him. Id. Hester recounted that on August 13, 2018 at 4:09 p.m., police knocked on the door

but there was no answer; the dispatcher called the house but there was no answer. The officer told Hester that "all residents' cars were there." Id.

On August 28, 2018, the plaintiffs attempted to serve Tharpe and the trust at 602 River Bluffs in Williamsburg, Virginia, 23185 by first-class mail. Dkt. No. 43-1.

Plaintiffs' counsel, Attorney Govern, contacted Attorney Richard J. Thomas, who was representing defendant Aiani, and asked that Aiani accept service on behalf of the Tharpe defendants. Dkt. No. 56 at ¶2. Apparently Thomas responded October 1, 2018 that "we have no authority to accept service on behalf of Mr. Tharpe . . . ." Dkt. No. 56-1 at 2.

On October 3, 2018, process server Crystal Kleiber went to 602 River Bluffs in Williamsburg, Virginia and was escorted by an officer; she posted the summons, amended complaint and exhibits "on main door to unit." Dkt. No. 43-4.

The plaintiffs made a second attempt at mail service, again to 602 River Bluffs, on October 5, 2018. Dkt. No. 43-3.

Finally, on October 12, 19 and 26, 2018, the plaintiffs published service in the Daily Press in Newport News, Virginia,[10] and on October 13, 20 and 27, 2018, they published service in the Virginia Gazette in Williamsburg. Dkt. No. 43-5.

---

[10] Newport News is about a half hour from Williamsburg, according to Google Maps.

The plaintiffs filed their request for default on December 10, 2018. Dkt. No. 41.

C.    The Evidence

As noted, the Tharpe defendants assert that Tharpe did not live in Williamsburg between July and December of 2018. They assert that he lived in Midland, which is in another part of the state, and that he didn't receive the summons and complaint until mid-May 2019.

1.    *Tharpe's First Declaration*

In his June 7, 2019 declaration supporting the motion to set aside default, Tharpe attested that since January 2017, he had lived at 10287 Messick Road in Midland, Virginia. Dkt. No. 49 at ¶2. Midland is in Fauquier County, Virginia. https://www.visitfauquier.com/about-fauquier/towns-and-villages/midland. Fauquier County is in north central Virginia. https://demographics.coopercenter.org/sites/demographics/files/VirginiaMap _Cities-Counties.pdf. According to Google Maps, Midland is between 130 and 160 miles from Williamsburg.

Tharpe asserted that over a decade earlier, he had been a part owner of property at 602 River Bluffs in Williamsburg. Id. at ¶5. Tharpe averred, however, that he hadn't had an ownership interest in the River Bluffs property since 2008,[11] and that he never had lived or worked at that address. Id. He also asserted that the Tharpe trust never had owned an interest or conducted

---

[11] In the declaration he submitted with the supplemental evidence, Tharpe clarified that he later recalled that he transferred ownership of the River Bluffs property to his estranged wife in March 2007. Dkt. No. 75 at 2 n.1.

57

business out of the River Bluffs address. Id. at ¶6. Tharpe explained that he and his wife had been legally separated since 2008, and that his wife lived at the River Bluffs address, which was in her name only. Id. at ¶7. He asserted that when the plaintiffs had tried to serve him at the River Bluffs address, his estranged wife had returned any envelopes to the sender without opening them. Id. at ¶12. He averred that his estranged wife had not forwarded the summons, complaint or other pleadings to him or the trust at his current address. Id. at ¶14. Finally, Tharpe attested that "around the time of October 3, 2018"—when Crystal Kleiber posted the documents on the door at the River Bluffs address—his estranged wife had been in the hospital and did not receive those documents. Id. at ¶13.

### 2. *Lang's Responsive Declaration*

The plaintiffs believe that Tharpe was living at the River Bluffs address, and that he purposefully evaded their repeated attempts to serve him there.

Lang filed a responsive declaration asserting that at some point during almost daily conversations between March 2012 and March 2014, Tharpe told Lang that Tharpe lived with his wife at 602 River Bluffs, Williamsburg, Virginia, and that Tharpe also had a home in Midland, Virginia. Dkt. No. 57 at ¶4. Lang claimed that Tharpe informed Lang that Tharpe "had designed a scheme by which he would 'hide assets,' avoid creditors and evade those seeking to locate Tharpe by titling the River Bluffs residence solely in his wife's name, and thereafter claiming that he and his wife were estranged to avoid joint title of assets." Id. at ¶6. Lang said he recalled Tharpe "repeated stating" to him that

Tharpe's "assets were protected." Id. Lang also asserted that during "numerous" phone calls, Tharpe would tell Lang that Tharpe was either at the Williamsburg home or driving to or from that home. Id. at ¶7. Lang asserted that at no time did Tharpe tell Lang that Tharpe had "ceased residing" at the River Bluffs address. Id. at ¶8. Lang claimed that in the summer of 2016, he learned that Tharpe's home in Midland, Virginia had been foreclosed upon. Id. at ¶5.

### 3. *Tharpe's Third Declaration*[12]

In a third declaration dated July 11, 2019, Tharpe asserted that prior to living at the Messick Road address in Midland, he'd lived at 6105 Great Marsh Place in Bealton, Virginia. Dkt. No. 60 at ¶3. He said he'd live at that address from 1985 until about December 2016, and that it was approximately two miles from Midland. Id. He asserted that he'd sold the Great Marsh property in 2016. Id. at ¶5. He maintained that Lang had visited the Great Marsh address "at least twenty times." Id. at ¶6. Tharpe denied ever telling Lang that Tharpe lived with Tharpe's wife at the River Bluffs address. Id. at ¶8. He denied ever devising a scheme to hide assets and avoid creditors by titling the River Bluffs address in his estranged wife's name. Id. at ¶9. Tharpe conceded that he stored a car at the River Bluffs address because the garage at his Messick Road address did not accommodate the size of the car. Id. at ¶14. He said, however, that when he visited the River Bluffs address to pick up the car, he did not

---

[12] Tharpe filed a second declaration on June 21, 2019, generally asserting that he did not conduct business in or own property in Wisconsin and that he'd never lived or worked in Wisconsin. Dkt. No. 53.

check mail. Id. at ¶15. Tharpe attached to this second declaration a document purporting to be an email from Lang's assistant Suzanne Schroeder to Lang, in which Schroeder responded to Lang's November 12, 2012 request for Tharpe's UPS address by reciting the Great Marsh address. Dkt. No. 60-1.

4. *The Supplemental Evidence*

a. Tharpe Defendants

Tharpe filed yet another declaration as part of his supplemental evidence. Dkt. No. 75. This affidavit asserted that Tharpe owned the Messick property with his brother; he said that each of the brothers was granted an undivided half interest in the property in 2006 after their mother, the previous owner of the property, passed away. Id. at ¶3. He asserted that he had received mail at the P.O. Box 240 address in Midland since "at least 1990." Id. at ¶13. He attached to this declaration several documents: a March 26, 2007 deed transferring 602 River Bluffs, Williamsburg, VA from Donald and Toni Tharpe to Toni Tharpe for $10.00 in consideration, Dkt. No. 75-1; Dominion Energy bills for the months of January 2018 through August 2018 addressed to Tharpe for the address at 10287 Messick Road in Midland, Virginia, Dkt. No. 75-2; Dominion Energy bills for the month of October 2018 through January 2019 for the Messick Road address, Dkt. No. 75-3; a notice of grand jury service sent to Tharpe at the Messick Road address, instructing him to appear for grand jury service on July 23, 2018, Dkt. No. 75-4; a thank-you letter from Community Touch, Inc. dated March 5, 2018, thanking Tharpe for a contribution and addressed to Tharpe at the Messick Road address, Dkt. No.

60

75-5; a portion of a January 31, 2018 letter from Citi Cards addressed to Tharpe at the Messick Road address and a July 20, 2018 Sears Mastercard statement, Dkt. No. 75-6; and two tax bills addressed to Donald R. and H. Moffette Tharpe at the P.O. box in Midland, with due dates of June and December, 2018, Dkt. No. 75-7.

The Tharpe defendants' supplemental evidence also included a declaration from Emily Gellings, the manager of the information resource center at Reinhart, Boerner, Van Deuren, S.C. (defense counsel's firm). Dkt. No. 76. Gellings stated that on January 17, 2020, she looked for Tharpe's address on a public records database called idiCORE. Id. at ¶3. Gellings stated that her research revealed that Tharpe's most recent addresses were the P.O. box in Midland, Virginia and the 10287 Messick Road address. Id. She attested that on January 31, 2020, she ran the 10287 Messick Road address through the Fauquier County online real estate database, which revealed that the owners of that property were Donald R. Tharpe and H. Moffette Tharpe, Jr. Id. at ¶4. Gellings attached to her affidavit the idiCORE search results, which listed the P.O. box in Midland as "current" for Tharpe and the Messick Road address as valid from 1990 through May 30, 2019. Dkt. No. 76-1. It also showed the 6105 Great Marsh address in Bealton (although it indicated that that Tharpe was associated with that address from 1988 through 2016). Id. She also attached the result of the Fauquier County Real Estate Online search, which listed the mailing address for the owners of the Messick Road property

(Donald R. and H. Moffette Tharpe) as P.O. Box 240, Midland, VA 22728. Dkt. No. 76-2.

Finally, the Tharpe defendants' supplemental evidence included an affidavit from Toni Tharpe. Dkt. No. 77. Toni Tharpe attested that she has lived at the 602 River Bluffs address since 2006, when she purchased it from Tharpe. Id. at ¶¶2-3. She averred that Tharpe never lived at the 602 River Bluffs address. Id. at ¶3. Toni Tharpe stated that she was married to Tharpe, but that they were separated in 2008 and have been separated since. Id. at ¶4. She attested that she obtained sole ownership of the River Bluffs address in March 2007 and has been the sole owner since. Id. at ¶5. She averred that Tharpe was not living at the River Bluffs address in the fall of 2018. Id. at ¶6. Toni Tharpe stated that because she and Tharpe bought the property together in 2006, the landline telephone account is "nominally in Mr. Tharpe's name," but that Tharpe does not, and has never, lived at the River Bluffs address. Id. at ¶7. She attests that "[s]ometime in the fall of 2018," she remembered receiving two "large envelopes" at the River Bluff address that were addressed to Tharpe; she said that she didn't recall who sent them and that she didn't open them because they weren't addressed to her. Id. at ¶8. She stated that she did not contact Tharpe to tell him about the envelopes; she just returned them to sender. Id. Toni Tharpe stated that she didn't recall seeing any notices for Tharpe posted at the River Bluffs address. Id. at ¶9. Attached to Toni Tharpe's declaration was the same March 26, 2007 deed that Tharpe had attached to his fourth declaration, dkt. no. 77-1, and a deed dated November 7,

2011 in which Toni Tharpe transferred the River Bluffs property from herself to herself as the trustee of the Toni M. Tharpe trust, dkt. no. 77-2.

        b.    The Plaintiffs

The plaintiffs' supplemental evidence included an affidavit from Richard Hendricks, a legal researcher at the DeWitt LLP law firm. Dkt. No. 83. He attested that when he searched the public data records available on Westlaw, he found conflicting addressees for Tharpe. Id. at ¶5. He asserted that Tharpe had owned several different real properties and had used a post office box "on documents submitted to government officials." Id. at ¶6. After listing the various databases he'd searched, Hendricks stated that he had found phone records registered to Tharpe at the 602 River Bluffs address, from as early as January 1, 2000 and as late as September 18, 2017 and August 15, 2019. Id. at ¶13. He asserted that he found credit reports listing Tharpe at the River Bluffs address in January 2012 and April 2018. Id. at ¶14. He stated that he found that Tharpe had been paying utility bills at River Bluffs in October 2008 and October 2017. Id. at ¶15. He also found records from a lawsuit filed against Tharpe in the Eastern District of Virginia. Id. at ¶¶16-18. Hendricks concluded that "[b]ased on [his] research examining the conflicting results, and [his] over twenty-one (21) years at DeWitt LLP as a researcher, [he] concluded that the best address to serve Mr. Tharpe was 602 River Bluffs, Williamsburg, VA 23185." Id. at ¶34.

The plaintiffs attempted to serve the Tharpe defendants between July 13, 2018 and sometime before December 10, 2018. The phone record information

attached to Hendricks' affidavit indicates that "Don Tharpe" was first reported as having a phone at 602 River Bluffs on January 28, 2010, and "last reported" having a number at that address on September 18, 2017—ten months *before* the plaintiffs filed their complaint. Dkt. No. 83-1. A second record, however, indicates that a "D. Tharpe" had a phone registered at the River Bluffs address between January 28, 2010 and August 15, 2019—a period that would have included the time the plaintiffs were trying to effect service. Dkt. No. 83-2. A PeopleFinder report attached to the affidavit shows that since April 12, 2018— three months before the plaintiffs filed suit—TransUnion credit report had Tharpe's address listed as 602 River Bluffs. Dkt. No. 83-3. Another report from Data by Infogroup showed that as of July 2019—months after the plaintiffs filed their request for default—Donald R. Tharpe and Toni M. Tharpe lived at the 602 River Bluffs address. Dkt. No. 83-4. A utility report, with the source listed as Equifax credit reporting, showed utility service being connected under the name Don Tharpe at the River Bluffs address on October 11, 2017 and indicated that the information was current through October 7, 2019. Dkt. No. 83-5. Another utility record, with the source listed as Equifax credit reporting, showed utility service being connected under Tharpe's name at the River Bluffs address on January 31, 2009, and indicated that the information was current through October 7, 2019. Dkt. No. 83-6.

The lawsuit Hendricks mentioned was <u>Brown University v. Donald R. Tharpe, Toni M. Tharpe and the City of Newport News</u>, Case No. 10-cv-167 (E.D. Va.). Dkt. No. 83-7. The summons was issued on January 10, 2011—

years before the plaintiffs filed this lawsuit. Id. at 1. The amended complaint in that case alleged that Donald R. Tharpe and Toni M. Tharpe resided at 602 River Bluffs, Williamsburg, Commonwealth of Virginia. Dkt. No. 83-9 at 3. In Tharpe's answer to the complaint, he admitted the veracity of that allegation; the answer was dated July 11, 2011. Dkt. No. 83-8.

The plaintiffs' supplemental evidence included a declaration by process server William Hester. Dkt. No. 84. Hester stated that he first tried to serve Tharpe and the trust on August 2, 2018 at 2:43 p.m. Id. at ¶4. He said that there was no answer at the 602 River Bluffs address, but that a neighbor who lived nearby and was doing remodeling on his unit that day came out after hearing Hester knock. Id. Hester told the neighbor that Hester was looking for Tharpe; the neighbor said that Tharpe was home. Id. The neighbor stated that he had seen Tharpe earlier and knew that Tharpe was in the residence because Tharpe's car "was in its usual, assigned parking space." Id. Hester said he tried a second time on August 10, 2018 at 3:47 p.m., but that there was no officer available to escort him to the unit. Id. at ¶5. He explained that his third attempt was on August 13, 2018 at 4:09 p.m. Id. at ¶6. This time an officer escorted him to the property and he knocked, but no one answered. Id. The officer told Hester that "all of the vehicles attributed to this particular condominium unit were in their designated parking spaces," and the officer said the officer believe the vehicles belong to Tharpe. Id. Hester opined that on two of the three occasions, there were "one or more occupants who were present inside 602 River Bluff who refused to come to the door," and said he

had no question that the neighbors (plural, though he described only one neighbor) and the security officer were referring to Tharpe. Id. at ¶7.

The plaintiffs also included a March 7, 2020 declaration from Gary Hendershott. Dkt. No. 85. Hendershott attested that he had "engaged in long standing business transactions with Tharpe in the area of rare art and collectibles" for over ten years, involving over five million dollars in business and over one hundred transactions. Id. at ¶1. Hendershott stated that Tharpe frequently instructed Hendershott to send art, collectibles and checks to Tharpe at the 602 River Bluffs address and that between 2012 and 2016 Hendershott mailed packages to Tharpe at that address. Id. at ¶2. Hendershott said that Tharpe owned—in the past and at the time of the affidavit—several properties in Virginia with different address, and that Tharpe also used a post office box. Id. at ¶3.

Hendershott also claimed that on "several occasions," Tharpe had told Hendershott about legal cases that had been brought against Tharpe, and how Tharpe "was attempting and then successfully able to evade service." Id. at ¶4. He asserted that "this was one of the reasons that [Tharpe] frequently only provides a Post Office Box and not a physical address to service providers, governmental agencies and potential creditors." Id. Hendershott also alleged that Tharpe "only recently asserts" being estranged from his wife "so that he can disavow living at the 602 River Bluff address in Williamsburg, VA." Id. He asserted that Tharpe had made statements directly to Hendershott in the past that Tharpe was "going home to Williamburg to be with his wife Toni Tharpe,

whom he enjoys a good relationship with, and that he has stayed with her for more than 30 days at a time in Williamsburg." Id. Hendershott averred that Tharpe told Hendershott that "while [Tharpe] works in Midland, Virginia he travels home on weekend's [sic] to be with his wife at their home at 602 River Bluff in Williamsburg, Virginia." Id.

Hendershott asserted that Tharpe conducts businesses under aliases to "launder his assets/money and income from creditors and he maintains bank accounts in all of these Aliases that he uses." Id. at ¶6. Hendershott claimed that Tharpe's aliases included Donald R. Tharpe personal company, Donald R. Tharpe Trust, Toni Tharpe "his wife that receives checks for him over $100,000.00," Toni Tharpe Trust "that receives checks for him over $100,00.00," Bala Cwynyd, Ltd "that receives checks over $ 1 Million dollars," Bala Cwynyd Company, White Marsh Manor, Ltd. "That receives checks over $1 Million," White Marsh Manor Company and Blue Ridge Preservation LLC. Id.

Attached to Hendershott's declaration was an email purporting to be from Tharpe (reflecting the same email address as reflected in other emails provided by the plaintiffs) to Brainerd@HA.com and copied to TomS@HA.com. Dkt. No. 85-1. The message is dated December 19, 2014, the salutation says, "Hi, Richard," the second sentence says "I will mail the check today," and the third sentence reads, "Once received, I would appreciate mailing all my purchases to me at 602 River Bluffs, Williamsburg, Va. 23185 Ph. # 540 270 7700." Id.

Hendershott also attached screen shots of news stories about the litigation between Brown University and Tharpe. Dkt. No. 85-2. The first purports to be from the "Daily Press" at https://www.dailypress.com; it appears to have been written by author Peter Dujardin and dated January 6, 2011. Id. at 1. Contrary to Hendershott's assertion in his declaration that the article shows that Tharpe and his wife "have in fact been identified together as a prominent married couple living in Williamsburg as residents," dkt. no. 85 at ¶5, the article says only that Donald and Toni Tharpe were added to the lawsuit as defendants, and that "a message left on the phone number listed for the Tharpes in Williamsburg was not immediately returned Thursday." Id. at 1-2. The second article, a June 20, 2013 piece by Joshua Axelrod published by NBC at https://www.nbcwashington.com, mentioned nothing about Toni Tharpe, and identified Tharpe as an "ardent collector of Civil War-era swords in Williamsburg, Va." Id. at 5.

       c.     Tharpe Defendants

On March 26, 2020, Tharpe filed yet another declaration. Dkt. No. 93. This one was a response to Gary Hendershott's declaration; it stated that Tharpe began doing business with Hendershott in 2004. Id. at ¶2. Tharpe said that for a while, he considered Hendershott to be "a friend and close business partner." Id. Tharpe said that he suffered a "major stroke" in 2014, and afterward consigned valuable artifacts to Hendershott and asked Hendershoot to help him manage his affairs. Id. Tharpe said that later in 2014, he had to undergo quadruple bypass surgery; because of concerns about his ability to

68

weather the surgery and his trust in Hendershott, Tharpe asked Hendershott

"to handle certain business endeavors for [him] while [he] was recuperating."

Id. Tharpe explained that after the November 2014 bypass surgery, Tharpe had

another stroke and developed atrial fibrillation. Id. at ¶4. He said that his

condition was so severe that he could not recuperate at home—at that time, his

home was 6105 Great Marsh Place, Bealton, Virginia. Id. He asserted that he

stayed with his wife, "from whom [he is] legally separated" for about forty-five to

sixty days while he recovered from the November 2014 surgery. Id. at ¶5.

Tharpe concedes that he "directed at least one shipment to the River Bluffs

Address" between November and December 2014, because that was where he

was recuperating. Id. at ¶6.

Tharpe asserted that he learned in December 2017 that Hendershott

"had converted hundreds of thousands of dollars' worth of assets" from Tharpe.

Id. at ¶7. Tharpe indicated that in February or March 2018, he reported this

"misconduct" to the Fauquier County Sheriff's Office, and that in May 2019,

Hendershott was arrested for felony embezzlement. Id. at ¶8. Tharpe asserted

that the criminal proceedings against Hendershott were still progress. Id. at ¶9.

He said he had not spoken to Hendershott since December 2017. Id. at ¶10.

Tharpe asserted that he did, on one occasion in early October 2014, pick

up his wife (from whom he repeats that he is legally separated) at the hospital

after surgery and drove her back to her house at 602 River Bluffs. Id. at ¶11.

As for the lawsuit filed by Brown University, Tharpe indicated that after his

lawyer filed the answer, Tharpe noticed that "it mistakenly admitted that

69

[Tharpe] resided at 602 River Bluffs, Williamsburg, Virginia." Id. at ¶12. He says he brought the error to his lawyer's attention, but that the lawyer did not correct it. Id.

Tharpe attached to this declaration a Daily Activity Report for the Fauquier County Sheriff's Office for May 15, 2019, which indicated that at 11:00 a.m. that day, "Gary Lynn Hendershott, 65, Del Ray Beach, FL, was arrested for Felony Embezzlement." Dkt. No. 93-1 at 3. He also attached a screen shot of the Virginia Judiciary Online Case Information System, reflecting case number GC19000764-00 against defendant Gary Lynn Hendershott of Del Ray Beach, Florida charged with embezzlement and reflecting an offense date of April 30, 2015. Dkt. No. 93-2 at 2. The most recent docket entry is dated May 6, 2020.[13] Id. at 2.

D.    Analysis

The plaintiffs assert that the Tharpe defendants cannot show good cause for their default, because Tharpe told Lang more than once that although Tharpe lived at the River Bluffs address with his wife, he was able to disclaim the residence because the property was not in his name and because Tharpe and his wife allegedly were estranged. Dkt. No. 55 at 4. Tharpe denies ever having told Lang such a thing. Dkt. No. 59 at 1. Each accuses the other of lying.

---

[13] The court reviewed that docket in the process of preparing this decision. As of September 3, 2020, the "disposition information" section of the docket indicated "nolle prosequi." https://eapps.courts.state.va.us/ocis/details;caseNumberSearch=true, last visited September 3, 2020).

It may be that something is rotten in the state of Denmark. Donald and Toni Tharpe purport to be separated, and assert that only Toni lives at the River Bluffs address. Yet the two are not divorced despite asserting that they have been separated for fourteen years. The deed transferring the River Bluffs property to Toni Tharpe shows nominal consideration of only $10. The landline phone at the River Bluffs address is in Donald Tharpe's name and utility records reflect utilities in his name at the address. When Brown University sued Donald and Toni Tharpe in 2011, they listed the River Bluffs address and Tharpe's answer admitted that that was his residence (although he now claims that was a mistake on his lawyer's part). Tharpe keeps a car at the River Bluffs address, although it is over one hundred miles from what he claims is his actual address. He convalesced at the address after his heart surgery and subsequent stroke and admits to having driven his wife there from the hospital and to having at least one shipment delivered there (Dkt. No. 85-1). On one occasion in August 2018, a neighbor told the process server that the neighbor had seen Tharpe at the River Bluffs address.

The plaintiffs mailed the summons and complaint to the River Bluffs address on two different occasions. Toni Tharpe says that sometime in the fall of 2018, she received two envelopes addressed to Tharpe and that she returned them to sender. Plaintiffs' counsel does not indicate whether the packets came back. If Toni and Tharpe, despite being estranged, are cordial enough that Toni would allow Tharpe to store his car at her condo and that each of them rely on the other when they are ill, one cannot help but wonder why Toni would not

contact Tharpe to tell him that she had received mail addressed to him. The plaintiffs also asked Aiani, through his lawyer, to accept service on behalf of the Tharpe defendants. The attorney responded that "we" do not have authority to accept service, without specifying whether the "we" included Aiani. Aiani provided a declaration on October 30, 2018 in which he made the rather cryptic assertion that he "ha[d] been" counsel for Tharpe and the Tharpe trust; the use of the past perfect progressive tense implied that Aiani was no longer, as of October 2018, counsel for the Tharpe defendants, but he did not state that directly.

On the other hand, in 2006, Rinda Tharpe left 10287 Messick Road in Midland, Virginia to H. Moffette Tharpe, Jr. and Donald R. Tharpe. Dkt. No. 76-2. In 2012, Tharpe's lawyer, Ronald Aiani, showed Tharpe's address as "Great Marsh, Midland, Virginia 22728-0240." Dkt. No. 11-1 (Aiani letters re: White Marsh Project agreement); Dkt. No. 11-4 (Icon Collection agreement showing Tharpe as a resident of Midland, VA). It appears that Lang's assistant, Suzanne Schroeder, believed as of November 2012 that 6105 Great Marsh Place, Bealeton, VA 22712 was Tharpe's "UPS address" for shipping. Dkt. No. 60-1. The idiCORE search document provided by the Tharpe defendants shows that between February 2005 and December 2016, there were three addresses associated with Tharpe that contained the word "Marsh"—10751 Marsh Road in Bealeton, VA 22712; 10685 Old Marsh Road in Bealeton, VA 22712; and 6105 Great Marsh Place in Bealeton, VA 22712. Dkt. No. 76-1.

On January 31, 2018, Citi Cards addressed a letter to R. Tharpe at 10287 Messick Road, Midland, VA 22728-1941, regarding his account ending in 0864. Dkt. No. 75-6. That account was a Sears Mastercard account. Id. From November 2017 through July 2018, Dominion Energy Virginia billed Tharpe for energy provided to 10287 Messick Road in Midland, Virginia. Dkt. No. 75-2. The bills ranged from a high of $533.78 for the period February 22 through March 26, 2018 to a low of $18.39 for the period June 25 through July 25, 2018. Id. From August 22, 2018 through December 26, 2018, Dominion Energy Virginia billed R. Tharpe for energy provided to 10287 Messick Road in Midland, Virginia. Dkt. No. 75-3. The bill for the period November 21 through December 26, 2018 was for $435.09 (a past-due balance of $161.98 and a current balance of $273.11; this bill contained a notice that the service would be disconnected if the bill was not paid by January 10, 2019. Id. at 4.

On March 5, 2018, Dr. T. Tyrone Champion of the Bealeton, Virginia non-profit Community Touch, Inc. addressed a contribution acknowledgment letter to Tharpe, 10287 Messick Road, Midland, VA 22728-1941. Dkt. No. 75-5. The sheriff of Fauquier County, Virginia sent a notice of grand jury service to Tharpe at 10287 Messick Road in Midland, VA, requiring him to appear for grand jury service on Monday, July 23, 2018 at 8:45 a.m. Dkt. No. 75-4. For the year 2018, the treasurer of Fauquier County, Virginia issued two real estate tax bills to Donald R. Tharpe and H. Moffette Tharpe, Jr. Dkt. No. 75-7. The bills did not reflect the address of the property on which tax was due. The bills

73

were addressed to PO Box 240, Midland, VA 22728-0240. Id. The idiCORE search showed the 10287 Messick Road address as affiliated with Tharpe from November 1, 2000 through May 30, 2019. Dkt. No. 76-1.

Perhaps Tharpe lives at River Bluffs and uses Midland for business. Perhaps Tharpe lives between the two residences. Perhaps Tharpe lives in Midland but maintains a cordial relationship with his estranged wife, keeping a car at her condo and relying on her when he is ill. Perhaps Tharpe is working the system, using various addresses for various reasons, with one possible reason being to avoid service. The Seventh Circuit has held that continued efforts to avoid service of process and frustrate the efficient administration of justice "warrant the use of default." Swaim v. Moltan Co., 73 F.3d 711, 721 (7th Cir. 1996).

The court concludes, however, that there is good cause to set aside the default. First, as Judge Easterbrook noted in Sims, the question is not whether the Tharpe defendants had good cause for failing to appear until almost a year after the complaint was filed, but whether there is good cause for the court to set aside the default. Sims, 475 F.3d at 868. While the plaintiffs insist that Tharpe lived at River Bluffs and was avoiding service, it appears that they chose to serve the Tharpe defendants *only* at the River Bluffs address. It appears they made this choice for two reasons—because, according to Lang, Tharpe had told Lang that Tharpe still lived with his estranged wife at River Bluffs but had contrived to make it look as though he didn't, and because Hendricks found records connecting Tharpe to the River Bluffs address.

74

Though Hendricks appears to have looked at some of the same databases viewed by the defendants' researcher, Gellings, he either did not find the Messick Road address or somehow concluded that it was not, in his words, "the best address to serve Mr. Tharpe." Dkt. No. 83 at ¶34. Despite Hendricks acknowledging that "Mr. Tharpe owns or owned several different real properties," the plaintiffs chose to attempt service at only one of those properties and persisted in trying to serve him at that address despite their lack of success. Although the plaintiffs attempted service by mail, they apparently did not use a form of mail (such as certified mail) which would have provided verification of receipt.

More to the point, if the court declines to vacate the default, the plaintiffs next will seek a default judgment against the Tharpe defendants. Given the allegations in paragraphs 43 and 114 of the amended complaint, the plaintiffs would seek compensatory damages upwards of five million dollars. While "[a] default judgment is a sanction for misconduct during the litigation," "[d]amages disproportionate to the wrong afford good *cause* for judicial action, even though there is no good *excuse* for the defendant's inattention to the case." Sims, 475 F.3d at 868. Even if the Tharpe defendants evaded service between August and December 2018, that evasion delayed litigation by four months or less. A judgment that could be as much as five million dollars for a four-month delay in a case involving years of interaction between the parties would be disproportionate, even if the Tharpe defendants were deliberately avoiding service.

The court also must heed the Seventh Circuit's "well established policy" favoring a trial on the merits over default judgment. C.K.S. Eng'rs, Inc. v. White Mountain Gypsum Co., 726 F.2d 1202, 1205 (7th Cir. 1984). "When a court enters a default judgment as to liability, it must accept as true all factual allegations in the complaint, except those regarding the amount of damages." Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc., 961 F.3d 942, 948 (7th Cir. June 5, 2020) (citing Fed. R. Civ. P. 8(b)(6); Quincy Bioscience, LLC v. Ellishbooks, 957 F.3d 725, 725 (7th Cir. 2020)). The plaintiffs have made serious allegations of fraudulent conduct against the Tharpe defendants. For the court to accept those allegations as true, preventing the Tharpe defendants from defending against them, as a punishment for a delay of several months would violate the Seventh Circuit's policy.

That policy preferring merits-based findings to default judgments mandates that "a default judgment should be used only in extreme situations, or when other less drastic sanctions have proven unavailing." C.K.S. Eng'rs, Inc., 726 F.2d at 1205. The defendants have appeared—according to them, only three weeks after they learned that the court had entered default. The plaintiffs have asked for only one sanction—default. They have not asked for the costs of the attempts at service, or some other, less extreme sanction. For the court even to consider entering a multi-million-dollar judgment against the defendants would constitute using the most extreme sanction when the plaintiffs have not sought less extreme measures.

76

The court will grant the Tharpe defendants' request to set aside default.

## V.    Tharpe Defendants' Motion to Dismiss for Failure to State a Claim (Dkt. No. 51)

The amended complaint is forty pages long. Dkt. No. 11. Pages 2 through 19 consist of eighty-nine paragraphs of factual allegations. As discussed above, the allegations relate to a number of factual subsets: the White Marsh real estate development facts; the Lincoln Collection facts; the "War and Peace" and "Healy" facts; facts relating to the purchase or sale of other artifacts, such as the George Washington watch or the Burnside sword; facts relating to the Sona Bank loan; facts relating to loans from the plaintiffs to the Tharpe defendants; the Icon Agreement facts; facts about Molly Mattison and the Facebook stock.

Starting at paragraph 97 on page 19, the amended complaint alleges twenty-three causes of action. Id. at 19-38. Most of those causes of action do not reference any of the facts in the preceding eighty-nine paragraphs. Instead, the plaintiffs make broad, general assertions in support of each cause of action. For the first cause of action, intentional misrepresentation (alleged against all three defendants), the amended complaint states that

> Defendants made false representations of fact to Plaintiffs regarding ownership of art work, that certain property being sold or pledged was free and clear of all liens and encumbrances, that financial conditions or representations were true and correct when they were not true and correct, as set forth herein, knowing that said representations were untrue or recklessly made without caring whether said representations were untrue. Defendants owed a duty to Plaintiffs to disclose all known material facts relating to the Hotel. Defendants made these representations with the intent to deceive and induce Plaintiffs to act upon the representations. Plaintiffs believed Defendants' representations to be true and justifiably relied upon the representations to the Plaintiffs' detriment.

77

Id. at 19-20, ¶¶98-100. The cause of action does not identify the specific representations that the plaintiffs believe were false. It does not say which of the defendants made which representations when. It does not identify the artwork about whose ownership they believe false representations were made. It claims that the defendants had a duty to disclose known material facts relating to "the Hotel"—as far as the court can make out, this is the first reference to a "hotel" anywhere in the complaint. The complaint follows the same pattern for the second cause of action (strict liability misrepresentation) and the third (negligent misrepresentation). Id. at 20-21, ¶¶103-111.

The fourth cause of action alleges conversion. Id. at 21-22, ¶¶112-116. The plaintiffs were more specific here—they provide a list of items they allege "Defendants" converted. Id. at ¶114. They do not indicate which of the defendants converted which items, however, and some items have generic descriptions such as "[o]ne battle scene in gold frame" and "[f]ramed Lincoln photograph." Id.

The fifth cause of action, civil theft under Wisconsin law, returns to the pattern of making general allegations without identifying particular property or defendants. Id. at ¶¶117-123. The sixth cause of action is a malpractice claim against Aiani, who has been dismissed as a defendant. Id. at 124-128. The seventh cause of action, breach of contract, makes general assertions that "Plaintiffs and Defendant"—singular, without identifying *which* defendant— formed contracts and agreements which the defendants breached. Id. at ¶¶129-133. The eighth cause of action, breach of fiduciary duty, consists of

nothing more than the assertions that the defendants owed the plaintiffs a fiduciary duty and that they breached that duty by "diverting" the plaintiffs' assets for the defendants' benefit. Id. at ¶¶134-137. The pattern continues with the ninth (breach of loyalty, good faith, and fair dealing), tenth (accounting), eleventh (civil conspiracy) and twelfth (civil conspiracy under Wis. Stat. §134.01) causes of action. Id. at ¶¶138-156.

The thirteenth, fourteenth, fifteenth and sixteenth causes of action allege various forms of civil RICO in violation of 18 U.S.C. §1962. Id. at ¶¶157-182. While the thirteenth cause of action asserts various "repeated" violations of certain criminal statutes, such as the mail and wire fraud statutes, the plaintiffs do not allege which defendant committed which particular action or in relation to what subset of facts. The seventeenth cause of action, violation of the Wisconsin Organized Crime Control Act, consists of a recitation of the provisions of the statute. Id. at ¶¶183-193. The eighteenth and nineteenth causes of action recite the provisions of other sections of that statute. Id. at ¶¶194-200. The twentieth cause of action is a contribution or subrogation claim that appears to relate to the transaction with Victor Xie (although it makes repeated reference to "XI;" the court assumes this is a typographical error). Id. at ¶¶201-209.

Finally, the twenty-first, twenty-second and twenty-third causes of action allege federal and state securities fraud. Id. at ¶¶210-226. While these causes of action do mention some of the factual subsets described in the first eighty-nine paragraphs—the Sona Bank loan, the Icon Collection, the White Marsh

Project—they fail to identify what particular defendants did (in some instances, stating simply that "one or more defendants" did certain things, and allege that the defendants represented ownership of certain things "without verifying title or right to sell."

The Tharpe defendants ask the court to dismiss the first, second, third, seventh, eighth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, twenty-first, twenty-second and twenty-third causes of action, mostly for failure to plead with specificity as required by Fed. R. Civ. P. 9(b). Dkt. Nos. 51, 52. Rule 9 requires that when a plaintiff alleges fraud or mistake, the plaintiff "must state with particularity the circumstances constituting fraud or mistake." The rule protects against "the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 441 (7th Cir. 2011). It "ensures that a plaintiff have some basis for his accusations of fraud before making those accusations and thus discourages people from including such accusations in complaints simply to gain leverage for settlement or for other ulterior purposes." Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 924 (7th Cir. 1992). The court agrees that the plaintiffs have not pled their fraud claims with the required particularity, because they have not identified which of the facts alleged in the preceding eighty-nine paragraphs constituted fraud or which defendants committed which acts.

The court notes that Fed. R. Civ. P. 8(b) states that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While the amended complaint provides a surplus of facts, it does not link those facts to the causes of action. Many of the causes of action are stated as "labels and conclusions," "formulaic recitation[s] of [the] cause of action" which the Supreme Court has held "will not do." Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). The purpose of Rule 8 "is to ensure that defendants and the court understand whether a valid claim is alleged and if so, what it is." Bowers v. Thurmer, No. 10-cv-63, 2010 WL 3937959, at *2 (E.D. Wis. Oct. 6, 2010) (citing Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 775 (7th Cir. 1994); Hoskins v. Poelstra, 320 F.3d 761, 764 (7th Cir. 2003)). "Under Rule 8, a plaintiff must present a complaint with 'clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search of what it is the plaintiff asserts.'" Id. (quoting Vicom, 20 F.3d at 775).

The Seventh Circuit has repeatedly held the plaintiff should be given at least one opportunity to amend before the entire case is dismissed. See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. and Nw. Ind., 786 F3d 510, 522 (7th Cir. 2015). The plaintiffs have had that one opportunity—rather than opposing defendant Aiani's first motion to dismiss (dkt. no. 6), they filed the amended complaint. But because the litigation relating to personal jurisdiction and the Tharpe defendants' request to set aside default has extended for such a long time (in great part due to the court's delay), the court

81

will give the plaintiffs a last opportunity to amend the complaint against the Tharpe defendants. The court urges the plaintiffs to keep Rules 8(a) and 9(b) in mind when drafting the amended complaint.

## VI.  Conclusion

The court **GRANTS** defendant Colasante's motion to the extent that it **FINDS** that it does not have personal jurisdiction over defendant Colasante. Dkt. No. 14.

The court **DEFERS RULING** on defendant Colasante's request to dismiss the case against him. Dkt. No. 14.

The court **ORDERS** that if Colasante wishes to respond to the plaintiff's motion to transfer venue (Dkt. No. 106), he must do so by the end of the day on **October 2, 2020**. If Colasante does not respond by the deadline, the court may rule on the motion without further hearing.

The court **GRANTS** the Tharpe defendants' motion to set aside default. Dkt. No. 47.

The court **DENIES** the Tharpe defendants' motion to dismiss for lack of personal jurisdiction. Dkt. No. 51.

The court **DENIES WITHOUT PREJUDICE** the Tharpe defendants' motion to dismiss for failure to state a claim. Dkt. No. 51

The court **ORDERS** that the plaintiffs must file an amended complaint

that complies with Fed. R. Civ. P. 8(a) and 9(b) by the end of the day on

**October 16, 2020**.

Dated in Milwaukee, Wisconsin this 14th day of September, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**