UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROBERT LANG,
and SUSANNE LANG,

                Plaintiffs,

                                    Case No. 18-cv-1077-pp

    v.

DONALD R. THARPE,
DONALD R. THARPE TRUST,
and PETER COLASANTE,

                Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO TRANSFER VENUE (DKT. NO. 106), ABSTAINING FROM RULING ON DEFENDANT COLASANTE'S MOTION TO DISMISS (DKT. NO. 117) AND GRANTING IN PART AND DENYING IN PART THARPE DEFENDANTS' MOTION TO DISMISS (DKT. NO. 119)**

## I.    Introduction

On October 16, 2020, the plaintiffs filed their second amended complaint. Dkt. No. 112. Prior to doing so, the plaintiffs had filed a motion to change venue. Dkt. No. 106. The venue motion makes clear that the plaintiffs seek a change of venue only if the court determines that it does not have personal jurisdiction over the defendants. On November 2, 2020, defendant Peter Colasante filed a motion to dismiss the second amended complaint, dkt. no. 117, and defendants Donald R. Tharpe and the Donald R. Tharpe Trust filed their motion to dismiss on November 13, 2020, dkt. no. 118.

1

## II.    Facts

Plaintiffs Robert and Susanne Lang (the Langs) are residents of Wisconsin. Dkt. No. 112 at ¶1.

Defendant Ronald R. Tharpe lives somewhere in Virginia, although exactly where has not been established. See id. at ¶2. The plaintiffs allege that Tharpe is the sole trustee of the Donald R. Tharpe Trust, which also is located somewhere in Virginia. Id. at ¶3. Defendant Colasante is the owner and operator of an art gallery in Washington, D.C. called "L'Enfant Art Gallery." Id. at ¶4. The plaintiffs allege that the Tharpe Trust is an alter ego of Tharpe and Colasante. Id. at ¶43.

Ronald J. Aiani is a former defendant. The court previously dismissed him, dkt. no. 44, but the plaintiffs still make several allegations against him in the second amended complaint, dkt. no. 112 at ¶5. He is a resident of Virginia. Id.

### A.    Robert Lang Meets Colasante

The plaintiffs allege that Robert Lang met Colasante at Colasante's gallery around August 2010. Id. at ¶7. Colasante allegedly solicited business from Lang starting in 2011, including sales by consignment, restoration and framing of art owned by Lang and requests to ship Lang's paintings from Wisconsin to Colasante's D.C. gallery. Id. at ¶8.

The plaintiffs say that sometime between August 2010 and August 2011, Lang commented on the "Dorchester Painting" Colasante was exhibiting and told Colasante that he had a collection of Lincoln art and artifacts ("the

2

Collection"). Id. at ¶13. Around August 2011, Colasante allegedly called Lang at Lang's home in Wisconsin to express interest in the Collection. Id. at ¶14.

B. <u>Restoration of the Lincoln Matthews Painting</u>

In September or October 2011, Lang's Collection was being exhibited at various locations in Wabash, Indiana. Id. at ¶15. Colasante drove to Wabash; while there, he gave Lang an estimate of between $2 and $3 million for the Collection. Id. at ¶¶15, 16. The plaintiffs allege that "Colasante convinced Lang of his many connections in the art world, his ability to quickly restore and sell paintings and art, his experience in the civil war and the names of many wealthy clients he had." Id. at ¶16.

One of the paintings Lang owned was "an extremely valuable painting of Abraham Lincoln," known as the "Lincoln Matthews painting." Id. at ¶17. The amended complaint alleges that, except for a brief period while it was being restored in Washington, D.C., the Lincoln Matthews painting always has been located in Wisconsin. Id. The plaintiffs assert that while he was in Indiana in 2011, Colasante convinced Lang that Colasante could restore the Lincoln Matthews Painting and other pieces of art in Lang's Collection, and that the restoration (given Colasante's alleged expertise) would increase the value of the collection. Id. at ¶18. The plaintiffs say that Colasante convinced Lang that "it was appropriate in the art industry for him to do restorations without documentation;" the plaintiffs maintain that Lang wasn't an expert in the art world and that he orally agreed to have Colasante restore the Lincoln Matthews painting. Id. at ¶19. The plaintiffs allege that based on Colasante's

3

representations, in November 2011, Lang had the Collection sent to the L'Enfant Gallery and Colasante worked on the restoration through the spring of 2012. Id. at ¶20. The plaintiffs allege that it was Lang's belief, based on Colasante's representations, that in February 2012 Colasante was restoring the Lincoln Matthews painting and documenting its value. Id. at ¶23.

C.    The Joining of the Collections

The plaintiffs allege that in December 2011, Colasante "proposed a scheme to Lang" where Colasante would join Lang's Collection with contributions from both Tharpe and Colasante. Id. at ¶21. This collection would then be called the "Combined Collections." Id. The plaintiffs claim that the "scheme was conceived of and communicated by Colasante," who said he'd worked with Tharpe for over twenty years, buying and selling art and artifacts. Id. The plaintiffs allege that based on these representations, Lang committed $300,000 to the Combined Collections based only on "oral representations and promises of future millions of profits [from] the Combined Collections." Id. at ¶22.

D.    Robert Lang Meets Tharpe

In February 2012, Lang met Tharpe at the L'Enfant Gallery; Colasante introduced the two and was present at the meeting. Id. at ¶24. The plaintiffs believed that Tharpe was one of Colasante's clients and that Tharp and Colasante owned art and artifacts together. Id. at ¶25. During the meeting, Colasante "represented to Lang" that Tharpe was "a wealthy real estate

4

developer from Warrenton, Virginia who was a collector or purchaser of Revolutionary and Civil War artifacts and artwork." Id. at ¶26.

The plaintiffs say that during this meeting, Tharpe "took Lang aside and told him about a real estate development in Warrenton, Virginia," identified as the White Marsh Project. Id. at ¶27. The White Marsh property was composed of two parcels—ninety-four acres owned by Tharpe and three acres, called the "Shaw Property," that provided ingress and egress to the project. Id. at ¶28. The plaintiffs believe that Tharpe lived in a home that adjoined the property, and they say that Tharpe told Lang that the land was available for development and that Tharpe had been working for a few years to obtain zoning. Id. at ¶27. Tharpe also told Lang that Tharpe was in debt to "Gibralter, LLC," and that the debt was secured by "the 94 acres supposedly owned by Tharpe." Id. The plaintiffs say that Tharpe had "deals" with a national real estate investment firm called the Toll Brothers to develop the White Marsh project. Id. According to the Langs, during this February 2012 meeting at the L'Enfant Gallery, Tharpe invited Lang to join the White Marsh development venture. Id.

E.   Art Purchases and the Shaw Property

The plaintiffs say that around April 12, 2012, Tharpe solicited Lang to pay $3,300,000 to Gibralter, LLC and the Toll brothers on behalf of Tharpe for both parcels of land comprising the White Marsh project. Id. at ¶29. The money

was supposed to be Lang's capital contribution to "Lang and Tharpe LLC;"[1] Tharpe's contribution was to be the land. Id. The plaintiffs allege that Tharpe agreed, on behalf of Lang and Tharpe, LLC, to "assume 50% of any outstanding liabilities of the Toll Brothers on White Marsh." Id. The plaintiffs assert that "after more than a year of negotiation with Gibralter and the Toll Brothers," Lang secured a commitment from Alliance Capital Corporation to procure $3,000,000, and that Lang paid Alliance a fee for that commitment. Id. at ¶30. The plaintiffs contend that at that time, Tharpe had not disclosed to Lang his other business dealings with Gibralter or the Toll Brothers, or his debt obligations to Sona Bank "in which many of the artwork and artifacts supposedly being sold to Lang were pledged as collateral for the Sona Bank loan(s)." Id. at ¶¶31, 35. The plaintiffs allege that Colasante was an obligor or guarantor on Tharpe's loans to Sona Bank. Id. at ¶31.

Around March or April of 2012, "Tharpe convinced" the Langs to purchase, at "full retail," the "War & Peace" painting and the "Healy" painting. Id. at ¶¶42, 47. The plaintiffs allege that Tharpe and Colasante represented to them in writing that the "War & Peace" painting was being transferred "free and clear of all liens and encumbrances." Id. at ¶44. Around the same time, the Langs purchased "from Tharpe and Colasante the General Grant Epaulettes and the McClellan Sword, which Tharpe and Colasante also represented was

---

[1] The timeline is a bit unclear; it appears the plaintiffs allege that Lang and Tharpe, LLC was not formed until April 27, 2012—about two weeks after Tharpe's alleged solicitation of the funds. Dkt. No. 112 at ¶34.

6

being transferred to the Langs free and clear of all liens and encumbrances."
Id. at ¶48. The plaintiffs say they paid Tharpe and Colasante $800,000—a
$200,000 transfer on March 15, 2012 and a $600,000 check on April 13,
2012.[2] Id. at ¶43. The plaintiffs assert that a portion of this $800,000 was for
the "War & Peace" painting, id. at ¶44, and a portion was for the General Grant
Epaulettes and the McClellan Sword, id. at ¶48. They allege that Tharpe
represented that he was going to use yet another part of the $800,000 to
purchase the "Shaw Property." Id. at ¶45.

The plaintiffs assert, however, that Lang never purchased the Shaw
Property. Id. at ¶46. They allege that contrary to assurances that the War &
Peace painting, the General Grant Epaulettes and the McClellan Sword were
being sold to them free and clear, Tharp and Colasante previously had pledged
all three items as collateral for Tharpe and Colasante's $750,000 debt to Sona
Bank. Id. at ¶49. The plaintiffs assert that they were not aware of Sona Bank's
security interest until June 17, 2015. Id. at ¶52. The plaintiffs also allege that
Colasante sold them various artifacts, including "the Windsor Sword," but that
Colasante—despite his representations to the contrary—did not own these
artifacts. Id. at ¶51.

The plaintiffs also allege, generally, that they have "advanced directly to
or for the benefit of Tharpe, Colasante or Aiani" or "paid . . . on behalf of

---

[2] The second amended complaint does not make clear to whom the $200,000 was paid, but it does say the $600,000 check was paid to Tharpe. Dkt. No. 112 at ¶43.

7

Tharpe, Colasante or Aiani to cover various payments due to creditors" a total of $2,625,687. Id. at ¶¶55-58. The plaintiffs allegedly made these payments "to the Defendants with the understanding that [the plaintiffs] would receive an ownership interest in White Marsh, historical artifacts, artwork, or some ownership interests in said assets." Id. at ¶58. The plaintiffs claim that they made additional payments totaling $1,531,996 to "Colasante and affiliates for the acquisition of the Dorchester Painting and other restoration or acquisitions." Id. at ¶59.

At some point, Tharpe allegedly represented that he used $600,000 "of the $800,000 received from the Langs as payment to the Toll Brothers on their alleged loan to Tharpe, in order to reinstate the purchase of the Shaw Property by White Marsh." Id. at ¶80. The plaintiffs continued to fund Tharpe or the Tharpe trust from 2012 through 2014. Id. at ¶81. In September of 2014, they asked attorney and former defendant Aiani to provide documentation regarding their partnership with Tharpe, which he failed to do; the plaintiffs assert that their requests for documentation were "alleviated by Aiani's assertions that an entity was created, and tax returns filed." Id. at ¶82. But Lang asserts that he has not been provided any financial records or financial statements despite "repeated requests for an accounting and verification of financial records." Id.

F.   The Icon Agreement and the Washington Lafayette Watch

The plaintiffs say that in October 2012, Tharpe told Lang that Tharpe needed additional cash for the White Marsh project. Id. at ¶86. They assert that around October 31, 2012, Tharpe told Lang that Tharpe owned a pocket watch

8

that supposedly had belonged to George Washington—the "Washington Lafayette Watch"—worth up to $5,000,000. Id. at ¶83. Lang asked for verification that Tharpe was the owner of the watch; the plaintiffs say that both Aiani and Tharpe "assured" Lang that Tharpe had title to the watch. Id. at ¶84.

The plaintiffs allege that in November 2012, in order to obtain the additional cash he needed for the White Marsh project, Tharpe "convinced Lang" to enter into an agreement regarding the "Icon Collection;" the parties to the agreement would include Tharpe, the Langs and the Langs' daughters, Molly Mattison and Katie DeGroft. Id. at ¶87. On November 7, 2012, these parties entered into an agreement in which the "Langs were to contribute a painting known as the 'Dorchester' painting valued at $800,000." Id. at ¶89. While the amended complaint doesn't explain any of this, the agreement itself reflects that the purpose of the agreement was to "organize, promote and sell for value the Lincoln Washington Icon Collection during the next three-six years." Dkt. No. 112-10. The agreement indicates that Robert Lang would contribute the Lincoln Matthews portrait valued at $1,675,000 and the Dorchester painting valued at $800,000, and that Tharpe would contribute the Washington Lafayette watch, valued at $3,125,000. Id.

The plaintiffs say that "Tharpe always represented to Langs that the Washington Lafayette watch [w]as more valuable than the Lincoln Matthews and the Dorchester paintings." Dkt. No. 112 at ¶90. They assert that Tharpe "used the discrepancy between these valuations to sell 'fractional interests' of the Watch to the Lang Family in the amount of $324,000," and that Tharpe

9

"solicited and accepted over $324,000 from the Lang Family to fund promotion of the Icon Collection." Id. The plaintiffs believe, however, that Tharpe "never possessed, controlled or owned the Washington Lafayette Watch, at any of the relevant times, or if he did he failed to provide[] evidence of title to the watch." Id. at ¶85. They say that "[c]ontrary to the representations of Tharpe, Aiani and Colasante," the Lang family received no assets or financial return on their investment into the Icon Collection. Id. at ¶91. They assert that Tharpe converted the $324,000 fractional interests he received from various Lang family members, and the Dorchester painting, to his own use. Id. at ¶92. The Langs still have title to and possession of the Lincoln Matthews painting. Id. at ¶93.

G.    <u>The Victor Xie Transaction</u>

The amended complaint says that "[n]either Lang nor Tharpe were able to successfully raise enough funds to acquire the White Marsh project and the Shaw Property from Gibralter, LLC or the Toll Brothers." Id. at ¶94. But in December 2013, the Toll Brothers gave Lang and Tharpe an extension to raise the money "in exchange for a cash payment of $150,000." Id. at ¶95. Around that time, Lang met a Chinese investor named Victor Xie, who agreed to lend Lang $312,000. Id. at ¶96. The amended complaint indicates that by this point, Lang had no "further liquid funds," and that he had a $715,000 first mortgage on a home he owned in Washington, D.C. and he agreed to place a second mortgage on the home as collateral for the loan with Xie. Id. at ¶97.

The amended complaint asserts that "[a]llegedly, pursuant to representations made by Tharpe and Aiani, Lang and Tharpe were co-owners (50/50) [of] the 'Burnside Sword,'"[3] which allegedly was purchased at auction for $180,000. Id. at ¶98. The amended complaint alleges that $150,000 of the purchase price of the sword came from the Langs. Id. It also asserts that Tharpe "had certain historic pistols, supposedly owned by King George, that were allegedly worth $1,500,000;" the plaintiffs assert that Colasante valued the pistols at Tharpe's request. Id. at ¶99.

As collateral for his loan of $312,000 to Lang, Victor Xie accepted the Burnside Sword, the King George pistols and the second mortgage on the Langs' home in Washington, D.C. Id. at ¶100. Aiani prepared the security agreement and the deed of trust on the Langs' D.C. home "to facilitate the transaction being proposed for the benefit of the joint business venture between the Langs and Tharpe." Id. The plaintiffs believe that Xie did not want to do business with Tharpe, so Aiani prepared paperwork to transfer title of the King George pistols to Lang "in exchange for another $750,000 note." Id. at ¶101.

In July 2014, Lang retained a Wisconsin law firm, DeWitt, Ross & Stevens, S.C.—now known as DeWitt, LLP—to represent him "in negotiating a resolution to the Victor Xie loan." Id. at ¶104. The plaintiffs assert that "[l]ater in 2014, with the assistance of the DeWitt Ross & Stevens firm, [Susanne] Lang

---

[3] The amended complaint sheds no light on what the "Burnside Sword" was.

paid $224,000 to Victor Xie and obtained a release of the second mortgage on their Washington, D.C. home." <u>Id.</u> at ¶105. The plaintiffs assert that Aiani told Lang that "Tharpe [was] responsible for 50% of any payments to Victor Xie." <u>Id.</u> at ¶106.

> H.     <u>Events in 2015</u>

The plaintiffs claim that sometime in 2015, Colasante visited Lang at Lang's office in Delafield, Wisconsin. <u>Id.</u> at ¶9. They claim that during this visit, Robert and Susanne Lang, Lang's administrative assistant and Colasante went to dinner and "Colasante toured Lang's gallery warehouse in Delafield, Wisconsin, where Lang maintained some of his art[], artifacts and antique collections." <u>Id.</u> at ¶10. They claim that during this visit, Lang and Colasante "discussed their business relationship, future business dealings, and Lang's ongoing investment in various agreements and arrangements with Colasante, among other topics." <u>Id.</u> at ¶11. The amended complaint says that during the visit, "Colasante encouraged Lang and [Susanne] Lang to invest additional money in art and artifact collections, some of which included combining collections with Tharpe and others." <u>Id.</u> at ¶12.

The plaintiffs claim that it was not until around July 17, 2015, "during a phone call with Maureen Taylor from Colasante's office," that Lang learned "for the first time, that Sona Bank had a security interest (lien) on the War & Peace Painting purchased from Tharpe in April of 2012." <u>Id.</u> at ¶102. They assert that during this same conversation, Taylor told Lang that Sona Bank also had a lien

on the Grant epaulettes and the McClellan sword, "with Colasante as trustee to retain and hold as collateral." Id. at ¶103.

## III.    Procedural History

The plaintiffs filed their complaint on July 13, 2018. Dkt. No. 1. Less than two months later, then-defendant Aiani filed a motion to dismiss for failure to state a claim and for lack of personal jurisdiction. Dkt. No. 6. About three weeks after that, the plaintiffs filed an amended complaint, which rendered moot Aiani's motion to dismiss. Dkt. No. 11.

On October 3, 2018, Colasante—representing himself—filed a motion to dismiss the original and the amended complaints under Fed. R. Civ. P. 12(b)(2) and 12(b)(6). Dkt. No. 14. On November 27, 2018, the parties stipulated to dismissal of Ronald Aiani as a defendant; the stipulation specified that the dismissal was to be with prejudice. Dkt. No. 38. The court approved the stipulation and Aiani was dismissed with prejudice on December 12, 2018. Dkt. No. 44.

In December 2018, the plaintiffs sought entry of default against Tharpe and the Tharpe trust. Dkt. No. 41. The clerk of court entered default on December 21, 2018. The Tharpe defendants appeared and moved to set aside the default, arguing they had not been properly served. Dkt. No. 47. They also filed a motion to dismiss the amended complaint on the grounds of lack of personal jurisdiction and failure to state a claim upon which relief could be granted. Dkt. No. 51.

The court held a status conference on August 3, 2020, dkt. no. 99, and on August 25, 2020, signed an order regarding next steps, dkt. no. 105. Less than a week later, the plaintiffs filed a motion to change venue in the event that the court found that it lacked personal jurisdiction over the defendants. Dkt. No. 106. On September 14, 2020, the court issued its order resolving the outstanding motions. Dkt. No. 107. The court found that it did not have personal jurisdiction over Colasante but deferred ruling on whether to dismiss him as a defendant rather than transfer the case against him to an appropriate district. Id. at 82. As to the Tharpe defendants, the court granted their motion to set aside the default and denied without prejudice their motion to dismiss for lack of personal jurisdiction and failure to state a claim. Id. The court ordered the plaintiffs to file a second amended complaint by October 16, 2020. Id. at 82-83.

The plaintiffs filed their second amended complaint on October 16, 2020. Dkt. No. 112. On November 13, 2020, Colasante filed another motion to dismiss for failure to state a claim, lack of personal jurisdiction and insufficient service of process. Dkt. No. 117. That same day, the Tharpe defendants filed a motion to dismiss for failure to state a claim. Dkt. No. 118. The motions have been fully briefed since December 2020. The delay in ruling on those motions is solely the responsibility of the undersigned.

## IV. Plaintiffs' Motion to Transfer Venue (Dkt. No. 106)

The plaintiffs' motion to transfer venue asked that if the court determines that it does not have personal jurisdiction over the defendants, it transfer the

14

case to either Virginia, the District of Columbia or both. Dkt. Nos. 106, 106-1 at 1. Two weeks after the plaintiffs filed the motion, the court issued its order determining that it had personal jurisdiction over the Tharpe defendants but that it did not have personal jurisdiction over Colasante. Dkt. No. 107 at 82. At this point, the plaintiffs' motion to transfer venue pertains only to Colasante.[4] The court will grant in part and deny in part the plaintiffs' motion. The court will grant the motion as to Colasante and deny the motion as to the Tharpe defendants.

The plaintiffs ask the court to transfer the case against Colasante to the District of Columbia under 28 U.S.C. §§1404(a), 1406(a) or 1631. Dkt. No. 106-1 at 1, 4. Section 1404(a) permits a court to transfer venue for the convenience of the parties and witnesses. Section 1406(a), titled "Cure or waiver of defects," permits a court to transfer of venue when a case was filed in the wrong division or district. Section 1631 is titled "Transfer to cure want of jurisdiction." The court will discuss only §1631 because the plaintiffs ask the court to consider a change of venue because the court has concluded that it does not have personal jurisdiction over Colasante.

Under 28 U.S.C. §1631, if a court concludes that there is "a want of jurisdiction," the court "shall, if it is in the interest of justice, transfer" the case to a district where it could have been brought at the time it was filed. The

---

[4] The plaintiffs indicate in their reply brief that because the court has decided that it has personal jurisdiction over the Tharpe defendants, they seek to transfer the case only as to Colasante. See dkt. no. 111 at 2.

15

plaintiffs argue that a transfer would be in the interests of justice because their "claims are nonfrivolous and should be decided on the merits." Dkt. No. 106-1 at 4. The plaintiffs assert that there is no dispute that either the District of Columbia or "the Virginia court" could exercise jurisdiction. Id. In his opposition brief, Colasante appears to corroborate this, stating that if the court decides to transfer venue rather than dismiss, it should transfer the case "to the District of Columbia where it could have been originally brought," because he lives in an apartment above his shop on Wisconsin Avenue in Georgetown and maintains a business there. Dkt. No. 110 at 2. Finally, the plaintiffs urge the court to transfer rather than dismiss the case because the operative facts behind the complaint date back as far as 2012 and dismissal may bar the plaintiffs' claims against Colasante due to the statute of limitations. Dkt. No. 106-1 at 4.

Colasante opposes the motion to transfer venue, insisting that the court should dismiss him entirely. Dkt. No. 110 at 1-2. He asserts that the plaintiffs sued in Wisconsin "solely for their convenience and to gain advantage by imposing hardship and expense on the part of the Defendants," and he says that if the court transfers the case to another court, the plaintiffs "can continue to pound defendant with expense and business pressure for years more to come." Id. at 1. He also asserts that the plaintiffs could have asked for a transfer of venue in 2018 when the defendants first raised questions of personal jurisdiction. Id. at 2. Colasante asks for the case to be dismissed rather than transferred; if the court declines to dismiss, he asks the court to

transfer the case to the District of Columbia where he resides and maintains his principal place of business. Id. The remainder of his opposition brief discusses 28 U.S.C. §1404(a), see id. at 2-4, which does not apply under these circumstances.

The court concludes that it is in the interests of justice to transfer the case as to Colasante to the District of Columbia. Colasante's arguments in support of dismissal do not address the merits of the plaintiffs' claims against him. Perhaps those claims have no merit, but the plaintiffs should have the opportunity for a court to make that determination. This court has concluded that it cannot do so because it does not have personal jurisdiction over Colasante. If this court were to dismiss the case as to Colasante, the statute of limitations could bar some or all of the plaintiffs' claims. The fact that the case has been pending for almost four years is, in part, due to the court's delays, not to delay by the plaintiffs.

As for Colasante's concerns about the cost of the litigation, he does not describe the costs. Colasante is representing himself and, to date, has not filed many or extensive pleadings. Litigation can be costly wherever it takes place. If the transferee court concludes that the plaintiffs' claims against Colasante are frivolous, he may have remedies available. But the prejudice to the plaintiffs if this court dismissed their claims and those claims ended up being time-barred is much greater than if the court transfers the case and the claims are tested under Colasante's motion to dismiss. The court will grant the plaintiffs' motion to transfer the case as to Colasante to the District of Columbia.

**V.     Defendant Colasante's Motion to Dismiss (Dkt. No. 117)**

Because the court is granting the plaintiffs' motion and transferring the case against Colasante to the District of Columbia, the court will abstain from ruling on Colasante's motion to dismiss the second amended complaint. The transferee court will decide the motion.

**VI.     Tharpe Defendants' Motion to Dismiss (Dkt. No. 118)**

The Tharpe defendants ask the court to dismiss the second amended complaint under Fed. R. Civ. P. 12(b)(6), 8(a) and 9(b). Dkt. No. 118.

The second amended complaint alleges twenty-two claims against the defendants:

- First Cause of Action: Misrepresentation (multiple alleged misrepresentations regarding art and artifacts);

- Second Cause of Action: Strict Liability Misrepresentation (multiple misrepresentations regarding art and artifacts);

- Third Cause of Action: Negligent Misrepresentation (multiple misrepresentations regarding art and artifacts);

- Fourth Cause of Action: Conversion (enumerated items);

- Fifth Cause of Action: Civil Theft in Violation of Wisconsin Statutes §§895.446 and 943.20 (enumerated items);

- Sixth Cause of Action: Breach of Contract (various agreements);

- Seventh Cause of Action: Breach of Fiduciary Duty (diversion of assets);

- Eighth Cause of Action: Breach of Loyalty, Good Faith, and Fair Dealing (diversion of assets);

- Ninth Cause of Action: Accounting;

- Tenth Cause of Action: Civil Conspiracy;

18

- Eleventh Cause of Action: Civil Conspiracy Pursuant to Wis. Stat. ¶134.01 (conspiracy to injure business);

- Twelfth Cause of Action: Acquisition and Continuance of an Interest in and Control of an Enterprise in a Pattern of Racketeering Activity Pursuant to 18 U.S.C. §1962(a) (mail fraud, wire fraud and unlawful monetary transactions);

- Thirteenth Cause of Action: Acquisition and Continuance of an Interest in and Control of an Enterprise in a Pattern of Racketeering Activity Pursuant to 18 U.S.C. §1962(b);

- Fourteenth Cause of Action: Acquisition and Continuance of an Interest in and Control of an Enterprise in a Pattern of Racketeering Activity Pursuant to 18 U.S.C. §1962(c);

- Fifteenth Cause of Action: Conspiracy to violate 18 U.S.C. §1962(d);

- Sixteenth Cause of Action: Violation of Wis. Stat. §946.83(3) Wisconsin Organized Crime Control Act (WOCCA);

- Seventeenth Cause of Action: Violation of Wis. Stat. §946.83(2) Wisconsin Organized crime Control Act (WOCCA);

- Eighteenth Cause of Action: Violation of Wis. Stat. §946.83(1) Wisconsin Organized Crime Control Act (WOCCA);

- Nineteenth Cause of Action: Contribution or Subrogation;

- Twentieth Cause of Action: Section 10 of the Securities Act of 1934 (The "34 Act" or Exchange Act");

- Twenty-First Cause of Action: Section 20(a) of the 34 Act;

- Twenty-Second Cause of Action: Wisconsin Uniform Securities Law §§551.

Dkt. No. 112 at ¶¶107-235.

A.    Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); Hosea v. Slaughter, 669 F. App'x 791, 792 (7th Cir. 2016) (citing Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990)). When evaluating a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiffs' favor. AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In this context, "plausible," as opposed to "merely conceivable or speculative," means that the plaintiffs must include "enough details about the subject-matter of the case to present a story that holds together." Carlson v. CSX Transp., Inc., 758 F.3d 819, 826-27 (7th Cir. 2014) (quoting Swanson v. Citibank, N.A., 614 F.3d 400, 404-05 (7th Cir. 2010)). "[T]he proper question to ask is still could these things have happened, not did they happen." Id. at 827 (internal quotation and citation omitted). The plaintiffs "need not 'show' anything to survive a motion under Rule 12(b)(6)—[they] need only allege." Brown v. Budz, 398 F.3d 904, 914 (7th Cir. 2005).

20

As the court noted in its September 14, 2020 order, Fed. R. Civ. P. 8(b) states that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of Rule 8 "is to ensure that defendants and the court understand whether a valid claim is alleged and if so, what it is." Bowers v. Thurmer, No. 10-cv-63, 2010 WL 3937959, at *2 (E.D. Wis. Oct. 6, 2010) (citing Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 775 (7th Cir. 1994); Hoskins v. Poelstra, 320 F.3d 761, 764 (7th Cir. 2003)). "Under Rule 8, a plaintiff must present a complaint with 'clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search of what it is the plaintiff asserts.'" Id. (quoting Vicom, 20 F.3d at 775).

Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading on fraud allegations. U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc., 772 F.3d 1102, 1105-06 (7th Cir. 2014). This requirement "includes pleading facts that make the allegation of fraud plausible." Id. at 1106 (citing Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Fin. Servs., Inc., 536 F.3d 663, 668-69 (7th Cir. 2008)). When a plaintiff alleges fraud or mistake, the plaintiff "must state with particularity the circumstances constituting fraud or mistake." The "complaint must state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." Id. (citing Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992)); see also Midwest Grinding Co. v.

21

Spitz, 976 F.2d 1016, 1020 (7th Cir. 1991) ("the complaint must, at a minimum, describe the predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetrating the fraud.'"). The rule protects against "the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 441 (7th Cir. 2011). It "ensures that a plaintiff have some basis for his accusations of fraud before making those accusations and thus discourages people from including such accusations in complaints simply to gain leverage for settlement or for other ulterior purposes." Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 924 (7th Cir. 1992).

### B. Fraud Claims Subject to Rule 9(b)

#### 1. *Misrepresentation Claims (First and Second Causes of Action)*

The plaintiffs have alleged three counts of misrepresentation: (1) intentional misrepresentation, (2) strict liability misrepresentation and (3) negligent misrepresentation. Dkt. No. 112 at ¶¶107-122. Intentional misrepresentation and strict liability misrepresentation claims are subject to the heightened pleading requirements of Rule 9(b). See Vicom, 20 F.3d at 777. The same is not true of negligent misrepresentation claims, which must satisfy only the requirements of Rule 8(a). Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 833 (7th Cir. 2007); Imagineering

22

Int'l Inc. v. Microsoft Corp., No. 09-C-0063, 2009 WL 10676431, *6 (E.D. Wis. Aug. 11, 2009).

For the most part, the plaintiffs have alleged the same conduct for all three misrepresentation claims. The plaintiffs allege:

> Defendants made false representations of fact to Plaintiffs regarding ownership of art work, that certain property being sold or pledged was free and clear of all liens and encumbrances, that financial conditions or representations were true and correct when they were not true or correct, as set forth herein, knowing that said representations were untrue or recklessly made without caring whether said representations were untrue. Specifically, the Defendants made false representations related to selling art and artifacts without clear title; selling art and artifacts that had been previously pledged as collateral elsewhere; inducing the Langs to pay for art and artifacts that were then never delivered; that $600,000 of the Langs money would be used to pay for the Shaw Property, when the $600,000 was not used for that purpose; and as further alleged in Paragraphs 16, 18-19, 21, 23, 26, 29, 31, 35, 44, 45, 48, 49, 51, 80, 81, 83, 85, 86, 90, and 98 of this Second Amended Complaint, and any other representations contained in this Second Amended Complaint.

Dkt. No. 112 at ¶¶108, 114, 119. Several of the enumerated paragraphs make allegations against Colasante rather than the Tharpe defendants. Others relate to allegations that do not include representations. The paragraphs making allegations against the Tharpe defendants include:

- 31.    On or about April 12, 2012, Tharpe did not disclose to Lang that as of April 2012, Tharpe also had debt obligations to Sona Bank, in which many of the artwork and artifacts supposedly being sold to Lang were pledged as collateral for the Sona Bank loan(s), among other material facts that were withheld or misrepresented to Lang. . . .

- 35:    Tharpe failed to disclose at that [sic] time Lang and Tharpe formed the LLC the full extent of his debt on the property involved or his other business dealings with Gibralter, LLC or the Toll Brothers.

23

- 44: A portion of the $800,000 payment was made to acquire the "War & Peace" painting, which Tharpe and Colasante represented, in writing, was being transferred to the Langs free and clear of all liens and encumbrances.

- 45: Tharpe represented to the Langs that some of the $800,000 payments set forth in the previous Paragraphs were to be used by Tharpe to purchase the three-acre parcel in White Marsh, known as the "Shaw Property"

- 48: At or about the same time that the Langs purchased the War & Peace painting, the Langs also used a portion of the initial $800,000 payment to purchase from Tharpe and Colasante the General Grant Epaulettes and the McClellan Sword, which Tharpe and Colasante also represented was being transferred to the Langs free and clear of all liens and encumbrances.

- 49: However, at the time that Tharpe and Colasante sold the War & Peace painting, the General Grant Epaulettes and the McClellan Sword to the Langs, Tharpe and Colasante were both borrowers on a $750,000 promissory note to Sona Bank. As collateral for the loan secured by the $750,000 promissory note, Tharpe and Colasante pledged, among other items, the War & Peace painting, the General Grant Epaulettes, and the McClellan Sword, in addition to other items that supposedly were being sold to Langs or included as part of transactions with the Langs

- 80: The LLC was allegedly a 50/50 business enterprise between Lang and Tharpe. Tharpe represented that he used $600,00 of the $800,000 received from the Langs as payment to the Toll Brothers on their alleged loan to Tharpe, in order to reinstate the purchase of the Shaw Property by White Marsh.

- 83: On or about October 31, 2012, Tharpe represented to Lang that Tharpe owns a very valuable watch called the "Washington Lafayette Watch." Supposedly, this was the pocket watch of George Washington, and worth up to $5,000,000.

- 85: Upon information and belief, Tharpe never possessed, controlled or owned the Washington Lafayette Watch, at any of the relevant times, or if he did he failed to provide[] evidence of title to the watch.

24

- 86: In October 2012, Tharpe represented to Lang he needed additional cash, for White Marsh.

- 90: Tharpe always represented to Langs that the Washington Lafayette Watch as [sic] more valuable than the Lincoln Matthews and the Dorchester paintings. Tharpe used the discrepancy between these valuations to sell "fractional interests" of the Watch to the Lang Family in the amount of $324,000. Tharpe solicited and accepted over $324,000 from the Lang Family to fund promotion of the Icon Collection.

- 98: Allegedly, pursuant to representations made by Tharpe and Aiani, Lang and Tharpe were co-owners (50/50) [sic] the "Burnside Sword" The "Burnside Sword" was purchased at auction for $180,000. Of the purchase price, $150,000 came from the Langs.

Dkt. No. 112 at ¶¶31, 35, 44, 45, 48, 49, 80, 83, 85, 86, 90, 98.

Intentional misrepresentation claims require that

"1) the defendant must have made a representation of fact to the plaintiff; 2) the representation of fact must be false; . . . 3) the plaintiff must have believed and relied on the misrepresentation to his detriment or damage. . . . 4) the defendant must have made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false; and 5) the defendant must have made the misrepresentation with intent to deceive and to induce the plaintiff to act on it to his detriment or damage."

Weaver v. Champion Petfoods USA, Inc., 3 F.4th 927, 939 (7th Cir. 2021)

(quoting Tietsworth v. Harley-Davidson, Inc., 270 Wis. 2d 146, 157 (Wis.

2004)).

As to strict liability misrepresentation, "[a] plaintiff asserting a claim of

strict liability misrepresentation is only required to show that the defendant: (1)

made the [mis]representation on the defendant's personal knowledge or under

circumstances in which he necessarily ought to have known the truth or

untruth of the statement; and (2) had an economic interest in the transaction

25

from which he expects to gain some economic benefit." <u>Van Lare v. Vogt, Inc.</u>, 274 Wis. 2d 631, 647 (Wis. 2004). Both allegations must be stated with particularity.

The second amended complaint leaves out necessary details. Under Rule 9(b), the plaintiffs must articulate the circumstances constituting the fraud, including, "the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." <u>Grenadyor</u>, 772 F.3d at 1106.

The first alleged representation concerns the War & Peace painting acquired with part of the $800,000 payment. Dkt. No. 112 at ¶42-44. The plaintiffs say the defendants represented that the War & Peace painting, the General Grant Epaulettes and the McClellan Sword were being transferred to the plaintiffs free and clear of all liens and encumbrances. <u>Id.</u> at ¶¶44, 48. According to the plaintiffs, this was false; they allege that Tharpe and Colasante already were borrowers on a $750,000 promissory note with Sona Bank secured by all three items. <u>Id.</u> at ¶49. With respect to the War & Peace painting, the plaintiffs have pled who made the representation (Tharpe), how it was made (in writing), when it was made (March or April 2012) and what was represented (that the War & Peace painting being transferred free and clear of all liens and encumbrances). Dkt. No. 112 at ¶44. The allegation lacks the required detail of "where" Tharpe made this representation. It also lacks any useful detail on how the representation was made, beyond being "in writing."

26

The plaintiffs do not indicate whether there was a sales agreement or anything else specifically detailing the nature of this transaction. The vagueness of the plaintiffs' allegations does not satisfy the heightened pleading requirements of Rule 9(b).

The next alleged representation pertains to the payments made on the Shaw Property. The plaintiffs allege that Tharpe represented that some of the $800,000 the plaintiffs paid for the War & Peace painting would be used to pay for the Shaw Property but that the defendants never purchased the Shaw property. Id. at ¶¶45-46. The plaintiffs also allege that "Tharpe represented that he used $600,000 of the $800,000 received from the Langs as payment to the Toll Brothers on their alleged loan to Tharpe, in order to reinstate the purchase of the Shaw Property by White Marsh." Id. at ¶80. These allegations provide the who and what, but do not explain when the representation was made, where it was made or how it was made. The court could speculate that these representations were made when the plaintiffs and the defendants formed the LLC in April 2012, but that is all it would be—speculation. The second amended complaint does not include any other allegations of representations made by the Tharpe defendants pertaining to the Shaw Property; they do not meet Rule 9(b)'s heightened pleading requirements.

The next alleged representation is that around the same time representations were made regarding the War & Peace Painting, Tharpe represented that the General Grant Epaulettes and the McClellan Sword were being transferred free and clear of all liens and encumbrances. Id. at ¶48.

27

While the plaintiffs assert that this representation was not true, Id. at ¶49, they provide no other information about the nature of this representation. The pleadings provide the who, what and when, but not the how or where. This allegation does not meet the Rule 9(b) heightened standard.

Next, the plaintiffs pled that "Tharp represented to Lang that Tharpe owns a very valuable watch called the 'Washington Lafayette Watch.'"[5] Id. at ¶83. The plaintiffs assert that after Lang requested documentation to verify ownership, Tharpe offered assurances that he had title to the watch. Id. at ¶84. Again, the plaintiffs allege that these representations were false. Id. at ¶85. This allegation omits the where, when and how and does not meet Rule 9(b)'s heightened standard.

The plaintiffs pled that "Tharpe always represented to Langs that the Washington Lafayette Watch as [sic] more valuable than the Lincoln Matthews and the Dorchester paintings." Id. at ¶90. This appears to be a separate representation than the representation that Tharpe owned the watch; it, too, omits where and how. It only vaguely alleges when the representations were made; the plaintiffs merely state that Tharpe "always" made the representation. Id. This allegation does not meet the Rule 9(b) standard.

---

[5] This paragraph of the second amended complaint also states: "Supposedly, this was the pocket watch of George Washington, and worth up to $5,000,000." Dkt. No. 112 at ¶83. The second amended complaint does not state where this information came from; the court will presume that it was not based on representations by Tharpe.

The plaintiffs pled that "[i]n October 2012, Tharpe represented to Lang he needed additional cash, for White Marsh." Id. at ¶86. The plaintiffs do not explain where or how this representation was made or provide other details about it. The allegation does not meet the Rule 9(b) standard.

The plaintiffs pled that "[a]llegedly, pursuant to representations made by Tharpe and Aiani, Lange and Tharpe were co-owners (50/50) the [sic] 'Burnside Sword.'" Id. at ¶98; see id. at ¶71(e). The second amended complaint makes no other mention of the Burnside Sword. The allegation does not explain when, how or where the representation was made. The plaintiffs plead only that this representation "allegedly" occurred, rather than alleging that it did, in fact, occur. U.S. ex rel. Bogina v. Medline Indus. Inc., 809 F.3d 365, 370 (7th Cir. 2016) (stating that "[a]llegations based on 'information and belief' thus won't do in a fraud case—for 'on information and belief' can mean as little as 'rumor has it that....'"). This allegation does not meet the heightened pleading standard.

The plaintiffs also allege two omissions of fact by Tharpe. Failing to disclose a fact is not an intentional misrepresentation unless there is a duty to disclose. Tietsworth, 270 Wis. 2d at 156. A duty to disclose arises "'where the seller has told a half-truth or has made an ambiguous statement if the seller's intent is to create a false impression and he does so.'" Weaver, 3 F.4th at 939 (quoting Ollerman v. O'Rourke Co., Inc., 94 Wis. 2d 17, 31 (Wis. 1980)). In that case, the failure itself is a misrepresentation. Id. (quoting Hennig v. Ahearn, 230 Wis. 2d 149 (Wis. Ct. App. 1999)).

First, the plaintiffs pled that

> [o]n or about April 12, 2012, Tharpe did not disclose to Lang that as of April 2012, Tharpe also had debt obligations to Sona Bank, in which many of the artwork and artifacts supposedly being sold to Lang were pledged as collateral for the Sona Bank loan(s), among other material facts which were withheld or misrepresented to Lang.

Dkt. No. 112 at ¶31. Second, the plaintiffs pled that "Tharpe failed to disclose at that [sic] time Lang and Tharpe formed the LLC the full extent of his debt on the property involved or his other business dealings with Gibralter, LLC or the Toll Brothers." Id. at ¶35. As to the duty requiring Tharpe to disclose these facts, the plaintiffs allege that "Defendants owed a duty to Plaintiffs to disclose all known material facts relating to . . . Sona Bank . . . ." Id. at ¶109. The plaintiffs alleged that Tharpe made the representation "with the intent to deceive" and that the plaintiffs believed the implied representation.

Even if Tharpe had a duty to disclose his debt obligations, the plaintiffs' pleadings are insufficiently particular. Neither of the allegations stating omissions indicate where or how Tharpe should have made the representation. The plaintiffs make only the general assertion that the representation should have been made. This is insufficient to meet Rule 9(b)'s heightened pleading standard.

The court will grant the Tharpe defendants' motion to dismiss the first and second causes of action.

> 2.  *RICO Claims (Twelfth through Eighteenth Causes of Action)*

The plaintiffs make claims under 18 U.S.C. §§1962(a), (b), (c) and (d) as well as Wis. Stat. §946.83(3), (2) and (1). Under the Racketeer Influenced and

Corrupt Organizations Act, a plaintiff can bring a civil suit for any act that violates RICO Section 1962. 18 U.S.C. §1964(c). Because the plaintiffs base their RICO claims on mail and wire fraud, "the complaint must describe the 'who, what, when, where, and how' of the fraudulent activity to meet the heightened pleading standard demanded by Rule 9(b)." Muskegan Hotels, LLC v. Patel, 986 F.3d 692, 698 (7th Cir. 2021); Menzies v. Seyfarth Shaw LLP, 943 F.3d 328, 338 (7th Cir. 2019) ("Rule 9(b) requires a plaintiff to provide 'precision and some measure of substantiation to each fraud allegation.'") (quoting U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC, 836 F.3d 770, 776 (7th Cir. 2016)). The Seventh Circuit has cautioned that "[g]iven th[e] heightened pleading standards and Congress's insistence that a RICO claim entail a clear pattern of racketeering activity, . . . 'we do not look favorably on many instances of mail and wire fraud to form a pattern.'" Menzies, 943 F.3d at 338 (quoting Midwest Grinding, 976 F.2d at 1024.

### a. Twelfth Cause of Action: 18 U.S.C. §1962(a)

Under 18 U.S.C. §1962(a),

> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

To state a §1962(a) claim, the plaintiffs must allege that the defendants "[1] received income from a pattern of racketeering activity, [2] used or invested that income in the operation of an enterprise, and [3] caused the injury

complained of through the use or investment of racketeering income."
Muskegan Hotels, 986 F.3d at 699.

The plaintiffs' RICO claims are not short, plain or precise. The plaintiffs many times describe specific conduct as having been performed by "defendants" or "Tharpe, Colasante or Aiani" rather than making clear and concise allegations against each defendant. See, e.g., Dkt. No. 112 at ¶¶55, 57, 167.

The plaintiffs allege that the "Defendants" repeatedly committed wire fraud in violation of 18 U.S.C. §1343 for the purpose of commingling fraudulently acquired assets—such as the money paid by the plaintiffs for the War & Peace and Healy paintings—with their own assets "to hide security interests that encumbered Plaintiffs' ownership of assets; [and] to take money from the Plaintiffs under false pretenses and to conceal the fraudulent actions." Id. at ¶167(b). The plaintiffs mention several wire transfers, such as the payment they made to either Tharpe and Colasante or just Tharpe for $200,000 on March 15, 2012. Id. at ¶43. They offer other instances of wire transfers from the plaintiffs to "Tharpe, Colasante or Aiani" in a list of advances sent from the plaintiffs to the defendants or on behalf of the defendants in 2012, 2013 and 2014. Id. at ¶¶55, 57.

The plaintiffs also allege violations of mail fraud in violation of 18 U.S.C. §1341, but the complaint contains no allegations that the Tharpe defendants sent or received anything to or from the plaintiffs through the mail. There is only one paragraph in which the plaintiffs allege that anything was mailed,

32

outside of the conclusions in their RICO claims. In that paragraph, the plaintiffs allege that they mailed money to *Aiani*, who by agreement no longer is a defendant, but fail to connect this money or conduct to the Tharpe defendants. See id. at ¶65. The second amended complaint includes many examples of checks and other payments from the plaintiffs to the defendants, see, *e.g.*, id. at ¶¶43, 55-57, but nowhere do the plaintiffs say that the checks were sent or received via mail.

The plaintiffs also allege that the defendants repeatedly violated 18 U.S.C. §§1952(a)(1) and (a)(3). Id. at ¶167(c), (d). Both sections of the statute require the defendants to have conducted some type of unlawful activity; the plaintiffs allege violations of 18 U.S.C. §§1956 and 1957 (money laundering) relating to the defendants' supposed fraudulent activity. Id. at ¶167(e)-(f). The plaintiffs otherwise merely recite the language of the statute.

As to the allegations of unlawful activities under §§1956 and 1957, the plaintiffs again list a series of paragraph numbers relating to their wire fraud and unlawful activity claims, rather than describing in a clear, concise manner what actions the defendants allegedly took that constituted money laundering. None of these paragraphs comply with the heightened pleading requirements of Rule 9(b). The plaintiffs' citations to §1956 do not explain who did what or how it constituted money laundering. Neither do the plaintiffs' use of the terms "Defendants" and "Tharpe, Colasante or Aiani" when describing who received funds from the plaintiffs suffice to put a particular defendant on notice of what he is accused of having done. See, *e.g.*, id. at ¶¶55, 57. For the allegations

33

under §1957, the plaintiffs point to the same paragraphs listed in their misrepresentation claims; as the court has explained, none of those paragraphs contain sufficient information to satisfy the requirements of Rule 9(b).

The court will dismiss the twelfth cause of action because it fails to satisfy the requirements of Rule 9(b). The plaintiffs failed to indicate who was specifically responsible for the actions in the alleged pattern of racketeering activity or what the defendants did that constituted mail fraud or money laundering.

   b.  Thirteenth Cause of Action: 18 U.S.C. §1962(b)

Under 18 U.S.C. §1962(b), "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

The plaintiffs allege that "the Defendants, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in or control of an enterprise." Dkt. No. 112 at ¶180. They cite to the same paragraphs offered in their misrepresentation claims. See id. at ¶¶108, 181. Because the court has determined that these paragraphs do not satisfy Rule 9(b)'s heightened pleading standard, this claim is insufficient.

The plaintiffs have failed to allege a pattern of racketeering activity in a manner that satisfies Rule 9(b). The court will grant the defendants' motion to dismiss the thirteenth cause of action.

34

c.     Fourteenth Cause of Action: 18 U.S.C. §1962(c)

Under 18 U.S.C. §1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." "To establish a violation of § 1962(c), the plaintiff must prove four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Muskegan Hotels, 986 F.3d at 698 (citing Salinas v. United States, 522 U.S. 52, 62 (1997)).

Again, the plaintiffs cite to the same paragraphs they cited in the previous RICO claims and the misrepresentation claims when alleging a pattern of racketeering. See Dkt. No. 112 at ¶189. They have not met the heightened pleading standard of Rule 9(b) and the court will grant the defendants' motion to dismiss the fourteenth cause of action.

d.     Fifteenth Cause of Action: 18 U.S.C. §1962(d)

Under 18 U.S.C. §1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this subsection." To state a claim under §1962(d), the plaintiffs must allege "that the defendant (1) agreed to maintain an interest in or control of an enterprise, or to participate in an enterprise's affairs, (2) through a pattern of racketeering activity, and (3) that the defendant agreed that some members of the conspiracy (not necessarily the defendant herself) would commit at least two predicate acts in furtherance of those goals." Domanus v. Locke Lord LLP, 847

35

F.3d 469, 479 (7th Cir. 2017)[6] (citing Deguelle v. Camilli, 64 F.3d 192, 204 (7th Cir. 2011)).

Because the plaintiffs have not adequately pled RICO claims, they cannot sustain a claim of conspiracy to engage in racketeering activity and this claim suffers from the same deficiencies as the substantive RICO claims. The court will grant the defendants' motion to dismiss the fifteenth cause of action.

e.    Sixteenth through Eighteenth Causes of Action: Wis Stat. §946.83(3), (2), (1)

Under Wis. Stat. §946.83(3), "[n]o person employed by, or associated with, any enterprise may conduct or participate, directly or indirectly in the enterprise through a pattern of racketeering activity." Under Wis. Stat. §946.83(2), "[n]o person, though a pattern of racketing activity, may acquire or maintain, directly or indirectly, any interest in or control of any enterprise or property." Under Wis. Stat. §946.83(1),

> [n]o person who has received any proceeds with knowledge that they were derived, directly or indirectly, from a pattern of racketeering activity may use or invest, whether directly or indirectly, any part of the proceeds or the proceeds derived from the investment or use thereof in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

The plaintiffs' claims under Wisconsin's racketeering statute are similar to their federal racketeering claims. See Dkt. No. 112 at ¶¶197, 203, 206. The

---

[6] Although Domanus considered a conspiracy only as to 18 U.S.C. 1962(c), 847 F.3d at 479, subsections (a), (b) and (c) all require a pattern of racketeering activities.

plaintiffs cite to the same paragraphs that the court has determined are insufficient under Rule 9(b).

The court will grant the defendants' motion to dismiss the sixteenth, seventeenth and eighteenth causes of action.

### 3. *Securities Claims (Twentieth through Twenty Second Causes of Action)*

The plaintiffs next assert three securities claims. In the twentieth cause of action, the plaintiffs bring a claim against the defendants under Section 10 of the Securities Act of 1934. Dkt. No. 112 at 39. The twenty-first cause of action alleges violations of Section 20(a). Id. at 40. The twenty-second cause of action alleges violations of §551 of the Wisconsin Uniform Securities Law. Id. at 42. The latter two claims—the twenty-first and twenty-second causes of action—are unchanged from the first amended complaint. The court ruled in its August 25, 2020 order that the plaintiffs had failed to state a claim on those causes of action because they failed to specify what particular defendants did. Dkt. No. 107 at 79-80. The plaintiffs have not remedied those deficiencies, so the court will again grant the defendants' motion to dismiss the twenty-first and twenty-second causes of action. That leaves the twentieth cause of action.

Claims for misrepresentation under the Securities Act of 1934 must comply with Rule 9(b) and the Private Securities Litigation Reform Act. Cornielsen v. Infinium Capital Mgmt., LLC, 916 F.3d 589, 598-603 (7th Cir. 2019). The PLSRA states:

> [i]n any private action arising under this chapter in which the
> plaintiff alleges that the defendant (A) made an untrue statement of
> a material fact; or (B) omitted to state a material fact necessary in

37

order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1).

The plaintiffs allege that the "Defendants made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct in violation of Section 10(b) of the 34 Act and Rule 10b-5." Dkt. No. 112 at ¶220. Specifically, the plaintiffs allege:

In particular, including but not limited to, Colasante, Tharpe, and Aiani knew and were involved in the creation, documentation, and creation [sic] of the Sona bank loan, which created liens upon much of the artwork to be invested in as part of one or more of the Tharpe Trust, Lang and Tharp, LLC, the Icon Collection, and the White Marsh Project and failed to disclose those liens as a cloud on title; represented Icon Collection's ownership of artwork and artifacts without verifying title or a right to sell; receiving investment funds for the purchase of interests in one or more of the Tharpe Trust, Lang and Tharp, LLC, the Icon Collection, and the White Marsh Project without providing title, etc.

Id. The plaintiffs cite to the same paragraphs they cited to for their misrepresentation claims

To state a claim for securities fraud under 10(b), the plaintiffs must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Cornielsen, 916 F.3d at

38

598 (quoting Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008). Claims of securities fraud must satisfy the particularity standard of Rule 9(b). Id. (citing Sears v. Likens, 912 F.2d 889, 893 (2008)). The PSLRA "added the additional requirement that complaints alleging securities fraud 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Id. at 598-99 (citing 15 U.S.C. §78u-4(b)(2)(A)). The plaintiffs must also "'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" Id. (quoting 15 U.S.C. §78u-4(b)(1)).

To state a claim under Rule 10b-5, the plaintiffs must allege: "'(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages.'" Tricontinental, 475 F.3d at 842 (quoting Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir. 1997)). The causation element has two "necessary components: 'transaction causation' and 'loss causation.'" Id. "To plead transaction causation, the plaintiff must allege that it would not have invested in the instrument if the defendant had stated truthfully the material facts at the time of the sale." Id. (citation omitted). "To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." Id. (citation omitted).

39

Because the plaintiffs rely on the same statements and omissions to support their securities claims as they did for their misrepresentation claims, their securities claims suffer from the same deficiencies—they are not pled with particularity. The claims do not put the defendants on notice as to who made what misrepresentations, how the maker of the misrepresentation knew it was false, when and how the misrepresentation was made. The plaintiffs' use of phrases like "including but not limited to" and "etc." support the defendants' argument that the pleadings lack particularity, implying that there may be other statements not listed or discussed in the complaint. Nor does the twentieth cause of action allege a connection between any alleged misrepresentation and the purchase or sale of a security. "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.' 15 U.S.C. § 78j(b)." Morrison v. Nat. Australia Bank Ltd., 561 U.S. 247, 266-67 (2010) (citing SEC v. Zandford, 535 U.S. 813, 820 (2002)). The second amended complaint does not identify the purchase or sale of any security, registered or unregistered, connected to the alleged misrepresentations.

The court will grant the defendants' motion to dismiss the twentieth, twenty-first and twenty-second causes of action.

40

C.   Claims Subject to Rule 8(a)

    1.   *Negligent Misrepresentation (Third Cause of Action)*

Negligent misrepresentation occurs when "(1) the defendant made a representation of fact; (2) the representation was untrue; (3) the defendant was negligent in the making of the representation; and (4) the plaintiff believed that the representation was true and relied on it." Malzewski v. Rapkin, 296 Wis. 2d 98, 113 (Wis. Ct. App. 2006). To be held negligent in making the representation, the defendant must "(1) have a duty of care or a voluntary assumption of a duty; and (2) fail to exercise ordinary care in making a representation or in ascertaining the facts." Kailin v. Armstrong, 252 Wis. 2d 676, 707 n.23 (Wis. Ct. App. 2002) (citing Ollerman, 94 Wis. 2d at 25).

The plaintiffs rely on the same paragraphs in their negligent misrepresentation claim as they did in their other misrepresentation claims. See Dkt. No. 112 at ¶¶108, 114, 119. Some of the enumerated paragraphs pertain to the sales of the War & Peace painting, the General Grant Epaulettes and the McClellan Sword. The plaintiffs pled that Tharpe and Colasante represented that all three items were being transferred free and clear of all liens and encumbrances. Id. at ¶¶44, 48. They allege that that representation was false because the items previously had been pledged as collateral for loans with Sona Bank—a fact that Lang did not disclose. Id. at ¶¶31, 49. They allege that the defendants were negligent in making the representations and that the plaintiffs believed and relied on the representations when making the purchases. Id. at ¶¶121-22.

The plaintiffs also allege that Tharpe solicited Lang, and Lang agreed to pay, $3,300,000 to Gibralter and the Toll Brothers for 94 acres and the Shaw Property; Tharpe was to contribute the land and Tharpe agreed to assume 50% of the outstanding liabilities of the Toll Brothers. Id. at ¶29. They allege that at the time he allegedly convinced Lang to form Lang and Tharpe, LLC, Tharpe did not disclose the extent of the debt he owed on the White Marsh property and in other business dealings. Id. at ¶35. The plaintiffs assert that Tharpe represented that part of the $800,000 the plaintiffs paid was to be used for purchasing the Shaw Property and that this representation was untrue, because "under information and belief, Tharpe never purchased the Shaw Property." Id. at ¶¶45-46.

The plaintiffs similarly allege that Tharpe allegedly falsely told Lang that Tharpe owned the Washington Lafayette Watch before Tharpe sold "fractional interests" of the watch to the plaintiffs and members of their family. Id. at ¶¶83, 85, 90. The plaintiffs allege that the defendants were negligent in making each of these representations and that the plaintiffs relied on the representations when making the purchases. Id. at ¶¶121-122.

The plaintiffs have stated a claim for negligent misrepresentation as to Lang's representations about the War & Peace painting, the General Grant Epaulettes, the McClellan Sword, the Shaw property and the Washington Lafayette Watch.

The remaining representations cited to by the plaintiffs involve only Colasante. Id. ¶¶16, 18, 19, 21, 23, 26, 51, 81.

42

The court concludes that the plaintiffs have stated a claim for negligent misrepresentation as to Tharpe's representations that the War & Peace painting, the General Grant Epaulettes and the McClellan Sword were sold free and clear of all liens and encumbrances, as well as that Tharpe made negligent misrepresentations about the purchase of the Shaw Property and the ownership of the watch. The court will deny the defendants' motion to dismiss the third cause of action.

### 2. *Conversion (Fourth Cause of Action)*

Under Wisconsin law, the elements of conversion are "(1) intentional control or taking of property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the rights of the owner to possess the property." Godec v. Hidden Lakes Cmty. Ass'n, Ltd., 383 Wis. 2d 785, at *3 (¶11) (Wis. Ct. App. 2018). The plaintiffs allege that the defendants "procured Plaintiff's property without Plaintiffs' consent or authorization" with respect to a list of items of property and money. Dkt. No. 112 at ¶124. The plaintiffs claim they "are entitled to the return of the property and the withholding of the property by Defendants interfered with the Plaintiff's control and use of the property." Id. at ¶127. The plaintiffs first direct the court to several paragraphs listing items or amounts of money allegedly converted by the defendants:

- $300,000 to fund the Combined Collection. Id. at ¶22.

- Either $3,300,000 or $3,000,000 to fund the acquisition of 94 acres and the Shaw Property. Id. at ¶¶29-30.

43

- Either the War & Peace and Healy paintings or the $800,000 paid by the Langs for the paintings. Id. at ¶42.

- $800,000 the Langs paid to Tharpe and Colasante. The Langs made this payment by a wire transfer of $200,000 on March 15, 2012 and a payment of $600,000 via check on April 13, 2012 to Tharpe. Id. at ¶43.

- $2,625,687 advanced to Tharpe, Colasante or Aiani for "ownership interest in White Marsh, historical artifacts, artwork, or some ownership interests in said assets." Id. at ¶¶55-58.

- Additional payments of $1,531,996 to "Colasante and affiliates" for acquisition of the Dorchester painting and other restorations or acquisitions. Id. at ¶59.

- The Dorchester painting the plaintiffs contributed to the Icon Collection under the terms of the Icon Agreement. Id. at ¶¶87-89.

- $324,000 given to Tharpe for a fractional share of the Washington Lafayette Watch. Id. at ¶90.

- A geometric watercolor still in Colasante's possession, worth $5,000. Id. at ¶125.

- 5 photos "missing art", worth $5,000.[7] Id.

- War & Peace painting, worth $600,000.[8] Id.

- Pair of Country Gentleman & Wife originals, worth $8,000. Id.

- One County Gentleman portrait, worth $3,000. Id.

- One battle scene in gold frame, worth $3,000. Id.

---

[7] The plaintiffs direct the court to "Exhibit A," but Exhibit A is a letter from Alliance Capital to Lang and Tharpe regarding the funding it was to provide. See Dkt. No. 112-1, Dkt. No. 112 at ¶30. None of the other attachments to the second amended complaint list or discuss missing art.

[8] Next to this item, the plaintiffs wrote, "(lost to UCC, Sona Bank)". See dkt. no. 112 at ¶125. The plaintiffs have not stated anywhere else in their complaint that this item was "lost," or explained whether they mean that Tharpe defaulted on the loan and Sona Bank collected the painting as collateral.

- Provenance to Irish Banner (box with copy, gold rope, and gold rope cable), worth $25,000. Id.

- Original A. Lincoln signature dated 1863 Commission 1st Lieutenant, worth $15,000. Id.

- Framed Lincoln photograph, worth $2,000. Id.

In a forty-five-page pleading, eight of the last nine items appear for the first and only time in the conversion count at page 24 of the amended complaint. there is no description of how these items constituted the property of the plaintiffs, how they allegedly came to be in the possession of a defendant or which defendant allegedly obtained which items under what circumstances. A conversion claim requires that a defendant intentionally control or take property without the owner's consent. As to five missing photos, the pair of Country Gentlemen & Wife originals, the Country Gentleman portrait, the battle scene in a gold frame, the Provenance to Irish Banner, the original Lincoln signature and the framed Lincoln photograph, the second amended complaint alleges nothing more than that "[u]pon information and belief," the defendants "came into lawful possession of the property but refused to return it to the rightful owners, the Plaintiffs, upon demand." Id. at ¶126. As to the geometric watercolor, the second amended complaint says only that it was "consigned" and was still in Colasante's possession. Id. at ¶125. Even under the Iqbal/Twombley standard, these allegations are not sufficient to state a claim that the defendants intentionally took control of the items without the owners' consent, or to state which defendant took which items.

45

The only allegations that clearly pertain to the Tharpe defendants and for which the complaint contains allegations explaining how the items came into the Tharpe defendants' possession are the money for the War & Peace and Healy paintings, for which the plaintiffs wired $800,000 to Tharpe, id. at ¶¶42-43, and the $324,000 given to Tharpe for a fractional share of the Washington Lafayette Watch, id. at ¶90.

The plaintiffs included the approximately $3,000,000 that Lang allegedly agreed to pay on behalf of Tharpe to Gibralter and the Toll Brothers for the ninety-four acres and the Shaw Property. Id. at ¶¶29-30. But the plaintiffs do not allege that *Tharpe* took control of that money. The plaintiffs do not identify which defendant received how much of the $2,625,687 the plaintiffs assert they advanced on the understanding that they would receive ownership interest in, or ownership of, various properties. Id. at ¶¶55-58.

Looking solely at the money the Langs allegedly gave Tharpe for the War & Peace painting and the Washington Lafayette Watch, the plaintiffs' allegations boil down to a claim that they voluntarily paid money but did not receive the benefit of their bargain. The plaintiffs received the War & Peace painting but not free of liens and encumbrances as they say they had been promised. They did not actually receive any portion of the Washington Lafayette Watch for which they paid, because the defendants allegedly did not actually own the watch. It is unclear what happened with the Healy painting.

The plaintiffs have not stated a claim for conversion. The Tharpe defendants did not take and control the War & Peace painting; the plaintiffs

46

received it. The pleadings allege that the plaintiffs voluntarily purchased the painting from Tharpe. The same is true of the watch, whether or not they actually received a fractional share. The plaintiffs are trying to squeeze the square peg of a breach of contract or fraud in the sale of goods claim into the round hole of conversion.

The court will grant the defendant's motion to dismiss the fourth cause of action.

3. *Civil Theft, Wis. Stat. §§895.446, 943.20 (Fifth Cause of Action)*

The plaintiffs allege that the defendants are "intentionally concealing or have converted Plaintiff's property . . . for the Defendants' use and benefit without Plaintiff's permission or authorization with the intent to permanently deprive the Plaintiffs permanently of the possession of their property." Id. at ¶131. They also say the defendants "used money provided by Plaintiffs . . . which was designated for the acquisition of artwork, collectibles and real estate, but was misappropriated for the Defendants' own use or benefit." Id. at ¶132. They allege that these actions violate Wis. Stats. §§895.446 and 943.20. Id. at ¶133.

The property the plaintiffs identify as the subject of this claim includes the $300,000 Lang committed to fund the Combined Collection based on Colasante's alleged representations, id. at ¶22; the $3,300,000 Lang agreed to pay to Gibralter and the Toll Brothers on Tharpe's behalf for the ninety-four acres and the Shaw Property, id. at ¶¶29-30; the $800,000 the Langs paid for the War & Peace and Healy paintings and the Shaw Property, id. at ¶¶42-43;

47

the $2,625,687 the plaintiffs say they advanced various defendants for various items, id. at ¶¶55-58; the $1,531,996 the Langs paid to Colasante "and affiliates" for the Dorchester painting acquisition and restoration, id. at ¶59; the Langs' contribution of the Dorchester painting under the Icon Agreement, id. at ¶89; the money paid for fractional interests in the Washington Lafayette Watch, id. at ¶90; and the items listed for the first time in the conversion count, id. at ¶125. Only the $3,300,000, the $800,000, the contribution of the Dorchester painting under the Icon Agreement and the money paid for the interests in the Washington Lafayette Watch relate to the Tharpe defendants.

Section 895.446 allows "any person who suffers damage or loss by reason of intentional conduct that occurs on or after November 1, 1995, and that is prohibited under . . . 943.20" to state a cause of action against the person who caused the damage or loss. Wis. Stat. §895.446(1). The plaintiffs' Wis. Stat. §895.446 claim is bare, stating only that the defendants are intentionally concealing or have converted the listed property and that they misappropriated the money for their own benefit. But the mention of §943.20 in the caption of the cause of action allows the court to reasonably presume the plaintiffs intend to bring this claim through the alleged violation of §943.20.

The amended complaint, however, does not indicate under which subsection of §943.20(1) the plaintiffs intend to bring their claim. The statute lists five ways in which a defendant may be held liable for civil theft: intentionally taking and carrying away property without the owner's consent with the intent to permanently deprive the owner of possession; bailment;

48

having a legal interest but taking the property out of the possession of someone with a superior interest with the intent to permanently deprive the superior interest holder of possession; obtaining property by false representation or deceit; and intentionally failing to return property possessed under a lease after the lease has expired.

The only one of these options that seems to make sense, given the plaintiffs' allegations about the $3,300,000, the $800,000, the contribution of the Dorchester painting under the Icon Agreement and the money paid for the interests in the Washington Lafayette Watch, is §943.20(1)(d) which makes liable a defendant who

> [o]btains title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme.

Wis. Stat. §943.20(1)(d). The plaintiffs have alleged that the defendants made several false representations, such as the statements about artwork being transferred free and clear of all liens and encumbrances, what money or property would be used for and the ownership of the Washington Lafayette Watch. The plaintiffs say they gave up their property—money or a painting—based on these false statements. The plaintiffs also have alleged that the defendants intended to deprive the plaintiffs of their property. Dkt. No. 112 at ¶131. The plaintiffs have alleged a claim for civil theft in violation of Wis. Stats. §§895.446 and 943.20.

49

The court will deny the defendants' motion to dismiss the fifth cause of action.

### 4. *Breach of Contract (Sixth Cause of Action)*

The plaintiffs claim that the defendants breached several contracts. In Wisconsin, a plaintiff alleging breach of contract must show: "(1) a contract between the plaintiff and the defendant; (2) failure of the defendant to do what it undertook to do; and (3) damages." Sears, Roebuck and Co. v. Bayshore Town Center, LLC, 377 Wis. 2d 335, ¶29 (Wis. Ct. App. 2017) (citations omitted).

The plaintiffs have described several agreements between the parties including, but not limited to, the White Marsh LLC agreement, the Icon agreement, the agreement to restore the Lincoln Matthews painting, the agreement regarding the Shaw property and the agreements about the purchase or sale of art and artifacts. Because the court must accept as true the facts pled by the plaintiffs, the court assumes that these contracts existed. The plaintiffs attached some contracts to the second amended complaint—a consulting agreement between White Marsh Manor, Ltd. and Robert Lang, dkt. no. 112-3; purchase agreements for the War & Peace and Healy Paintings, the General Grant Epaulettes and the McClellan Sword, "collectibles to be determined," the White Marsh project and the Shaw Property, dkt. no. 112-7; security agreements between Tharpe and Lang relating to the Victor Xie loan, dkt. no. 112-8 at 4-11; and an agreement regarding the Icon Collection, dkt. no. 112-10.

The plaintiffs allege that "Tharpe solicited and Lang agreed to pay on behalf of Tharpe approximately $3,300,000 to Gibralter, LLC and the Toll Brothers for the 94 acres and Shaw Property." Dkt. No. 112 at ¶29. The second amended complaint does not explain how or when the defendants breached this agreement. The plaintiffs make general allegations that the "defendants breached the terms and conditions of the contracts and agreements . . . by failing to perform in accordance with their duties" and the "Defendants fail[ed] to properly perform under the agreements," id. at ¶¶140, 141, but these allegations are conclusory and merely restate the element of breach of contract. See Divane v. Northwestern Univ., 953 F.3d 980, 987-88 (7th Cir. 2020) ("Although a plaintiff need not provide detailed factual allegations, mere conclusions and a 'formulaic recitation of the elements of a cause of action' will not suffice.") (quoting Twombly, 550 U.S. 544, 555 (2007)).

Regarding the sale of the War & Peace painting and the Healy painting, the plaintiffs allege that the paintings were represented as being transferred "free and clear of all liens and encumbrances." Id. at ¶44. The plaintiffs allege that Tharpe breached that agreement because the items were not transferred free and clear of all liens and encumbrances. Id. at ¶49. But the second amended complaint does not plead any damages stemming from this alleged breach. In paragraph 125 of the second amended complaint, the plaintiffs wrote "War & Peace Painting (lost to UCC[9], Sona Bank)," but as the court has

_____

[9] Presumably "UCC" refers to the Uniform Commercial Code.

noted, they do not explain what they mean by "lost." The court can speculate that Tharpe or Colasante or both defaulted on the $750,000 promissory note with Sona Bank and that Sona Bank foreclosed on its collateral—the War & Peace painting—causing the plaintiffs to "lose" possession of it. But the second amended complaint does not say that. It contains nothing more than the bare notation "lost to UCC, Sona Bank."

The plaintiffs generally allege that the defendants' actions caused damages

> including, but not limited to, the loss of business; loss of the benefit of the bargain; loss of collectibles, loss of money, loss of revenues; the loss in the value of Plaintiff's collection of collectibles; the exposure to additional debt; plus all amounts incurred by the Plaintiffs due to Defendants failure to perform in accordance with their duties.

Id. at ¶141. But there is no correlation between any of the enumerated damages and any of the allegedly breached contracts. It is a list of different types of damages that could have resulted from the plaintiffs' various allegations.

The plaintiffs allege a breach of the LLC operating agreement. Id. at ¶137. The second amended complaint contains no explanation of how the defendants breached this agreement.

The plaintiffs allege a breach of the Icon Agreement. Id. at ¶137. It is not clear what part of the agreement the plaintiffs believe was breached. The second amended complaint does not provide that information, but the exhibit attached as "Exhibit J" indicates that the Washington Lafayette Watch was supposed to be part of the collection created by the Icon Agreement. See Dkt.

52

No. 112-10. The plaintiffs allege that "[u]pon information and belief, Tharpe never possessed, controlled or owned the Washington Lafayette Watch, at any of the relevant times, or if he did he failed to provided [sic] evidence of title to the watch." Id. at ¶85. Liberally construing the allegations and making reasonable inferences in favor of the plaintiffs, the court presumes that the plaintiffs are alleging that Tharpe never contributed the Washington Lafayette Watch as the Icon Agreement required him to do. The plaintiffs also allege that they paid $324,000 for a share of the watch and that Tharpe "has completely converted the $324,000 to his own benefit." Id. at ¶¶90, 92. The court will recognize this as damage to the plaintiffs.

The plaintiffs have stated a claim for breach of contract as to the Icon Agreement. The court will deny the defendant's motion to dismiss the sixth cause of action.

5. *Breach of Fiduciary Duty (Seventh Cause of Action) and Breach of Loyalty, Good Faith and Fair Dealing (Eighth Cause of Action)*

The plaintiffs allege that the defendants breached a fiduciary to act in the best interests of the plaintiffs. Id. at ¶143. Under Wisconsin law, the plaintiffs must allege that "(1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breached caused the plaintiff damages." Springer v. Springer Bros., 391 Wis. 2d 495, ¶38 (Wis. Ct. App. 2020). The plaintiffs assert that the "Defendants breached their fiduciary duties to act in the best interests of the Plaintiffs by diverting Plaintiffs' assets . . . for the Defendants' benefit and in violation of the best business interests of the

53

Plaintiffs," and that, as a result, the plaintiffs suffered damages. Dkt. No. 112 at ¶¶144, 145.

The amended complaint gives no indication of the source of the alleged fiduciary duty. It alleges only that the "Defendants had a fiduciary duty to act in the best interests of the Plaintiffs." Id. at ¶143. "A fiduciary relationship arises from a formal commitment to act for the benefit of another (for example, a trustee) or from special circumstances from which the law will assume an obligation to act for anther's benefit." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck, 127 Wis. 2d 127, 136 (Wis. 1985). A fiduciary relationship is not inherent in every contract. See Jackson v. McKay-Davis Funeral Home, Inc., 830 F. Supp. 2d 635, 648 (E.D. Wis. 2011) (citing Merrill Lynch, 127 Wis. 2d at 136). The plaintiffs have alleged only the element of a fiduciary duty, rather than supporting facts. They have not stated a claim for breach of fiduciary duty and the court will grant the defendants' motion to dismiss the seventh cause of action.

The analysis is different for the plaintiffs' claim of breach of loyalty, good faith and fair dealing.

> Under Wisconsin law, each party to a contract owes a duty of good faith and fair dealing to the other. *Beidel v. Sideline Software, Inc.*, 2013 WI 56, ¶ 27, 348 Wis. 2d 360, 842 N.W.2d 240 (internal quotations omitted). *See In re Chayka's Estate*, 47 Wis. 2d 102, 107 n.7, 176 N.W.2d 561 (1970) ("Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties." (internal quotes omitted)). This duty is essentially one of "cooperation on the part of both parties," and arises whenever the cooperation of one party is required for the performance of the other. *Ekstrom v. State*, 45 Wis. 2d 218, 222, 172 N.W.2d 660 (1969). There is likewise an implied promise on the part of each party not to take action intentionally and purposefully that

54

will prevent the other party from carrying out his side of the agreement or from obtaining the benefits of the contract. *Id.*

A party breaches the duty of good faith and fair dealing when its actions have the effect of "injuring or destroying" the ability of the other party to receive the benefits of the contract. Wis. JI-Civil 3044; *Ikaria, Inc. v. Montgomery*, 2016 WI App 34, ¶24, 369 Wis. 2d 72, 879 N.W. 2d 809. Actions that amount to a breach of the duty of good faith and fair dealing may include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Beidel v. Sideline Software, Inc.*, 2012 WI App 36, ¶15, 340 Wis. 2d 433, 811 N.W.2d 856 (emphasis in original) (quoting in block from Restatement (Second) of Contracts § 205 cmt. d (1981)).

Betco Corp., Ltd. v. Peacock, No. 14-cv-193-wmc, 2016 WL 7429460, at *6-7 (W.D. Wis. Dec. 23, 2016).

The court has concluded that the plaintiffs have stated a claim for breach of contract as to the Icon Agreement. But the breach of loyalty, good faith and fair dealing claim in the eighth cause of action does not allege that the defendants did not cooperate in the execution of contracts. It states only that the defendants breached their duties "by diverting Plaintiffs' assets, including, but not limited to, the assets set forth in Paragraph 125 [the conversion claim] and its subparts, for the Defendants' benefit and in violation of the best business interests of the Plaintiff." Dkt. No. 112 at ¶148. The second amended complaint does not correlate the allegedly diverted assets with any particular contract. Because paragraph 125 references a paragraph alleging that Tharpe never had the Washington Lafayette watch (¶85), the court might conclude that the contract which gives rise to the plaintiffs' claims of breach of loyalty, good faith and fair dealing is the Icon Agreement. But the second amended

55

complaint does not allege that Tharpe diverted the watch to his own benefit—it alleges that Tharpe sold the plaintiffs interests in a watch he'd never owned to begin with. Perhaps the watch was one of the "collectibles to be named" in one of the contracts the plaintiffs attached to the second amended complaint, but the pleading does not say that.

The court cannot connect the bare-bones allegations in the eighth cause of action to any particular contract. The plaintiffs have failed to state a claim for breach of a duty of loyalty, good faith and fair dealing and the court will grant the defendants' motion to dismiss the eighth cause of action.

### 6. *Accounting (Ninth Cause of Action)*

The plaintiffs allege a claim of accounting. "Accounting is a claim in equity available when a plaintiff needs to compel an accounting of his money or property held by a defendant." RxUSA, Inc. v. Capital Returns, Inc., No. 06-C-790, 2007 WL 2712958, *12 (E.D. Wis. Sept. 14, 2007) (quoting Antigo Superior Nursing Home, Inc. v. First Fed. Sav. & Loan Ass'n., 186 N.W.2d 265, 268 (Wis. 1971)). "[C]ourts have most often concluded that an accounting is an appropriate remedy when the plaintiff has shown that the defendant owes him money, but through no fault of his own, the plaintiff is unable to determine the amount." Felton v. Teel Plastics, Inc., 724 F. Supp. 2d 941, 949 (W.D. Wis. 2010). "It requires both a complete inadequacy of legal remedies and a special ground to invoke equity jurisdiction." RxUSA, 2007 WL 2712958, at *12 (citing Walter Diehnelt, Inc. v. Root, 198 N.W. 388, 389 (Wis. 1924)). "These special grounds of equity jurisdiction may be stated, generally, to be the need of a

discovery, the complicated character of the accounts, and the existence of a fiduciary or trust relation.'" Id. (citing Root, 198 N.W. at 389). The plaintiffs have the burden to show they have a right to an accounting. Felton, 724 F. Supp. 2d at 949 (citing 1 Am. Jur. 2d Accounting §66, at 695 (2005)).

The plaintiffs allege that "[a]s a result of the Defendants' actions, including the diversion of Plaintiffs' assets . . . and failure to provide financial information relating to the transactions in question, Plaintiffs are not in a position to determine the amount of damages Plaintiffs have suffered without a proper accounting." Dkt. No. 112 at ¶151. They point to the assets listed in ¶125 of the second amended complaint in addition to other unnamed assets. Id. But ¶125 lists a specific value for each asset listed. Id. It is unclear what assets the plaintiffs believe are not capable of valuation or why, when they provide exact dollar amounts throughout the second amended complaint. See, e.g., id. at 29, 42, 55-59, 98. The plaintiffs also fail to allege that they have no other adequate remedy of law. Nor have the plaintiffs explained why they cannot determine, either from their own records or through discovery, the amount they believe they are owed. See RxUSA, 2007 WL 2712958 at *12 ("The need for a party to pursue an equitable accounting claim is generally unnecessary in light of modern discovery rules.") (citing Didion Mining, Inc. v. Agro Distrib., LLC, No. 05-C-227, 2007 WL 702808, at *11 (E.D. Wis. Mar. 2, 2007)).

The court will grant the defendant's motion to dismiss the ninth cause of action.

7. *Civil Conspiracy (Tenth and Eleventh Causes of Action)*

The plaintiffs allege civil conspiracy under Wisconsin common law and Wis. Stat. §134.01. Dkt. No. 112 at 28-29. Common law civil conspiracy requires "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not itself unlawful." N. Highland Inc. v. Jefferson Machine & Tool Inc., 377 Wis. 2d 496, ¶25 (Wis. 2017) (citations omitted). The plaintiffs must allege: "(1) the formation and operation of a conspiracy; (2) a wrongful act or acts done pursuant to the conspiracy; and (3) damage resulting from the act or acts." Id.

To state a claim under §134.01, the plaintiffs must allege that "(1) the defendants acted together, (2) with a common purpose to injure the plaintiff's business, (3) with malice, and (4) the acts financially injured the plaintiff." Virnich v. Vorwald, 371 Wis. 2d 565, ¶18 (Wis. Ct. App. 2016). Malice "'must be proved in respect to [all] parties in the conspiracy.'" Id. at ¶19 (quoting Maleki v. Fine-Lando Clinic Chartered, S.C., 162 Wis. 2d 73, 86 (Wis. 1991)).

The civil conspiracy claims in the second amended complaint are unchanged from first amended complaint, dkt. no. 11, which the court dismissed. In fact, the common law civil conspiracy claim states that the defendants "committed the acts set forth in this First Amended Complaint"— presumably a result of cutting and pasting from the first amended complaint the very claim the court dismissed. See Dkt. No. 112 at ¶156. In its September 14, 2020 order, the court found that the civil conspiracy claims consisted of

58

nothing more than recitations of the elements. Dkt. No. 107 at 78-79. That has not changed.

In the allegations based on common law, the second amended complaint states:

> 153. Plaintiffs reallege and incorporate the above paragraphs as if fully set forth herein.
>
> 154. Defendants knowingly and voluntarily agreed, formed, participated and/or operated a conspiracy and intended to further the conspiracy.
>
> 155. The purpose of the conspiracy was to gain a financial benefit for the Defendants and deprive Plaintiffs of business interests and assets.
>
> 156. Defendants, by their concerted actions, committed the acts set forth in this First Amended Complaint in furtherance of the conspiracy to deprive Plaintiffs of business interests and assets.
>
> 157. Defendants' actions in furtherance of the conspiracy to deprive Plaintiffs of business interests and assets have caused damage to the Plaintiffs.

Dkt. No. 112 at ¶¶153-157. The second amended complaint does not indicate which defendants participated or what they gained from the alleged conspiracy. It does not explain how the conspiracy worked or how the defendants' actions were "concerted." The second amended complaint alleges some acts by Colasante, some acts by Tharpe and some acts by Tharpe and Colasante, but the conspiracy claim does not identify which of those acts were part of the alleged conspiracy.

The same is true of the claim under Wis. Stat. §134.01, which states:

> 158. Plaintiffs reallege and incorporate the above paragraphs as if fully set forth herein.

59

159. Defendants acted together by agreeing to, combining, associating or mutually undertaking a common purpose.

160. Defendants' common purpose was to injure Plaintiffs' business, business interests and assets.

161. Defendants acted with the common purpose to injure Plaintiffs' business, business interests and assets acted with a malicious motive.

162. Defendants intentionally concealed the existence of the common purpose from the Plaintiffs.

163. Defendants' conduct violates Wis. Stats. § 134.01.

164. As a direct and proximate result of Defendants' actions, Plaintiffs have sustained economic damage, for which Defendants are jointly and severally liable.

Id. at ¶¶158-164. The second amended complaint alleges only the elements of a conspiracy claim without providing any context.

The court will grant the defendants' motion to dismiss the tenth and eleventh causes of action.

8.    *Contribution or Subrogation (Nineteenth Cause of Action)*

The plaintiffs make a claim for contribution or subrogation. A contribution claim has two elements: "(1) the parties must be liable for the same obligation; and (2) the party seeking contribution must have paid more than a fair share of the obligation." Wis. Wealth Mgmt., LLC v. Key Property Mgmt., LLC, 381 Wis. 2d 471, ¶28 (Wis. Ct. App. 2018). "Subrogation may arise in three different forms: contractual, statutory, and equitable subrogation." Steadfast Ins. Co. v. Greenwich Ins. Co., 385 Wis. 2d 213, 232 (Wis. 2019). Subrogation does not, itself, create an independent cause of action. Fischer v. Steffen, 333 Wis. 2d 503, 519 (Wis. 2011).

60

The second amended complaint suffers from the same deficiencies as the first amended complaint, remaining wholly unchanged from the first amended complaint with respect to the claim for contribution or subrogation. The claim appears to relate to the transaction with "Victor [X]ie ('XI')." Dkt. No. 112 at ¶211. It is unclear what the plaintiffs are claiming against the Tharpe defendants in this regard. The plaintiffs allege that they made several payments to Victor Xie and that those payments were in excess of their fair share compared to "Defendants," id. at ¶¶215-217, but the plaintiffs do not identify which defendants they are speaking of. It is impossible to determine from the second amended complaint what the Tharpe defendants are alleged to have done that plausibly requires contribution or subrogation.

The court will grant the defendants' motion to dismiss the nineteenth cause of action.

## VII. Summary and Dismissal with Prejudice

Of the twenty-two claims alleged in the second amended complaint, the court is dismissing all but three. The three that remain are the heart of the case—that the plaintiffs believe the defendants negligently misrepresented numerous salient facts relating to the sale and purchase of art and the investment in property, that the defendants' conduct rises to the level of civil theft and that the defendants breached contracts relating to those events.

The court will dismiss the remaining counts with prejudice. In its previous order, the court stated that it was giving the plaintiffs their last opportunity to amend the complaint. Dkt. No. 107 at 81-82. The plaintiffs have

61

filed three lengthy complaints; the last one added little, if any, clarity to their claims. The plaintiffs did not, as the court urged, "keep Rules 8(a) and 9(b) in mind when drafting the amended complaint." <u>Id.</u> at 82. There is no reason to believe another iteration would provide any additional clarity.

The court will require the Tharpe defendants to answer the three causes of action on which the court has allowed the plaintiffs to proceed.

## VIII. Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the plaintiffs' motion to transfer venue. The **GRANTS** the defendants' motion to transfer the case against defendant Peter Colasante to the District of Columbia under 28 U.S.C. §1631. The court **DENIES** the defendants' motion to transfer the case against the Tharpe defendants. Dkt. No. 106.

The court **ABSTAINS FROM RULING** on defendant Colasante's motion to dismiss the second amended complaint. The transferee court will decide this motion. Dkt. No. 117.

The court **GRANTS IN PART AND DENIES IN PART** the Tharpe defendants' motion to dismiss. Dkt. No. 118. The court **GRANTS** the defendants' motion as to the first, second and fourth causes of action, as well as the seventh through twenty-second causes of action, and **DISMISSES WITH PREJUDICE** those counts. The court **DENIES** the defendants' motion as to the third, fifth and sixth causes of action.

62

The court **ORDERS** that the Tharpe defendants must answer the third, fifth and sixth causes of action in the second amended complaint.

Dated in Milwaukee, Wisconsin this 19th day of May, 2022.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**